Jerome Shulkin, WSB No. 2198
**SHULKIN HUTTON, INC., P.S.**
2101 Fourth Avenue, Suite 200
Seattle, WA 98121
Telephone: (206) 623-3515
Facsimile: (206) 682-9289

Joseph M. Meier, ISB No. 3314
**COSHO HUMPHREY, LLP**
800 Park Boulevard, Suite 790
P.O. Box 9518
Boise, ID 83707-9518
Telephone:     (208) 344-7811
Facsimile:     (208) 338-3290

Attorneys for Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | ) Chapter 11 |
| | ) Case No. 06-00002-TLM |
| Don J. Simplot, | ) |
| Aka El Paso Tree Farm Company, | ) **FIRST AMENDED** |
| | ) **DISCLOSURE STATEMENT** |
| Debtor. | ) |
| | ) |

## DISCLOSURE STATEMENT

On January 4, 2006, Don J. Simplot (hereinafter referred to as "Debtor") filed his voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Idaho.    Pursuant to Section 1125 of the Code, Debtor has obtained an order of the court approving this Disclosure Statement for submission to the holders of claims against him.

**FIRST AMENDED DISCLOSURE STATEMENT  P -1-**
JMM/jib 01936-014/211522  12/14/06

INTRODUCTION

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR
UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN.
PLEASE READ THIS DOCUMENT WITH CARE.

Debtor is providing this Disclosure Statement to all of his known creditors pursuant to
Section 1125 of the Bankruptcy Code in order to permit such creditors to make an informed
judgment in exercising their right to vote on the Plan. Section 1125 of the Bankruptcy Code
requires that this Disclosure Statement be submitted to holders of claims against, and interests in,
the Debtor, and that this Disclosure Statement contains sufficient information about the Debtor to
enable creditors and other interested parties to make an informed decision regarding the Plan. The
Disclosure Statement is required to be approved by the court. The Debtor has complied with
requirements of Section 1125 of the Bankruptcy Code and the Disclosure Statement has been
approved by the Court as containing adequate information.

THE APPROVAL BY THE COURT OF THE DISCLOSURE STATEMENT DOES NOT
CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR A GUARANTEE
OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED
HEREIN.

Accompanying this Disclosure Statement are copies of the following documents:

Appendix A.   The Court's order approving this Disclosure Statement and affixing the time
for the filing of acceptances or rejections of the Plan and for a hearing on confirmation of the Plan
or Reorganization;

Appendix B.   Joint Plan of Reorganization of Debtor and Creditors' Committee.

Appendix C.   The proposed ballot form for acceptance or rejection of the Plan.

Appendix D.   The legal description of the Real Property owned by Debtor known as El
Paso.

Appendix E.    Comparison of Debtor's Income and Expenses as of the petition date vs. projected on the Effective Date of Plan.

Appendix F.    Debtor's March, April, May, June, July and August 2006 US Trustee monthly reports.

Appendix G.    The Settlement Agreement attached to the Robert Brennan confirmed bankruptcy plan.

Appendix H.    The map of the El Paso property and the Hollow Road Property located in Canyon County, Idaho.

Appendix I.    The results of the auction of the personal property, equipment, piper airplane and vehicles conducted by Bill Downs Auction Services.

Appendix J.    Debtor's Summary of Claims filed to date.

Appendix K.    Intentionally left blank.

Appendix L.    A statement from DJS Properties, LP concerning its position over the disputes between it and the Creditors Committee.

This Disclosure Statement is being furnished to all known creditors to inform them about the Plan and their rights with respect thereto.    The only representations that are authorized by the Debtor concerning his assets, income, and the value of the Debtor's assets, his reorganization prospects, or other matters are the representations contained in this Disclosure Statement.    The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent Certified Public Accountant.    For that reason, the Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy. However, great effort has been made to ensure that all such information is fairly represented.

<u>DEFINITIONS</u>

Unless the context otherwise requires, the following terms, when used in the Disclosure Statement shall have the following meanings:

FIRST AMENDED DISCLOSURE STATEMENT  P -3-
JMM/jjb 01936-014/211522  12/14/06

1.    <u>Administrative Claim</u>.  A cost or expense of administration of this Chapter 11 case, including any actual, necessary expense of preserving or liquidating the estate, any actual, necessary expense of operating the business of Debtor, and all allowances approved by the Court in accordance with the Code.  These include claims of professionals for fees and costs but subject to bankruptcy court approval.

2.    <u>Allowed Claim</u>:  "Allowed Claim" shall mean a Claim (i) with respect of which a Proof of Claim has been filed with the Court on or prior to the Bar Date; or (ii) which is scheduled in the Debtor's schedules of assets and liabilities and statement of financial affairs filed with the Court pursuant to §521 of the Bankruptcy Code and which has not been listed (or is no longer listed on the Confirmation Date, if previously so listed) as disputed, contingent or unliquidated; or (iii) in respect of which a proof of Claim has been filed with the Court with §502(h) or §502(i) of the bankruptcy code; and in any case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by Bankruptcy Rule or an order of the Court, or as to which, if objections has been interposed, the Claim has been determined by order of the Court.

3.    <u>Bankruptcy Code</u>:  "Bankruptcy Code" or "Code" shall mean the United States Bankruptcy Code, 11 U.S.C. §101 et seq., and any amendments thereof.

4.    <u>Claim</u>:  "Claim" shall mean any right to payment or right to an equitable remedy against Debtor for breach of performance if such breach gives rise to a right to payment, whether or not such right to payment or right to an equitable remedy is reduced to judgment, or whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured.

5.    <u>Class</u>:  "Class" shall mean any class into which Claims or Interests are classified pursuant to Article I of the Plan.

6.    <u>Committee</u>:  "Committee" shall mean that group of individuals appointed by the United States Trustee in this case as the official Unsecured Creditors Committee of the Debtor. The current members of the unsecured Creditors Committee are:

a.    Frontier Bank

b.    Citicorp USA, Inc.

c.    Regal Financial Bank

d.    Washington Trust Bank

e.    AmericanWest Bank

f.    Foundation Bank

g.    CitiCapital Commercial Corp.

7.    <u>Confirmation Date</u>:  "Continuation Date" shall mean the date of entry of the order confirming the Plan.

8.    <u>Contested Claim</u>:  "Contested Claim" shall mean any Claim which is listed on the schedules filed by the Debtor as contingent, unliquidated or disputed or is, or becomes, the subject of an objection filed with the Court in accordance with the provisions of the Bankruptcy Code and which remains unresolved on the Effective Date.

9.    <u>Court</u>:  "Court" shall mean the United States Bankruptcy Court for the District of Idaho, presiding over the cases or, if necessary the United States District Court for said district having original jurisdiction over bankruptcy cases and the judges thereof.

10.    <u>Effective Date of the Plan</u>:    The "Effective date of the Plan" shall mean the first business day on which all conditions set forth in Article 9.1 of the Plan have been either satisfied or waived as provided in Article 9.2 of the Plan.

11.    <u>Plan Administrator</u>:  "Plan Administrator" shall mean that person appointed to liquidate the remaining non exempt assets of the Debtor after the Effective Date of the Plan.

12.    <u>Order of Confirmation</u>:  "Order of Confirmation" shall mean that order entered by the Court approving the Plan.

13.    <u>Person</u>:  "Person" shall mean an individual, corporation, partnership, joint venture, trust, estate, unincorporated organizations, or a government or any agency or political subdivision thereof.

14.    <u>Plan</u>:  "Plan" shall mean that document that is presented by the Committee and the Debtor for Confirmation by the Court as may be modified and amended prior to the Court entering an order of confirmation.

15.    <u>Proof of Claim</u>:  "Proof of Claim" shall mean a document filed as a claim with the Court by any party in interest.

16.    <u>Trust or Creditors' Trust</u>:  "Trust or Creditors' Trust" shall mean the entity formed upon confirmation into which Debtor shall transfer assets, claims and rights described herein to be managed and to permit distributions to unsecured creditors.

<u>GENERAL HISTORY OF THE DEBTOR</u>

The Debtor is 70 years old.  Debtor was divorced from Raine Simplot on December 29, 2005 and he is therefore single, living on his pension, social security and certain deferred compensation.  Debtor also has access to an IRA, subject to issues raised by the Committee as disclosed under the "Exemptions" section of this Disclosure Statement.  Debtor pays child support to Raine Simplot pursuant to a court order on two minor children.  Debtor also has children from prior marriages who are now emancipated.

Over the relevant time period, Debtor has been connected with various businesses, which are described in more detail below.

A.    <u>DEBTOR'S CONNECTIONS TO J.R. SIMPLOT COMPANY</u>

The J.R. Simplot Company describes itself on its website as:

The J. R. Simplot Company is a privately held food and agribusiness corporation based in Boise, Idaho. We employ approximately 10,000 people in the U.S., Canada, China, Mexico, and Australia.

Annual sales are about $3 billion, derived principally from food, fertilizer, turf and horticultural, cattle feeding, and other enterprises related to agribusiness.

Simplot is one of the world's largest frozen-potato processors, annually turning out 3 billion pounds of french fries and other potato products worldwide.

The firm also is one of the nation's largest beef-cattle producers, and ranks as a major agricultural-fertilizer manufacturer, with markets in the U.S., Canada, and Mexico.

The company is named for founder J.R. Simplot, who now serves as Chairman Emeritus.

J.R. Simplot Company internet website

The Debtor was employed by the J.R. Simplot Company in various jobs until he became a Vice President.  Don Simplot retired as an employee and officer in May 2001.  Since 2001 Don Simplot, however, continued to serve on the corporation's board of directors until January 2006 at which time he resigned from the Board of Directors.  Debtor also continued to maintain his books and records at the J.R. Simplot Company offices in Boise, and the corporation's employees maintained books and records for the Debtor.  In the past several years the Debtor paid a periodic fee for the services provided by the company in not only maintaining his records but also providing secretarial and certain accounting functions for him.  After the Debtor resigned from the corporation in 2001 he has been receiving a monthly retirement contribution under the corporation's defined benefit plan as well as monthly payments under two separate deferred compensation plans in which the Debtor participated until his retirement.

The J.R. Simplot Company has certain stock that is issued and outstanding including "A stock" consisting of 76.445 shares, which has voting rights.  There is also nonvoting "B-stock", of

which there is believed issued and outstanding a total of 153,681.661 shares and "preferred stock",

which has certain annual distributions to the holders. Don Simplot owns 18 shares of A Stock or

approximately 23.55% of the A shares; 39.78 shares of B Stock which he owned pre-petition and

93.547 B shares that he received post-petition. The combined B shares held by the Debtor are

approximately .09% of the total. Don Simplot does not hold any preferred stock, although an

entity entitled DJS Properties, L.P., in which the Debtor holds a partnership interest, owns

approximately 25% of the preferred shares. DJS Properties, L.P. is discussed below.

      B.    DEBTOR'S CONNECTION TO MICRON TECHNOLOGY, INC

      Between approximately 1982 and April 2003 the Debtor also served on the Board

of Directors of Micron Technology, Inc. In 2003 the J.R. Simplot Company, which held a large

amount of Micron Technology, Inc. stock, determined that it would be beneficial to it for Don

Simplot to resign from the Micron Technology, Inc. board of directors. Debtor agreed to do so in

exchange for an agreement that the J.R. Simplot Company would pay him $50,000.00 a year for

ten years, which was approximately what the Debtor had been receiving from Micron Technology,

Inc. as a director. That payment has been made by the J.R. Simplot Company each year since 2003

including a payment made in 2006 after the bankruptcy was filed.

      C. DEBTOR'S CONNECTIONS WITH IMPCO TECHNOLOGIES, INC

      Debtor was also a Director of Impco Technologies, Inc until January 2006 at which time

he resigned due to his bankruptcy petition.

      Debtor participated in this corporation's deferred compensation plan. After the bankruptcy

petition was filed, the corporation paid the amount due Debtor in a lump sum, which sum, less

taxes withheld, is being held in a bank account entitled "exempt account." That sum is being held

subject to issues over exemptions claimed that are described later in this disclosure statement. Debtor also held certain options and warrants that he owned as part of his employment with Impco Technologies, Inc. These options were converted and sold for the combined gross proceeds of approximately $1,650,000.00 in the normal course of business after the bankruptcy. By agreement with the Committee these proceeds were deposited in the account entitled "Asset Sales Account." This account was established and various funds have been deposited into it and distributions can only be made from it after court order, or agreement between the Committee and the Debtor.

It should also be noted that Debtor also owned other shares of stock in Impco Technologies, Inc, which were pledged to AmericanWest Bank. During the bankruptcy proceeding AmericanWest Bank obtained relief from the bankruptcy stay. In March it sold the 170,132 shares of stock in Impco Technologies, Inc and an additional 70,132 shares of stock in Quantim Fuel Systems for a reported net of $1,155,476.38. AmericanWest Bank has alleged that this amount was applied in full to the loan balance and that the proofs of claim filed by it in this bankruptcy proceeding reflect the loan balance after not only the proceeds of this stock were applied, but also after application of the proceeds from the sale of stock that was also pledged by Douglas Toms, another guarantor under the AmericanWest Bank notes. It should also be noted that DJS Properties, L.P. claims that it owned the 170,132 shares of Impco Technologies, Inc. stock and that the Debtor not only did not have the power to pledge the stock for the loan, but also that the stock was liquidated without its permission.

### D. DEBTOR'S CONNECTIONS TO DJS PROPERTIES, L.P.

On January 7, 1997, upon the advice of professionals who perform estate planning services, an entity called DJS Properties, L.P., was formed by the Debtor. Don Simplot became a general partner and a limited partner of DJS Properties, L.P. an Idaho Limited Partnership. This entity was formed many years prior to any of the activities in the Western District of Washington described in subparagraph E below, or any of the loans either incurred or guaranteed by Debtor.

**FIRST AMENDED DISCLOSURE STATEMENT P -9-**
JMM/jib 01936-014/211522  12/14/06

At the time the bankruptcy proceeding was filed, the Debtor held a 2% general partnership interest and a 73.3576% limited partnership interest in DJS Properties, L.P..  The balance of the limited partnership interests are owned by DJS Family Trust II and certain individuals and entities controlled by the Debtor's children.  Since 1997 this entity has held a separate tax number, has held its own bank accounts, has filed tax returns, has incurred debts and paid obligations in the normal course of its business.  Still the Debtor holds the majority interest in this entity.  The Debtor valued his interest in that entity at $9,231,174.02 as of the date the bankruptcy was filed.

Once the Debtor filed this bankruptcy proceeding under Idaho law and the partnership agreement, DJS Properties, L.P. alleged that the Debtor became disassociated as a general partner. The limited partners then voted to appoint a new general partner.

This limited partnership owns preferred shares of stock in the J.R Simplot Company and "B Shares" in the J.R. Simplot Company.  It also owns various parcels of real property and other partnership and stock interests.   When this entity was formed in 1997, it was capitalized by the Debtor transferring to it his J.R. Simplot Company B Stock, some of which was later converted into preferred shares by the J.R. Simplot Company, and other real and personal property. Thereafter, according to DJS Properties, L.P., the entity purchased and sold assets in the normal course of business.  Some of these assets include the real property described as the Hollow Road Property, the McCall Idaho Property and the Boise Condo.  These properties are described below. DJS Properties, L.P. states it paid the purchase price and the real property taxes and expenses regarding these parcels.  In the case of the Hollow Road Property and the McCall Property it states that it has paid loan the obligations which encumber the real property, including loans to Morgan Stanley, which is holding the liens under PPH Mortgage Company.   It has also carried these parcels on its financial statements since acquisition.  The Committee disputes many of these claims.

In November 2005, the Debtor and DJS Properties, L.P. realized that three parcels of real property that had allegedly been acquired by DJS Properties, L.P. were titled in the name of the Debtor. In that same month, or within 90 days of the bankruptcy filing, the Debtor transferred, by deed, three parcels of real property to this entity consisting of:

a.    The so-called Hollow Road property located in Canyon County Idaho consisting of approximately 127.240 acres of unimproved farm land. This property is adjacent to property owned by the Debtor which is called the "El Paso" property. Both of these parcels are depicted on the map which is attached hereto as Appendix "H" and incorporated herein by this reference. It is unclear as to the value of this property but it may have a value that exceeds $2.5 million dollars. The Debtor believes this property can be sold with the El Paso property, as described later in this Disclosure Statement, and the true value can be determined.

b.    The McCall, Idaho Property (located in Valley County) is encumbered with a loan in favor of approximately $870,000.00. This property has not been recently appraised but it may have a value between $2 to $3 million dollars. This real property is located on Payette Lake in McCall, Idaho and within the last 10 years was converted from a lease from the State of Idaho to a fee interest.

c.    The Boise Condo which is located in the Grove Hotel building in downtown Boise, Idaho. It may have a value of $600,000.00. These transfers were all disclosed in the Debtors schedules filed in this proceeding.

The Committee does not agree with many of the statements above concerning the three parcels and disputes many of the statements of fact and legal conclusions pertaining to DJS Properties, L.P.

Also DJS Properties, L.P. is indebted to the Debtor under a promissory note dated June 30, 2004, with an original balance of $9,088,547.00. DJS Properties, L.P. has calculated that this note has an unpaid principal and interest balance of $8,950,662.14 as of June 30, 2006, which includes

accrued interest thereon of $225,002.49 as of that date. This note is payable in annual interest only installments every June 30th until June 30, 2024, when the entire principal is due. The present value of this note was determined by an accountant to be $4,490,955.00, as of August 31, 2004, based on a discount for lack of marketability. This appraisal was made on the original face amount of the note of $9,088,547.00, which does not take into account payments made since then. This note was assigned to Debtor by the original payee that was JRS Properties III, LP. These payments were current as of the date the bankruptcy was filed. A payment of interest was due on June 30, 2006, from this entity to the Debtor. While DJS Properties, L.P. acknowledges that it has an obligation to pay $225,002.49 on June 30, 2006, it has asserted that it is entitled to certain offsets which are described in the last paragraph below and has not made the payment of $225,002.490. The Committee disputes this claim.

Further, on March 30, 2000, an entity entitled DJS II Family Trust purchased a 20% limited partnership interest in DJS Properties, L.P. from the Debtor and agreed to pay $5,910,000.00 for that interest based on an appraised value. 19 payments of $364,959.00 are payable in annual installments each March 31st until the entire remaining unpaid amount is due on March 31, 2022. Also this entity secured the payment to the Debtor by granting a security interest in the 20% interest in DJS Properties, L.P. As of the date the bankruptcy was filed the payments were current. After the bankruptcy was filed the payment due March 31, 2006 was paid by this Trust transferring to Debtor 93.579 shares in B Stock in the J.R. Simplot Company, which, according to the J.R. Simplot Company stock valuation is equal in value to the annual payment. The transfer of B Shares to the Debtor is consistent with the past prebankruptcy practice of how this note has been paid. Pre-bankruptcy, the Debtor and his wife would then gift those shares received to their children. Obviously, this gifting ceased on the day the bankruptcy was filed and Debtor continues to hold 93.579 shares of B Stock in the J.R. Simplot Company.

Since the Bankruptcy was filed the Debtor, DJS Properties, L.P. and the Committee have been in dispute over the status of the limited partnership. The Committee has alleged that it is the Debtor's alter ego and/or that it should have been dissolved after the bankruptcy was filed. Thus it argues, Don Simplot's liquidated interest in the entity could be distributed to creditors after wind up of the partnership. DJS Properties, L.P. believes that what the Debtor's creditors are entitled to, under Idaho law and this agreement, is a charging order on his interest in the partnership that permits the disbursement of all distributions that would be made to the Debtor to his creditors. Neither the Debtor, nor DJS Properties, L.P., asserts that the partnership is not an alter ego, or that creditors are entitled to anything more than a charging order. A charging order under the partnership agreement and Idaho law does not permit creditors to insert themselves as partners or to make management decisions. While indeed legal title was transferred to these entities by the Debtor within 90 days of the bankruptcy, DJS Properties, L.P., claims that it continually paid the taxes and liabilities on and the purchase price of the properties and that it has a strong defense to any alleged transfer for lack of reasonable consideration. The Committee disputes this claim.

Further DJS Properties, L.P. makes claims to the following property, in which Debtor holds legal title, (DJS Properties, L.P. claims it paid the taxes and expenses related to these parcels) for the reasons specified:

a. 2 McCall Airplane Hangars, which may be worth $80,000.00. These are held in Debtor's name according to DJS Properties, L.P., due to requirements of Homeland Security that airport related assets be held in individual names wherever possible.

b. The Caldwell Airplane Hangar, which may be worth $78,000.00. This is held in the Debtor's name, according to DJS Properties, L.P., due to requirements of Homeland Security that airport related assets be held in individual names wherever possible.

c. Anacortes Marine slip, which may be worth $114,112.00.

d.  Mazatlan Real Property consisting of a house and receivable on sales of real property, which may be worth $1,000,000.00.  DJS Properties, L.P. alleges it was discouraged by Mexican authorities from holding legal title in a limited partnership name in that country as opposed to an individual name.

e.  PCS School Stock - this asset is disclosed on the financial statements of DJS Properties, L.P. as its asset, however, PCS School reports that its records reflect that the stock is owned by Debtor.

f.  Membership in Entech Development and stock in Entech Corporation (a.k.a. Fusion) - the membership interest is held in Debtor's name.  This entity appears to be liquidating its assets consisting of a building and equipment in Canyon County, which will be used to pay off loans held by Banner Bank, who according to its records, holds liens against this property.

g.  Stock in Impco Technologies, Inc - see disclosure contained above under the heading Impco Technologies, Inc.  This stock appears to have been sold by AmericanWest Bank and according to AmericanWest applied to its loan balance.  The Committee disputes DJS Properties, L.P.'s claims to the foregoing property.

Finally, it should be noted that DJS Properties, L.P. has not only participated in this bankruptcy through its own counsel but has also filed a claim in the bankruptcy for $14,000,000.00.  DJS Properties has made a series of claims which include that the Debtor obligated it to pay two Key Bank loan obligations that exceed $2 million dollars when he did not have the authority to bind the partnership to that obligation.  This obligation has since been adjudicated and Key Bank has obtained a judgment against DJS Properties, L.P. for an amount that exceeds $2 million dollars.  That judgment has been appealed by the partnership.  Second it

**FIRST AMENDED DISCLOSURE STATEMENT  P -14-**
JMM/jib 01936-014/211522  12/14/06

has alleged that Don Simplot should not have pledged its Impco Technologies, Inc. stock and it has been damaged.  Third it alleges that Banner Bank has made certain demands on it for payment of certain loans which may also cause it damage.  It also alleges that its costs and attorneys fees incurred can be asserted against the Debtor's estate.  While Debtor agrees that there may be a claim held by DJS Properties, L.P., he does not agree that the claim is $14 million dollars.  Please see Appendix "J" which sets forth Debtor's analysis of this claim.  Again, the Committee and DJS Properties, L.P. are at serious odds with one another over the majority of these issues.

DJS Properties, LP has raised numerous defenses and claims to the position of the Debtor on certain claims  and to the Committee on many others,  The Plan in section 5.3 describes in detail the claims the Debtor has made and then the claims in addition thereto that are made by the Committee against DJS Properties, LP.   DJS Properties, LP may attach to this disclosure statement, with the consent of the Debtor, its summary of its claims and defenses to many of these asserted claims by the Debtor and the Committee.

E.    THE BRENNAN-TOMS CONNECTION

While serving on the Impco Technologies, Inc. Board Don Simplot became acquainted with an individual named Doug Toms.  Mr Toms who was a former officer with Honda Motor Company after a while convinced Don Simplot to invest with him in travel related companies. They also became connected with an individual named Bob Brennan.  They commenced with other investors by investing in a deal which was eventually called 3DM, LLC which in turn held an interest in Coastal Hotel Group Management, Inc. and Coastal Hotel Group Management and Investment, LLC, which combined, acted as a management company for 7 or 8 hotel properties

located primarily in the Northwest. They also became share owners in Rascals, Inc. which owned and operated a card room in the Seattle Washington area.

Bob Brennan convinced both of them to commence investing in a defunct cruise ship company that conducted seasonal operations primarily in the inside passage to Alaska. Entities were formed to acquire and to operate three cruise ships. Debtor was informed that Bob Brennan was a veteran in the travel industry for over 35 years and knew how to run travel related companies. Thus, in approximately late 2002 to early 2003, an entity was formed that purchased three ships and a cruise company named Glacier Bay Cruiseline, from a Juneau based Alaska native corporation, called Goldbelt, Inc.

The acquiring entity was called GB Vessel Acquisition, Inc. and it owned and operated three ships which were the 87-passenger Wilderness Discoverer; the 69-passenger Wilderness Adventurer; and the 31-passenger Wilderness Explorer. A portion of the money to acquire at least one of these vessels was apparently borrowed from Washington Mutual Bank, which also claimed a lien on all three ships.

Another entity, BB Acquisition, LLC, was formed to acquire a fourth vessel called the Executive Explorer. This vessel, Debtor believes, was acquired and substantially overhauled from loans including a loan from Citicaptial, which was secured by the ship. It should be noted that the schedules originally incorrectly described BB Acquisition, LLC as EEX, Inc. or EEX Acquisition, LLC.

Finally, two more entities were formed in 2004, to acquire and operate the Columbia River Queen vessel. It was acquired from another company that had gone out of business. These entities, created by Brennan, Toms and Debtor, are called CQ Acquistion, LLC and CQ River

Cruises, LLC. Thus combined, these entities formed by Brennan, Toms and Debtor, owned and operated 5 different ships in the Northwest.

On September 14, 2004, Bob Brennan filed for protection under chapter 11 of the United States Bankruptcy Code in the Western District of Washington as case no. 04-22003. The Debtor and Douglas Toms believed, and soon discovered, that Bob Brennan had illegally removed multimillions of money from some, or maybe all, of the entities described above and made these allegations in the bankruptcy proceeding. Brennan disputed the allegations. Brennan was able to confirm a plan which appeared to have settled the claims pursuant to the terms of the plan and a settlement agreement that is attached to the plan as an exhibit.

In that plan, confirmed on November 4, 2005, pursuant to a settlement agreement attached thereto, Robert Brennan released his interest in the following to Debtor and Doug Toms:

All of his interests in GB Vessel Acquisitions, LLC; Rascals Casino, LLC; Rascals, Inc; CQ River Cruises, LLC; CQ Acquisitions, LLC; Royal Management, Inc. and BB Acquisitions, Inc.

The plan also provided that the following creditors would be treated by the same settlement agreement:

i) Rhodes Asset Management, LLC, in the approximate amount of 1.07 million dollars.
ii) Pacific Trade and Investments, LLC, in the approximate amount of $132,098.64.
iii) AmericanWest Bank, in the approximate amount of $4,095,432.36.
iv) Frontier Bank, in the approximate amount of $5,000,000.00.

Pursuant to the terms of the settlement agreement, Pacific Trade and Investments, LLC was to be paid. Also Rhodes Asset Management, LLC was to be paid $150,000.00 by Brennan. AmericanWest Bank and Frontier Bank were not to be paid by Brennan. Debtor does not know if

Rhodes Assert Management, which has filed a claim in this bankruptcy, was paid the $150,000.00. Pacific Trade and Investments, LLC have not asserted a claim in Debtor's bankruptcy, and AmericanWest Bank and Frontier Bank have each filed greater claims than as described in the settlement agreement.   A copy of the settlement agreement attached to the Brennan plan, is attached to this disclosure statement as Appendix "G".

After Brennan filed the bankruptcy, Doug Toms attempted to run the day-to-day operations of the businesses described above and Debtor made hundreds of thousands of dollar advances to pay payroll and other obligations that these entities required.  The cruise companies faltered and eventually Douglas Toms signed a petition putting some entities in bankruptcy in the Western District of Washington.  GB Vessel Acquisition, LLC filed on October 14, 2005, as case no. 05-28316 but it was dismissed in 2006.  Also BB Acquisition, LLC filed on October 14, 2005, as case no. 05-28286, which was also dismissed in 2006.

After Debtor filed for bankruptcy, he is informed that Washington Mutual Bank foreclosed on the three boats owned by GB Vessel Acquisition, LLC, and upon information and belief, made a credit bid for the three vessels at its scheduled sale.  Debtor has, as of August 24, 2006, received information regarding the sale.  Washington Mutual filed an amendment to the large claim it has filed in the Debtor's bankruptcy proceeding reducing that claim to $3,016,328.45, and showing that the boats were sold for $3,150,00.00.  It also alleges there were various expenses and fees that it incurred that leaves a deficiency of $3,016,328.45.

Further, after Debtor filed for bankruptcy, he was informed that Citicapital foreclosed on the EEX Explorer boat on which it held a lien.  Upon information and belief, Debtor is informed that a third party bid at the scheduled sale of the boat, and that CitiCapital did not bid its entire

debt as a credit bid, thereby allowing a third party to purchase the boat for less than that which is owed to CitiCapital. Debtor does not have all the information regarding the sale, and as of the date of this disclosure statement, Citicapital has not filed any amendment to the large claim it has filed in the Debtor's bankruptcy proceeding. Debtor's claims analysis, attached as Appendix "J," addressed this issue with the information he has received.

Debtor is also advised that the Columbia Queen Vessel is not being operated, that it has been seized by a lender holding a lien in the ship and that it has not been foreclosed upon. That ship is located in Portland, Oregon near Swan Island. Debtor is aware that Frontier Bank is claiming a secured junior lien on this vessel and that the first lien held by Marad, which is non-recourse to the Debtor, has not been foreclosed. Debtor is also informed that Marad has assigned its secured claim for a discount to a third party. Neither Marad nor its assignee has filed a claim in this proceeding. Debtor is also informed by the Committee that Frontier Bank has assigned two of its three claims secured by the Columbia Queen vessel to Ambassador Group, which is apparently the same entity who purchased the Marad claim. To date neither Frontier Bank nor Ambassador Group have filed assignments of the claims with the Court.

Upon reviewing the records of the bankruptcy court of the Western District of Washington, counsel for the Debtor has also discovered that an Altamont Partners-Coastal, LLC, which is owned by 3DM, LLC had filed a chapter 11 on March 11, 2004, in the Western District of Washington as case no. 04-13290. While Don Simplot did not own an ownership interest in Altamont Partners-Coastal, LLC some of its debt is alleged to be guaranteed by Don Simplot and claims have been filed in the Debtor's bankruptcy proceeding related to those alleged guarantees. After confirmation Altamont Partners-Coastal, LLC filed a subsequent chapter 11 proceeding in

the same district on April 6, 2006, as case number 06-10955. An order approving the sale of all interests in Coastal Hotel Group was entered in that subsequent proceeding that effectuated a full payment to an entity entitled Ontario Partners, and, upon information and belief, Debtor is also informed that Foundation Bank, also received $300,000.00 from the sale. Ontario Partners alleged that Debtor has signed a guaranty of a claim for $320,645.75. It filed that in Debtor's case. Debtor and Ontario Partners have entered a Stipulation filed with the Court that withdraws this claim. Foundation Bank also has alleged in a claim that Debtor is indebted to it for numerous claims including a $500,000.00 claim related to Altamont Partners-Coastal, LLC. At a minimum the payment to it of $300,000.00 should reduce its claim in this bankruptcy, however, as of the date of this Disclosure Statement no amendment of the claim has been done by Foundation. Foundation Bank also released its lien, as it was not paid in full to permit this Altamont to sell the assets, however, in a filed release it stated it was reserving all rights against the guarantors Doug Toms and Debtor.

Finally Debtor is informed by creditors on the Committee that Rascals, Inc has shut its doors and that it is no longer operating.

Debtor continues to believe that while his professionals recommended settlement in the Brennan bankruptcy proceeding to Doug Toms and Debtor for economic reasons, that loan proceeds and operating moneys were siphoned out of these entities by the managers. He did not run the day to day operations of any of these companies. Rather he was asked to guaranty loans and obligate himself to loans, and that no controls or oversight was done by any party, including the lenders lending multimillions to these entities, to ensure that funds were used as proposed. Debtor did not receive any of the loan proceeds made to any of these entities or to him, and from a

FIRST AMENDED DISCLOSURE STATEMENT  P -20-
JMM/jib 01936-014/211522  12/14/06

review of the claims it appears that over $35 million dollars has been asserted in claims against the Debtor due to the failures that occurred in the Western Washington proceedings. This means that over $35 million disappeared and still no accounting has been provided to the Debtor.

In late 2005, Debtor and Doug Toms hired Aequetas Capital Management Company to attempt to get to the bottom of all the loans inquired, the status of the entities and to see if a loan workout could be accomplished. While Aequetas began that process, and was extremely useful to the Debtor to help assemble records and information that the Debtor did not have on many loans, this process quickly failed when the creditors were unwilling to wait. This bankruptcy proceeding was commenced when creditors Citicorp and Citicapital commenced suit in the State of New York and the State of Washington respectively against the Debtor. Debtor was faced with having to defend himself in various forums. Further lawsuits were threatened by other creditors including Key Bank and AmericanWest Bank. As of this juncture, other than certain rights the Debtor may hold against creditors regarding the loan transactions and the liquidation of non debtor assets in the Western District of Washington, it does not appear that the Debtor's interests in any of those entities abandoned to him and Doug Toms have any value as they no longer appear to be going concerns. Debtor is in this bankruptcy proceeding because of the failure of his partners that ran the business in Washington and the inexplicable loss of money by the entities in a very short time.

## RECENT MAJOR ASSET DISPOSITIONS

There have been asset dispositions by the Debtor. Debtor has worked closely with the Committee to identify assets that can be sold and has commenced liquidating assets. These assets, other than the Impco Technologies, Inc warrants and options that were sold in the ordinary course of Debtor's business, have all been sold to private parties after notice and hearing. The following

assets have been sold, or are being sold as of the date of this Disclosure Statement, and the net proceeds are being held in an interest bearing account called the "Asset Sales Account":

|  | Asset | Net Proceeds |
|---|---|---|
| 1 | 1983 Porsche | $12,000.00 |
| 2 | Jet Boat | $13,500.00 |
| 3 | Ford Phaeton | $55,000.00 |
| 4. | Sunesta Ski Boat | $2,980.00 |
| 5. | 1974 Pickup | $3,000.00 |
| 6. | SW Express Trailer | $8,000.00 |
| 7 | Guns | $27,000.00 |
| 8 | IMPCO Options (conversion of sale of 60,000) | $152, 153.13 |
| 9. | IMPCO Warrants and options (conversion and sale of 200,000 warrants and 10,000 in options) | $1,584,241.89 |
| 10 | Mexico Personal Property (pending) | $95,000 .00 |
| 11 | 1979 Lake Airplane (pending) net of repair | $55,000.00 |
| 12 | Airex Motor Home (pending) | $7,000.00 |
| 13 | 2005 Cadillac Escalade (pending) $31,525.00 less $3,000 exemption | $28,525.00 |
| 14 | 334,965 Blue Frog Mobile Shares (Offer received) | $200,000.00 |
|  | Total projected: | $2,243,400.02 |

In addition to the foregoing, Debtor has hired an auctioneer, Bill Downs Auction Service, who will be liquidating the balance of the personal property located at El Paso Real Property and at Payette Farms, including a Piper airplane, titled equipment, skeet shooting equipment, farm

equipment, etc. That auction has been completed over a period of two days. The total gross proceeds received were $726,065.00, however, the auctioneer has applied for reimbursement of costs in the amount of $26,838.45 and the projected net to be received from the estate is $699,226.55.

PENDING LEGAL PROCEEDINGS

1.    State court and federal court actions - There were several lawsuits pending at the time the bankruptcy proceeding was filed. To the best of Debtors knowledge these included:

a.    *Citicorp USA, Inc vs. Don Simplot, case no*. 604047/05 in Supreme Court of State of New York, an action to collect on a promissory note; case pending. This suit should be dismissed as of the Effective Date of the Plan.

b.    *Citicapital Commercial vs. Don Simplot,* case no. CV-05-2033 in U.S. District Court for the District of Western Washington, an action to collect on a guaranty of BB Acquistion, LLC.; case pending. This suit should be dismissed as of the Effective Date of the Plan.

c.    *Rhodes Asset Management vs. Don Simplot, case no 04-2-12588* in Superior Court of King County Washington obtained Judgment in 2004.

d.    *Don J. Simplot vs Raine Simplot,* case no CV DR 0500824 in the State of Idaho District Court for 4th Judicial District: Judgment entered December 29, 2005, child support ordered for two minor children.

2.    Bankruptcy Proceedings: There are no adversary proceedings pending at this time. Debtor and certain creditors, however, have entered stipulations to extend time for those creditors to file nondischargeability complaints as follows[1]:

---

[1] Debtor and the creditors listed in subparagraphs a through g are in the process of entering stipulations that will extend the time for these particular creditors to file a nondischargeability complaints until the Effective date of the Plan. If the Plan is confirmed that same stipulation will provide that these creditors shall drop any claims under 11 USC §523.

     a.        AmericanWest Bank to December 1, 2006;

     b.        Citicapital Commercial to December 1, 2006 ;

     c.        Citicorp USA to December 1, 2006;

     d.        Regal Bank to December 1, 2006 ;

     e.        Washington Trust to December 1, 2006;

     f.        Foundation Bank to December 1, 2006;

     g.        Frontier Bank to December 1, 2006; and

     h.        Key Bank to January 2, 2007. (Docket No 361)[2].

3.       Claims to be contested: See Appendix "J" as Debtor reserves the right to object to amounts claimed by creditors as part of their claims, and the Plan shall reserve in the Plan Administrator the right to oppose any claim.

4.       Preferences, fraudulent conveyances and lien avoidance:  At the current time Debtor does not believe there are any preference actions, however, whatever rights the Debtor has will be transferred to a trust to be managed by a Plan Administrator under the Plan.  The Committee has alleged that certain transfers made to DJS Properties, L.P. are fraudulent transfers under either 11 USC §548 or under state law under 11 USC §544 and that certain claims of DJS Properties, L.P. to assets held in the Debtor's name may be avoided under, among other things 11 USC §544.  These rights are to be transferred to a trust to be managed by the Plan Administrator appointed under the Plan.  The potential avoidance actions with DJS Properties, LP are described

---

[2] Key Bank applied to the Court and obtained an extension to January 2, 2006.  To date Key Bank has been unwilling to enter into any stipulation described in footnote 1 that will be entered by the other creditors.

**FIRST AMENDED DISCLOSURE STATEMENT  P -24-**
JMM/jib 01936-014/211522  12/14/06

in this disclosure statement. The balance of the potential avoidance actions are described on Exhibit 1.2.3 of the Plan.

## BASIS OF VALUATION

The basis of the evaluation of property contained in the liquidation analysis, or best interest of creditors' test, was obtained from various sources. The Debtor has had various experiences with the purchase and disposal of property and has a practical experience in the understanding of the value of such real and personal property. Further, the Committee and Debtor have attempted to determine the value of the El Paso Real Property. The Debtor has applied to the Court to hire a realtor to market and sell the El Paso real property. That application was recently approved.

IT SHOULD BE BORNE IN MIND THAT THE VALUES ESTABLISHED IN THIS ANALYSIS ARE ONLY THE BEST ESTIMATES OF THE DEBTOR. These values were arrived at by assuming that the entirety of the Debtor's assets would be liquidated, and it is assumed that different values might be obtained in limited or spot sales, of similar property over an extended period of time. It must be kept in mind that secured creditors will exert a major effort to reclaim their property at the earliest possible time to avoid their collateral being involved in the liquidation process. In this case, this relates mainly to liens asserted by PPH Mortgage Company on the El Paso real property, and the lien of Diversified on three pivots located in Payette County (the "Payette Farms Pivots"), as these are the only secured creditors filing claims in the bankruptcy case. This sort of activity will reduce the liquidation value of the Debtor's estate with respect to the El Paso real property and the 3 pivots.

## LEASE OBLIGATIONS AND EXECUTORY CONTRACTS

1.    As Lessor:

**FIRST AMENDED DISCLOSURE STATEMENT  P -25-**
JMM/jib 01936-014/211522  12/14/06

Debtor is neither a lessor or a lessee under a long term lease.  Debtor, however, is charged a rental by DJS Properties, L.P. to stay at the Boise Condo, the McCall Property and the Mazatlan home.

2.    Executory Contracts:

a.    The agreements that the Debtor has signed with the J.R. Simplot Company and/or certain shareholders of the J.R. Simplot Company that restricts the sale of the "Class A Stock" may be executory.  This restriction includes a right of first refusal and certain preferences for sale.  As this is a restriction no value is attributed to it.  The Plan proposes to transfer this stock owned by Debtor to a Creditors' Trust managed by a Plan Administrator which will take the stock subject to these restrictions but who will have the ability to litigate over those restrictions with the JR Simplot Company.

b.    Some agreements that Debtor has signed with DJS Properties, LP may be executory.

On any executory contract, the Plan proposes to transfer all contracts and reserves in the Plan Administrator or the Trustee under the Creditor Trust the right to determine whether to assume or reject these agreements and also reserves the right of any contract holder, including DJS Properties, LP and the J.R. Simplot Company (and/or certain shareholders of the J.R. Simplot Company) the right to receive notice of any election and the right to raise any claims or defenses thereto.

## LIQUIDATION ANALYSIS

"Best Interests of Creditors Test"

Notwithstanding acceptance of the Plan by creditors, in order to confirm the Plan the Court must independently determine that the Plan is in the best interests of all classes of creditors. The "best interest" test requires that the Court find that the Plan provides to each member of each impaired class of claims and interest a recovery which has a present value at least equal to the present value of a distribution which each such person would receive from the Debtor if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code instead of being reorganized under Chapter 11 of the Bankruptcy Code.

To calculate what members of each impaired class of unsecured claims or interest would receive if the Debtor were liquidated, the Court must first determine the dollar amount that would be generated from the disposition or liquidation of the assets of the Debtor in excess of the amount necessary to pay allowed secured claims, plus the cash held by the Debtor, and plus recoveries on actions against third parties. The proceeds of this liquidation will then be reduced by the costs of the liquidation. Such a liquidation would probably take place in a Chapter 7 proceeding and such a proceeding would likely include the fees of a trustee as well as those of counsel and other professionals that might be retained by such trustee, selling expenses (including costs of advertising and auctioneer's fees or brokerage commissions) unpaid expenses incurred by the Debtor during his reorganization proceedings under Chapter 11, and claims arising by rejection by the trustee of obligations incurred by the Debtor during the pendency of the Chapter 11 case.

The value of the distributions after liquidation, deduction of costs of liquidation, and in keeping with the analysis described above would then be compared by the Court with the present value being offered to each of the classes of unsecured claims and interests under the Plan.

The Debtor also believes that unsecured claims in a chapter 7 liquidation would be significantly greater than under the present circumstances. For example, many contracts and leases which would be assumed pursuant to the Plan would probably be rejected in a liquidation and would give rise to unsubordinated claims against the liquidation proceeds. These obligations are generally taken care of in Debtor's Plan and thus should increase the amount of distribution under the Plan to unsecured creditors.

The Debtor also believes that liquidation of the Debtor's estate would be a time consuming matter and might involve litigation between a Chapter 7 trustee and the various claimants to assets of the estate. It would not be unusual that no distribution to unsecured creditors in a Chapter 7 liquidation proceeding would be forthcoming for two or more years. Further a trustee may elect to allow the secured creditors to liquidate the real property at which point the unsecured creditors would receive substantially less then projected in this analysis.

It should also be noted that the Plan is a liquidation plan. While a chapter 7 Trustee is not being appointed, all of Debtor's non exempt property is being liquidated. The differences between the Plan and a chapter 7 liquidation can be summarized as follows. First all remaining issues over exemptions are resolved. The Debtor is dropping any claim to the Micron annual payment which means during the term of the Plan the creditors will benefit by receiving $275,000 that was claimed as exempt. In exchange the Committee is dropping any objection to the Debtor's deferred compensation plans, the homestead exemption and the IRA. Second the Plan proposes that if the Debtor obtains employment he shall turn over 25% of the gross income he receives for a maximum of 60 months from any source other than exempt property. Third if the Plan is confirmed all but one creditor is dropping their reserved rights to pursue debtor under 11 USC

§523(a), thus potentially saving the estate from paying professional expenses[3]. Forth while a third party individual is being appointed to liquidate the remaining non-exempt property this individual will be paid hourly vs. the rate of compensation allowed to chapter 7 trustees under 11 USC §326. This individual more than likely will be paid more than a chapter 7 trustee. The Committee, however, believes that this individual will have the commercial background which shall increase the return from the sale of certain assets.

As a consequence since the Debtor is only retaining exempt assets the Committee and Debtor believe that the Plan shall return a greater share for the creditors than as set forth in the proposed chapter 7 liquidation analysis. Other than the Micron Exemption and the saving in costs of Debtor's attorney fees which can be calculated with a certainty, it is difficult, however, to quantify how much greater the balance of the recovery will be. It is difficult because the Plan Administrator or Trustee will be required to liquidate assets such as partnership and stock interests subject to various prepetition contractual claims. While that cannot be quantified it is being completely turned over to a third party who will act on the benefit of creditors.

The Committee strongly believes that the DJS Properties, LP and J.R. Simplot Company assets are worth more than that which is disclosed below and that they can realize more value than a chapter 7 trustee through the appointment of the Plan Administrator and Liquidating Trustee. Thus it believes that creditors will receive the benefit of additional sums for these assets due to the claims for relief it advances in the Plan.

---

[3] There is mixed case law on the issue of whether the Debtor's counsel can be paid from estate funds for costs and fees incurred only related to defending the Debtor from nondischargeability actions. To the Debtor's knowledge this issue has not been adjudicated in this district. Confirmation of the Plan resolves these issues by ending the dispute and leaving the Debtor with only one potential adversary proceeding under 11 USC §523(a), which if it is filed Debtor will be required to defend using his own resources and not estate funds.

THE DEBTOR FIRMLY BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CREDITORS AND THAT THE CREDITORS WILL RECEIVE A LARGER DISTRIBUTION UNDER THIS PLAN THAN THEY WOULD IF THE DEBTOR'S ESTATE WERE LIQUIDATED IN A CHAPTER 7 AS OPPOSED TO THE PLAN PROPOSED HEREIN.

The following pages set forth assets, liabilities and estimated expenses Debtor is using to calculate its liquidation analysis.

## I. ASSETS

|       |                              | Estimated at |
|-------|------------------------------|--------------|
| A.    | Bank Accounts                | Confirmation Date |

1. Asset Sales Account:           $2,243,400.02*
    * this assumes the pending sales listed above close.

2. General Account:               $200,000.00**
** On the June operating report the Debtor reported cash in this account of $286,407.00.   This amount is an estimate and will vary based on actual expenses incurred.

3. Exempt Account:                $30,524.12  see below

| # | Amount in Acct | Source | Exempt Amt | NonExempt Amt |
|---|---|---|---|---|
| 1 | $13,610.77 | Defined Benefit Plan payments received since May | $13,610.77 | 0 |
| 2 | $6,917.09 | Deferred Comp plan (see Q below) payments received since May 2006 | $5,187.82 | $1,729.27 |
| 3 | $4,940.18 | Executive deferred comp plan (see R below) payments received since May 2006 | $3,705.14 | $1,235.04 |
| 4 | $50,000.00 | Micron Annual Payment from Simplot Company received in 2006 (see H below) | $37,500.00 | $12,500.00 |
| 5 | $60,239.35 | Impco deferred compensation plan | $45,179.54 | $15,059.81 |

| | | payment received –One time | | |
|---|---|---|---|---|
| 6 | $128.70 | Interest accrued in account | | |
| | $135,836.09 | Total in account as of 7/31/06 | $105,183.27[4] | $30,524.12 |

All funds received from these 5 sources were placed into this account as of May 2006. The Debtor has asserted exemptions as to each of these 5 accounts and there has been no objection as to the exemption claimed in the defined benefit plan payment from the JR Simplot Company identified in row no. 1. In rows 2, 3, 4 and 5 the Debtor has not disputed that a portion of these funds are not exempt and these undisputed portions are described in the last column for each under "NonExempt amt". The disputed portion is described under the second to last column labeled "Exempt Amt". Regarding items 2 and 3 Debtor is receiving payments monthly and those future payments are further described below under sections Q and R. Debtor is claiming 75% as exempt and that 25% is not exempt. Prior to confirmation Debtor will receive more payments from these sources that will reduce the balance in sections Q and R. Regarding item 4 this is the annual payment made and the balance of the payments are described in section H below. Regarding item 5 this is the Impco Deferred Comp received which is a one time payment. The total distribution to the Debtor was $80,319.14. Impco withheld $20,079.79 and paid that to the IRS. The balance delivered to the Debtor is $60,239.25. Debtor claims an exemption to 75% or the difference of $45,179.54 in the account related to Impco Deferred compensation. See below regarding exemptions. For the purpose of this liquidation analysis Debtor assumes he will prevail on all exemptions claimed and therefore used the undisputed non exempt portion figure. The Committee would assert that it may prevail and that a higher number of an additional $91,572.50 should be utilized.

Also, since May 2006, Debtor has received a monthly IRA distribution. These funds have not been included in this analysis.

    4. Other Accounts:                  $6,139.00****
        **** This is the total of four small accounts held by Debtor

Total all Bank Accounts (items 1 through 4):        $2,480,063.14

| B. | Real Property: | Value | Debt | Exemption | Equity |
|---|---|---|---|---|---|
| | 1. El Paso Real Property | $5,000,000 | $3,100,000 | $50,000 | $1,850,000* |

* This property is listed for sale through a court appointed Realtor Thornton Oliver Keller. The actual value will be determined through the silent auction to be conducted by this realtor who will charge a 5% commission on the sales price. The debt is held by Merrill Lynch in two separate notes recorded as two separate liens.

---

[4] Of the $105,183.27 the amount of $13,5610.77 claimed as exempt was not opposed by the Committee. Thus as of the date of this Disclosure Statement the balance of $91,572.50 is opposed. If the Plan is confirmed the Debtor will drop his exemption claim to $37,500.00 in that account and that will be made available to the creditors. The balance of the exemptions claimed in the amount of $5,187.82; $3,705.14; and $45,179.54 will be allowed as the Plan provides that the Committee will drop any claim to these amounts.

C.    <u>Equipment and Title Vehicles, Piper Airplane</u>:                     $705,226.55
      These items together with household property located at El Paso Property, Payette Farms
will be auctioned off by Bill Downs Auction Company("Auctioneer") on the 14th and 16th of
September 2006.  It includes that listed in the schedules filed by the Debtor as the following:
nonexempt property at the El Paso Property; household goods Payette Farms Lodge; skeet
shooting equipment at Payette Farms; many of the vehicles listed in B-25 not previously sold;
equipment at El Paso Road.  The net amount received from the auction less the claimed costs by
the Auctioneer from these two auctions is $699,226.55. See Appendix I for further details.  The
net proceeds have been deposited in the interest bearing asset sales account to be held until
confirmation of the Plan, but under this disclosure statement it is accounted for here.  Also the
Auctioneer did not sell the nonexempt furniture from the Boise Condo and will sell those at a later
auction.  It is anticipated that the net to be received from the sale of this property will be
approximately $6,000.00.  Thus the value used for this Disclosure Statement is $705,226.55,
which includes the anticipated $6,000.00 to be received later this fall and the $699,226.55 that has
been received.

D.    Personal Property in McCall Idaho*                          $7,120.00
      *Debtor has certain personal property consisting of furniture, appliances, bikes, tv and 2
skows all described all exhibit B-4 McCall cabin which is attached to Debtor's schedules.  Debtor
shall either sell these or purchase from undisputed exempt assets.

E:    DJS Promissory Note (present value):                        $4,490,955.00

F.    DJS II Family Trust Note ( face value)*:                    $5,722,443.63
      *It is difficult to place a present value on this asset due to long term payoff over 19 years.

G.    Payette Farms Pivots less secured debt $106,561*:           $86,238.00
      * At the time the bankruptcy schedules were filed Debtor believed
      these pivots had a value of $350,000.  Since the schedules were filed,
      however, Debtor has consulted with an auctioneer to determine the in
      place value of these pivots.  There are a total of 8 pivots.
      Three appear to be secured by Diversified Financial who filed a claim
      for $106,561.  There may be equity in these 3 pivots
      over and above the secured debt.  On the five remaining pivots, the auctioneer
      has suggested that the pivots are worth $3,000 a tower less $3.00 per foot
      to remove them.  Based on these figures these five remaining pivots may have
      a liquidation value of $86,238.00.

H.    Micron Directors payment paid by J.R. Simplot in $50,000 annual
      payments for ten years 6 remaining no discount (2006 paid)       $75,000.00
      less exemption claimed at 75% of total:

I.    Timeshare Mazatlan-value unknown:    $0.00

J.    Interest in Ruby Shipp Estate:    $400,000.00

K.    Debtor interest in CQ Acquisitions, LLC; GB Vessel Acquisitions, LLC*;
      *BB Acquisitions, LLC; Rascals, Inc.; 3DM, LLC; CQ River Cruises, LLC;
      and claims against those entities.   These assets will be assigned to the    $0.00
      Creditors' Trust under the Plan.  These may have value as asserted
      offsets against Doug Toms or against the lenders holding liens on the assets
      of these entities.  For the purposes of this Disclosure Statement the value is
      unknown.

L.    18 Shares of Class A Stock of J.R. Simplot Company, value inserted is
         the share value reported by the Company*:    $72,552.42
      *Presumed there is a market for the stock as Company claims it has right
      of first refusal and buy back options.  These are share restrictions
      but should not reduce stock below stated value.

M.    133.331 Shares of Class B Stock of JR Simplot Company*:    $521,293.54
      * Consists of 93.547 received post petition and 39,784 held pre
         Bankruptcy, value based on reported value by Company at
         $3,909.77 per share.  Assume below substantial discount as
         shares are not voting and may not be marketable.

N.    13% of outstanding shares of stock in Claremont Development*:    $1,150,519.00
         *  Debtor holds a minority interest in this company that owns
         and develops real property in Boise.  The amount recognizes a discount
         for this ownership from a calculated value of $2,171,025.00

O.    75.3576% Interest in DJS Properties, L.P.*    unknown
         *Debtor scheduled this value at $9,231,174.02.  DJS has recently
         Estimated that the liquidation value is closer to $675,494 due to
         the large amount of the minority interests that the partnership owns
         and due to the fact that on paper the value of the J.R. Simplot Company
         B Stock and preferred stock is $19,806,203 on the financial statement
         of the partnership that may not be marketable.

P.    Claims made in Class Action suits (see amended schedule B-35):    Unknown.

Q.    J.R. Simplot Company Deferred Compensation Plan (6/30/06)*:    $60,697.25
         *Debtor is receiving $2,490.19 a month until approx. April
      2021.  Total of each monthly payment that is not exempt is
      $622.54.  Total value stated is balance as of June 30, 2006-

value will  change per month as it is paid.  Value stated is 25%
of $242,789 which is not claimed as exempt.

R.      J.R. Simplot Company Executive Deferred Comp Plan (6/30/06)*:   $60,424.25
      *Debtor is receiving $2,613.80 a month until approx. April
2021.  Total of each monthly payment that is not exempt is
$653.45.  Total value stated is balance as of June 30, 2006-
value will  change per month as it is paid.  Value stated is 25%
of $241,697, which is not claimed as exempt.

S.      Intentionally left Blank.

T.      Brokerage Accounts (7/31/06)*:   $104,632.58
      1. A.G. Edwards Account as of July 31, 2006:  $104,632.58.
      2. Morgan Stanley Account as of July 31, 2006:  $29,317.88.*

   *  This account at Morgan Stanley contains proceeds deposited since the bankruptcy
proceeding was filed from the IRA described in the exemptions below.  At the beginning to the
case it had funds contained therein which were not exempt. It has been used to pay expenses.
Using the first in first out rule the only funds remaining in this account are exempt funds only.
The full amount of the account is disclosed herein, however the exempt amount of $29,317.88  is
not included in the liquidation analysis.

## II. LIABILITIES

A.      Secured Indebtedness
      1.    See claims stated above as to each property, including real property pivots.

      TOTAL           ($.00)

B.      Unpaid Estimated Administrative Expenses at   $ ( 1,100,000.00)
confirmation date:  estimated attorney fees,
accountant fees, and US Trustee fees.   As of
July 31, 2006 the law firm of Cosho Humphrey, LP
had unpaid fees and costs of $155,000.94, of which
$87,770.03  had been applied for with the Court and
which were subsequently approved and paid .  Holland
and Hart has applied for fees and costs incurred of
$351,701.87 through June 30, 2006, which were applied
for and paid.  The Committee's accountants Dawson &
Gerbic are also professionals employed and who will be
paid as an administrative expense and included in this
estimate and have incurred fees and costs that will be

applied for.    It is anticipated that Debtor's
Accountants have incurred approximately $25,000
in costs and fees.  Fees and costs appear to be running
approximately  $70,000 a month for the Committee; $21,000
a month for the Debtors attorneys and $5,000 a month for
the Debtor's accountants.  Shulkin Hutton may have $30,000
in fees and costs.  Estimating these over the next 4 months equals
approximately $1,100,000.00.  This does not include any fees
related to discovery and disputes concerning objection to non-
dischargeability

C.      Estimated unsecured priority:                    ($747,382.39)

IRS filed a priority claim for 2004 and 2005 of $538,606.10; and
State Tax Commission filed a claim for both years of $208,776.29.

D.      General Unsecured Creditors filed
            Total Claims (approximately) ***          ( $58,243,216.31)
        See claims summary attached hereto as Appendix J.
                *** As shown by Appendix J many of those debts are disputed and there
should be reductions in the claims.    There are two additional claims that have not been
filed but which are being asserted at this time.  The first is from Commerce Bank in the
asserted amount of $316,982.60 and the second is from Venture Bank in the asserted
amount of $758,815.03. If these are allowed the unsecured creditors total filed claims shall
grow to $59,319,013.94.    Also Debtor has made certain assumptions that many of the
claims can be reduced for the reasons set forth in page two of Appendix J and the claims
for unsecured creditors may be reduced to $39,457,925.16.

## SUMMARY OF FIGURES USED FOR LIQUIDATION ANALYSIS
### I. ASSETS
The values listed above are net of the liens that encumber the property described.  See above.

|   |   | VALUE | % Upon Liquidation | Estimated Value Upon Liquidation |
|---|---|---|---|---|
| A. | Bank Accounts: | $ 2,480,063.14 | 100% | $2,464,598.86 |
| B. | Real Property(equity): | $1,850,000.00 | 90% | $1,665,000.00 |
| C. | Equipment to be auctioned: | $705,226.55 | n/a | $705,226.55 |
| D. | McCall Personal Prop | $7,120 | 50% | $3,560.00 |
| E. | DJS Note | $4,490,955.00 | see above | $4,490,955.00 |
| F. | DJS II Trust Note | $5,722,443.63 | 50% | $2,861,221.81 |
| G. | Pivots | $86,238.00 | 100%* | $86,238.00 |
| H. | Micron Payment | $75,000.00 | 90% | $67,500.00 |

| | | | | |
|---|---|---|---|---|
| I. | Mazatlan Timeshare | $ unknown | n/a | $0.00 |
| J. | Shipp Estate | $400,000.00 | 90% | $360,000.00 |
| K. | Washington Entities | $ see above | n/a | $0.00 |
| L. | 18 Shares A Stock | $72,552.42 | 100% | $72,552.42 |
| M. | 133.331 Shares of B Stock | $521,293.51 | 50% | $260,646.75 |
| N. | 13% of Claremont | $1,150,519.00 | see above | $1,150,519.00 |
| O. | DJS Partnership Interest | $9,231,174.02 | see above | $675,494.00 |
| P. | Class Action Suit | unknown | n/a | unknown |
| Q. | Deferred Comp. | $60,697.25 | 90% | $54,627.52 |
| R. | Executive Deferred Comp | $60,424.25 | 90% | $54.381.82 |
| S. | Intentionally Left Bank | $0 | | |
| T. | Brokerage Accounts | $104,632.58 | 90% | $94,169.32 |

TOTAL Liquidation Value:                                                                $15,083,154.47

* On the Pivots the full liquidation costs were already taken out of
the calculation above  so the % on liquidation is stated at 100% for this
calculation.

| 1. | Less Estimated Administrative Expenses-Ch. 11 includes US Trustee Expenses | $(1,100,000.00) |
|---|---|---|
| 2. | Less Chapter 7 estimated expense including: | $ (13,900.00) |

|   | | |
|---|---|---|
| | Chapter 7 Trustee @ 3% of $15,178,432.32: | $ (455,352.99) |
| | Chapter 7 Accountant : | $ (50,000.00) |
| | Chapter 7 Attorney: | $ (200,000.00) |

3.    Less Estate Income taxes if property liquidated            ***Unknown accountant***
immediately by trustee (Sale price --basis)                  ***is estimating-this will***
                                                                                    ***be provided as a***
                                                                                    ***supplement to this***
                                                                                    ***disclosure statement***
                                                                                    ***estimate 30% of***
                                                                                    ***above***
                                                                                    ***($4,553,529.70)***

4.    Less priority Creditors:  IRS                                      $(747,382.39)

5.    Less estimated fees and costs to be incurred by Debtor      $(300,000.00)
in event adversary proceedings filed

6     Total Available to Fund Unsecured Creditors:              $7,661,989.49,

If the claims remain at approximately $59,000,000.00 then unsecured creditors would receive approximately .13 cents on the dollar in a chapter 7 proceeding. If the claims can be reduced to approximately $39,000,000 then unsecured creditors would receive .196 cents on the dollar. The liquidation figure does not include any deduction for sums that the Debtor may incur related to his defense and discovery in any adversary proceeding related to claims raised under 11 U.S.C. §523(a), which have been reserved by 8 creditors but which also have not been commenced. Debtor believes this cost would exceed $1,000,000.00 if all are prosecuted and defended vigorously. There is conflicting case law on whether the Debtor can collect these fees and costs from bankruptcy estate property. See earlier disclosures in this Disclosure Statement.

ESTIMATED DISTRIBUTION OF
LIQUIDATION PROCEEDS

The Plan proposes certain settlements to avoid the large cost of litigation that has been experienced so far in this case and to turn over the assets that are not sold on confirmation to a Creditors' Trust. Unless the claims are changed radically the Debtor does not estimate that creditors will be paid in full. Debtor believes however that liquidation of its assets in a Chapter 7 after protracted litigation will result in a lot lower dividend to the creditors. Further, Debtor believes that the secured creditors may assert large control over the property secured by their liens. Many may seek relief from stay to liquidate the property and without a substantial amount of time the properties may be liquidated for less than the value described herein.

EXEMPTIONS

The Debtor has claimed certain exemptions under state law to certain property. While some of those exemptions are allowed the Committee objected to some and the Court conducted an evidentiary hearing and accepted briefing from the Debtor and the Committee on those exemptions. The issues raised concerning the exemptions and the objections thereto involve novel

issues of law especially concerning the IRA which addressed a law change effective October 17, 2005. It is unclear who will prevail on these arguments and if one prevails it is certain that the decision would likely be appealed. When it appeared that a consensual plan could be put together the Committee and the Debtor asked the Court to withhold a decision on the claimed exemptions and the objection thereto. The Debtor believes that the Committee will withdraw its objection to those exemptions so long as Debtor agrees to the creation of a Creditors' Trust and Plan Administrator. The Plan provides if the creditors accept the Plan and the objection to all exemptions, except as specified below, will be withdrawn on the effective date of the Plan. The following are the exemptions that have been allowed as there were no timely objections, or such objections have been resolved:

|   | Description | Value | Objection |
|---|---|---|---|
| 1 | Ruger G28 | $400 | No |
| 2 | Household Goods at Boise Condo. | $4,500.00 | No |
| 3 | Clothing | $500.00 | No |
| 4 | Watch | $1. | No |
| 5 | Wedding ring | $100 | No |
| 6 | Hauser 2000 Chronograph | $700 | No |
| 7. | Cash in insurance policy and Death benefit | $1,006.17* | No |
| 8. | Social Security | $1,630 per month | No |
| 9. | 2004 Escalade | $3,000 | No |
| 10. | Defined Pension Plan | Monthly $6,228.25** | No |
| 11. | Proceeds held in Exempt account received since May 2006 through July 31, 2006. All payments received after | $29,317.88 | No |

| | July are also exempt as described in 10 above. | | |
|---|---|---|---|

      * Since the case was filed the cash values in the life insurance has increased to $1,006.17 from the petition balance of $921.52. It is all claimed as exempt under the Idaho Exemption.

      **Since the case was filed the J.R. Simplot Company corrected an error in the plan and changed the monthly gross payment to $6,228.25. When the case was filed the Debtor was receiving a gross payment of $6,166.12. Debtor has also received a lump sum in the net amount of $3,912.55 from the defined benefit plan administrator to correct the mistake from the inception of payments received by Debtor. This lump sum is deposited in the exempt property account and makes up a portion of the $29,317.88 being held in that account related to the defined benefit plan distributions.

      The following property claimed as exempt was objected to by Committee but which objection will be released on confirmation of the Plan:

| | Description | Value | Objection |
|---|---|---|---|
| 1 | Homestead claimed in El Paso Real Prop. | $50,000 | Yes |
| 2.a. | JR Simplot Deferred Compensation Plan: Debtor is receiving $2,409.19 a month until approx. April 2021. Total of each monthly payment that is not exempt is $602.30. Total value stated is balance as of June 30, 2006-value will change per month as it is paid. Value stated is 25% of $242,789 which is not claimed as exempt. | Debtor claimed 75% of each payment or $1,806.89 as exempt-or a total exemption on 75% of the total expected or $182,091.75 claimed as exempt | Yes |
| 2.b. | 75% of all proceeds held in exempt account related to payments received since May 2006(total received is $6,917.09) through the Effective Date of the Plan on the JR Simplot Deferred Compensation Plan. As of 7/31/06 75% of the amount received is $5,187.82 but more shall be received prior to the effective date. These are proceeds received since May and through 7/31/06 on account referenced in 2.a. | Debtor claims $5,187.82 plus 75% of all payments received from that source and deposited into that account after 7/31/06 prior to the Effective Date of the Plan. | Yes |
| 3.a. | JR Simplot Company Executive Deferred | Debtor claims 75% of each | Yes |

| | | | |
|---|---|---|---|
| | Compensation Plan: Debtor is receiving $2,613.80 a month until approx. April 2021. Total of each monthly payment that is not exempt is $653.45. Total value stated is balance as of June 30, 2006-value will change per month as it is paid. Value stated is 25% of $241,697, which is not claimed as exempt. | payment or $1,960.35 as exempt-or a total exemption on 75% of the total expected or $181,272.75 claimed as exempt. | |
| 3.b. | 75% of all proceeds held in exempt account related to payments received since May 2006 (total received is $4,940.18) through the Effective Date of the Plan on the JR Simplot Company Executive Deferred Compensation Plan. As of 7/31/06 75% of the amount received is $3,705.14 but more shall be received prior to the effective date. These are proceeds received since May and through 7/31/06 on account referenced in 3.a. | Debtor claims $3,705.14 plus 75% of all payments received from that source after 7/31/06 and deposited into that account prior to the Effective Date of the Plan. | Yes |
| 4 | IRA with Morgan Stanley-rollover from 401k plan. Amount in IRA is $2,175,688.25 | Debtor claimed entire amount of $2,175,688.25 as exempt. Committee objected and stated that only $1,000,000 is exempt under October 17, 2005 changes to law. | Yes as to approximately $1,175,688.25 |
| 5. | Balance in Morgan Stanley brokerage account traceable to a distribution from the IRA identified in 4 | There is $29,317.88 in the account as of July 31, 2006. | Yes. |
| 6. | 75% of all proceeds held in exempt account related to payments received on the IMPCO Deferred Comp lump sum payment. Debtor claims $45,179.54 as exempt | $45,179.54 | Yes |

The following is an exemption claimed that would be an exemption claim withdrawn by Debtor if his Plan is confirmed:

|   | Description | Value | Objection |
|---|---|---|---|
| 1 | Debtor claimed an exemption in the Micron receivable from the J.R. Simplot Company, which as of the Bankruptcy filing, was payable for 7 more years at $50,000 per year. One payment has been made at $50,000. Total left $300,000 | Debtor claimed an exemption on 75% of the deferred compensation or $225,000 | Yes |
| 2 | Proceeds of $50,000 held in exempt account related to payment in 2006 by the J.R. Simplot Company on the Micron Agreement. | Debtor claims an exemption on 75% of these proceeds or $37,500.00 | Yes |

## PLAN ADMINISTRATOR

The Plan provides for the creation of a Creditors' Trust and the appointment of a Plan Administrator upon confirmation of the Plan.    Upon confirmation of the Plan the following property that is not exempt would be delivered to the Plan Administrator who shall have the full rights to pursue all collection actions allowed under the bankruptcy code to the Debtor-in-Possession including all rights under 11 USC §§544, 547 and 548 as well as any state law remedy. It is anticipated that at least the following property will be delivered to the Plan Administrator, unless it is liquidated before confirmation of the Plan pursuant to notice and hearing, which proceeds shall be turned over to the Plan Administrator:

|   | Description (referred to same letter as in liquidation chart) | Comments |
|---|---|---|

| | | |
|---|---|---|
| B. | El Paso Real Property less $50,000.00 exemption | |
| D. | DJS Properties, L.P. Promissory Note | |
| E. | DJS II Family Trust Note | |
| H. | Micron Agreement payments of $50,000 per year | |
| J. | Shipp Estate Receivable | |
| K. | All Claims to the Washington State entities described in K under the liquidation analysis | |
| L | 18 Shares of A Stock in J.R. Simplot Company | |
| M | 133.331 Shares of B Stock in J.R. Simplot Company | |
| N. | 13% interest in Claremont Properties | |
| O. | Debtor's interest in DJS Properties, L.P. | |
| P | Any rights in as a plaintiff in the Class action suits | |
| S. | Any remaining tax credit after applied to the Debtor's tax obligations | |
| T. | All other property that is not retained by Debtor.  Called "Retained assets" in the Plan | |

In addition to the foregoing assets, the following will be distributed to the Plan Administrator.  Cash remaining from the following assets, once the administrative and priority expenses are paid:

| |
|---|
| A.  Balance of cash in all accounts not attributable to exempt assets. |
| Q.  Balance of 25% interest in J.R. Simplot Company Deferred Compensation Plan. |
| R.  Balance of 25% interest in J.R. Simplot Company Executive Deferred Compensation Plan.* <br> *On both Q and R Debtor shall direct that 25% of the payment be delivered to the Plan Administrator for distribution.  Debtor may, with the Plan Administrator's consent, elect to prepay the future 25% income stream for a discount acceptable to the Plan Administrator and Debtor. |

T.  Any account balance left in AG Edwards Account and any nonexempt portion of Morgan Stanley brokerage account.

The Plan Administrator will take these assets as-is, where-is and shall be responsible for payment of all federal, state and local taxes that accrue due to the income, sale or liquidation of these properties.    Debtor will use his best efforts to cooperate with the Plan Administrator in identifying asset location and contact people that may know specifics about the assets and to testify truthfully as need be concerning his knowledge about the assets and claims thereunder. Debtor shall not be required to pay any of the expenses of the Plan Administrator, its employees, attorneys, accountants or other agents and professionals hired by the Plan Administrator.  Plan Administrator shall hire its own professionals.

It is intended that the assets so transferred shall be transferred with all rights and defenses currently available to the Debtor and the opposing parties.  Thus even though some agreements with DJS Properties, LP and the J.R. Simplot Company and/or certain shareholders of the J.R. Simplot Company may be executory, these are neither being assumed nor rejected on the Effective Date of the Plan.  The rights that the Debtor in Possession has are reserved in the Plan Administrator and the other parties to the contract are reserving all claims, rights and defenses they may have. Nothing in the Plan shall alter these rights as they exist or modify any contract unless the Plan specifically provides for such modification.

The Plan Administrator shall also be given the right to object to any claims filed in this proceeding.  Debtor believes that there are a substantial amount of issues that can be raised regarding the claims.  First ships that were appraised several years ago at a value of over ten million dollars may have been sold for less than fair market value and thereby left deficiency claims that are not reasonable.  Further Doug Toms has filed a $3.5 million dollar claim, however, it appears that Debtor has offsets that exceed the claim.  Third there are other obligors on the notes

and it is not clear what the lenders have done to pursue those claims.  Fourth claims including the claim of DJS Properties, L.P. appear to be overstated.  These claims objections can be pursued by the Plan Administrator under the Plan to the extend Debtor has not resolved them prior to Confirmation of the Plan.

ELIMINATION OF ADVERSARY PROCEEDINGS

A number of creditors have alleged that they may hold viable causes of action to object to the dischargeability of their debts or portions thereof under certain subsections of 11 USC §523(a). In fact, as disclosed earlier, Debtor and certain Creditors have agreed to the continuation of the time to file an adversary complaint so as to avoid unnecessary costs and expenses pending submission of the Debtor's Plan.  Debtor strenuously objects to the allegations that are raised that he covered up or did not disclose to certain lenders the various aspects and liabilities of the Washington entities.  In fact, Debtor believes that the majority of those lenders knew about the entities, the other loans and the precarious nature of the travel related business at the time they made the loans.  Debtor does not believe that these creditors can prove reliance.  Debtor's position is opposed by these creditors and discovery of those creditor's loan files has not been attempted to avoid the added cost and expenses to the bankruptcy estate.

What is clear is that if these adversary proceedings are commenced, that each party will incur substantial fees and costs and Debtor will apply to the court to allow his counsel to be paid to conduct discovery of all the loan files, etc.  By way of illustration of what this might cost a substantial amount of time and costs has been incurred by the Committee and its attorneys in obtaining the Debtor's records.  Debtor did not resist production of documents and in fact believes he has produced all the documents requested.  The Committee still incurred multi thousands of dollars going through this process.  This discovery process would be multiplied regarding each creditor that seeks extraordinary relief against Debtor.

Debtor and his counsel have worked hard to negotiate a consensual Plan with the Committee, to disclose and to respond to its multiple requests to ensure that the full picture was seen by that Committee. . Further Debtor has agreed to turn over his assets that are not exempt to a Plan Administrator who is an expert that can pursue causes of action that Debtor may not be able to pursue. Finally Debtor has, since the bankruptcy was filed, attempted to find buyers for various assets so that costs of brokers, and fees could be reduced. Debtor understands that the claims may not all get paid but he has attempted through the Plan to provide a quicker resolution between him and these creditors to avoid the protracted costs and time of litigation. Debtor believes that this Plan is the quickest way to obtain confirmation.

Debtor has negotiated for the elimination of any rights of 7 of the 8 creditors who have reserved the right to bring an adversary proceeding asserting claims under 11 USC §523(a) alleging that their particular debt is non dischargeable. The only creditor that has not agreed to release all of its claims is Key Bank with respect to its claims. The other seven creditors have agreed to release their rights if the Plan is confirmed and if the Debtor-in-Possession agrees to allow the Committee to have standing to prosecute certain actions prior to confirmation of the Plan. The seven creditors that have agreed to release any claims they have are Regal Bank; AmericanWest Bank, Citicapital, Citicorp USA, Foundation Bank, Frontier Bank (and its assignee Ambassador Group) and Washington Trust Bank.

### POST PETITION PROPERTY

On the date the petition was filed the Debtor was receiving an income from several sources. First he was receiving income as a director from the J.R. Simplot Company and from Impco Technologies, Inc. Immediately upon filing the petition Debtor resigned from both of those boards and thus that income ceased. By way of illustration in 2005 both Impco Technologies, Inc and J.R. Simplot Company paid Debtor a combined gross of $240,694.00.

Second Debtor was receiving income from DJS Properties, LP, interest income and Claremont Realty.  Any future income from these sources is an asset delivered to the Plan Administrator and not retained.

Third, Debtor was receiving exempt retirement income.  By way of illustration in 2005, Debtor reported gross retirement income from all sources of $155,054.  This retirement income is what is being retained by Debtor as exempt under the Plan, which makes up a portion of the Retained Assets described herein and in the Plan.

Thus under the Plan, the creditors are receiving the only income producing assets or sources the Debtor had, except the exempt retirement income.

Finally the Plan also provides that any post petition acquired property defined under 11 USC §1115 and §541 shall be delivered to the Plan Administrator or Trustee.  To the extent the Debtor, who is 70 years old, becomes employed within the next 60 months then the Plan also contains a provision requiring the Debtor to turn over 25% of the gross income he receives from this employment.  This agreement was negotiated between the Debtor and the Committee to provide an incentive for the Debtor to obtain employment, which he currently does not have, and to pay a portion of that new income to the Trustee for the benefit of the creditors.

CONFIRMATION OF THE PLAN

1.    Voting Procedure:

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the "Ballot for Accepting or Rejecting Plan" attached to this Disclosure Statement as Appendix "C".  The Ballot must be filed with the Bankruptcy Court and may be submitted personally or by mailing such Ballot to the U.S. Bankruptcy Court, 550 W. Fort Street MSC 042, Boise, ID 83724.  In order to be counted all ballots must be filed or received by the Bankruptcy Court prior to 5:00 o'clock p.m. on the date specified in the order approving the Debtor's Disclosure Statement.

FIRST AMENDED DISCLOSURE STATEMENT  P -46-
JMM/jib 01936-014/211522  12/14/06

2.      Persons Entitled to Vote on Plan:

Only the votes of classes of creditors whose claims or interests are impaired by the Plan will be counted in connection with confirmation of the Plan. Generally, and subject to the specific provisions of Section 1124 of the Bankruptcy Code, this includes any creditor who, under the Plan, will receive less than payment in full in cash of the allowed amount of their respective claims on the <u>effective date</u> of the Plan or if a creditor's legal, equitable or contract rights is altered by the Plan. In determining acceptance of the Plan, votes will be counted only if submitted by a creditor whose claim is scheduled by the Debtor as undisputed, non-contingent and liquidated, or who, prior to the hearing on confirmation, has filed with the Bankruptcy Court a Proof of Claim which has not been disallowed, disqualified or suspended prior to computation of the vote on the Plan. The ballot which accompanies this Disclosure Statement does not constitute a Proof of Claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtor's schedules which are on file with, and may be inspected at the clerks office of the United States Bankruptcy Court, 4th Floor, 550 W. Fort Street, Boise, ID 83724 or it may be inspected on the Bankruptcy Court website at www.id.uscourts.gov, if you are a registered Pacer user, under this case file number.

3.      Acceptances May Not be Necessary to Confirm Plan:

Under Section 1126 of the Bankruptcy Code an impaired class is deemed to have accepted the Plan if (1) at least 2/3 in amount and (2) more than ½ in number of the allowed claims or interests of class members who have voted on the Plan have voted to accept it. Further, unless there is unanimous acceptance of the Plan by an impaired class, the Bankruptcy Court must also determine that under the Plan such class members will receive property of value, as of the effective date of the Plan, that is not less than the amount that such class member would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the effective date of the Plan. Even if all classes of claims or interests accept the Plan, the Court may refuse to

confirm the Plan.    Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and there are other provisions therein which may affect confirmation exclusive of the votes of creditors.

4.    Confirmation of Plan Without Acceptances:

The Court may confirm a Plan even though less than all of the classes of claims or interests accepts the Plan.  The circumstances under which the Court may confirm a Plan over the objection of a class of claims or interests are set forth in Section 1129(b) of the Bankruptcy Code.  This section provides that the Court may confirm a Plan notwithstanding its rejection by one or more impaired classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired class which does not accept the Plan.  With respect to classes of secured creditors, the fair and equitable test requires that a secured creditor (1) retain its lien and receive cash payments having a present value equal to its allowed secured claim, and (2) receive the proceeds of the sale of its collateral, or (3) realize the indubitable equivalent of its claim the extent validly secured.

With respect to a class of unsecured claims, the fair and equitable test requires that if each creditor in such class does not receive property having a present value equal to the amount of such creditors allowed claim, no junior class can receive or retain any property.  The proponent of the Plan will rely on the features of Section 1129(b) in the event there is a rejection of the Plan by a class of claims or interests.  Under this Plan the equity security interests will receive nothing until all allowed unsecured claims are paid in full.

The invocation of the provision of 1129(b) is a legal matter required to be heard by the court at the confirmation hearing or at a hearing set by the court.

5.    Consequences of Confirming the Plan:

Confirmation of the Plan will discharge the Debtor from all of their prepetition debts except as otherwise provided for in the Plan, the Order of Confirmation or Section 1141 of the

Bankruptcy Code.   Confirmation makes the Plan binding upon the Debtor, creditors and other parties in interest regardless of whether they have accepted or rejected the Plan.  Confirmation of the Plan will, generally, provide for the distribution of value to the creditors as set forth in the Plan.

6.     Hearing on Confirmation of the Plan:

The Bankruptcy court has set a hearing date to determine whether the Plan has or will be accepted and whether the other requirements for confirmation of the Plan have been satisfied.  A time for hearing for confirmation of the Plan has been established in Appendix A hereto and each creditor and shareholder should make note of that Notice of Hearing and determine whether or not they want to attend.  Attendance is not mandatory to establish a claim and, as also set forth in Appendix A, all ballots must be filed with the Bankruptcy Court prior to the date set for hearing on Confirmation of Plan.

7.     Retention of Jurisdiction:

If the Plan is confirmed, the Bankruptcy Court will retain jurisdiction, as more specifically set out in the Plan, to adjudicate the allowance of claims, the value of secured interests, the disposition of executory contracts or unexpired leases, the avoidance of liens or  transfers, litigation concerning claims and property of the estate, rule on modifications of the Plan if any, and to issue such orders and judgments as may be necessary to implement the Plan and resolve disputes concerning the Plan.

BANKRUPTCY SCHEDULES

This Disclosure Statement is meant to disclose all of the assets and liabilities of the Debtor. To the extent it contradicts the bankruptcy schedules on file with the Bankruptcy Court the disclosures contained in this Disclosure Statement control over any ambiguities.

SUMMARY OF THE PLAN

The concepts behind Debtor's Chapter 11 Plan is relatively simple. It is simple in that it provides for the liquidation of all of Debtor's nonexempt assets and for the Trustee to enforce all of his rights and powers as Debtor-in-Possession. To the extent those assets are not liquidated as of the Effective Date of the Plan, those assets will be distributed to a creditors trust. On the Effective Date of the Plan, therefore, the Plan Administrator will have the authority to further liquidate assets and to make distribution as described in the Chapter 11 Plan. In essence, the creditors who are impaired shall be beneficiaries of the entity created by the Plan. With certain exceptions the creditors who shall be the beneficiaries are those who hold general unsecured claims. After payment of priority claims, and after payment of administrative expenses, including any tax liability created herein, the creditors holding uncontested, unsecured claims will receive pro rata each dollar distributed by the creditor's trust to the unsecured creditors. Creditors holding secured claims shall either receive their collateral or shall be paid in full.

DEBTOR BUYOUT OF CERTAIN PERSONAL PROPERTY

The Plan authorizes that to the extent Debtor desires to buy certain of his nonexempt personal property for fair market value he may, with the Plan Administrator's consent, elect to do so from Retained Assets, if he has not done so before the Effective Date of the Plan. If Debtor uses Retained Assets to buy certain items of personal property then they shall also be exempt from any collection activity of creditors, the Plan Administrator and the Trustee appointed under the Liquidating Trust. While Debtor may elect, with the Plan Administrator's consent, to buy any items of personal property, the following is a list of certain items which the Debtor has indicated he may desire to purchase for fair market value. Currently the Committee is reviewing the proposal to buy items a, b, c and d and desires to make an independent determination of the fair market value of those items:

a.  Buchaneer Airplane, which Debtor believes has a fair market value of $70,000.00. Debtor Found a buyer who was willing to pay this amount for the airplane ;

b.  Airex Motor Home, which Debtor believes has a fair market value of $7,000.00.  Debtor found a buyer who was willing to pay this amount for this vehicle;

c.  Mexico Personal Property which Debtor believes has a fair market value of $95,000.00. Debtor found a buyer who was willing to pay this amount for this personal property;

d.  Cadillac Escalade Automobile,  which Debtor believes has a fair market value of $31, 525, and which is subject to a $3,000 exemption;

e.  Phaeton Automobile, which has been sold but which Debtor will use exempt funds to buy back from the buyer; and

f.  Sunesta Boat, which has been sold but which Debtor will use exempt funds to buy back from the buyer.

## MEANS FOR IMPLEMENTATION OF PLAN

As soon as practical after the Effective Date of the Plan, and after all allowed administrative claims, and all allowed other priority claims against the Debtor have been paid in full or provided for, all property in the Debtor's bankruptcy case, including all causes of action owned or held by Debtor shall vest in the creditor's trust for the sole and exclusive benefit of the holder's of allowed unsecured claims.

## CREDITORS TRUST AGREEMENT

A creditor's trust agreement in a form substantially similar to that attached to the proposed Plan, shall become effective on the Effective Date of the Plan.  Subject to the terms and conditions of that trust agreement, the Plan Administrator shall have the full power, authority and

responsibility to take any steps necessary to administer the trust, including the duty and obligation to liquidate assets of the Debtor and to make distributions therefrom to the beneficiaries of the trust. The beneficiaries of the trust are the holders of the allowed unsecured claims filed against Debtor.

The Plan Administrator may retain such law firms, accounting firms, disbursing agents, experts, advisors, appraisers, auctioneers, or other professionals as the Plan Administrator may deem necessary to aid in the performance of his or her duties under the trust agreement. Professionals currently employed in this case may be employed by the Plan Administrator.

## TAX CONSEQUENCES OF THE PLAN

A. Introduction.

The implementation of the Plan may result in federal, state, local, or foreign income, excise or franchise tax consequences to the Debtor, to his bankruptcy estate (the "Estate") and to their creditors. No ruling from the Internal Revenue Service or any state or local taxing authority will be sought or obtained with respect to any federal, state, local or foreign income, excise or franchise tax consequences of the Plan. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This disclosure statement does not constitute, is not intended to constitute, and cannot be relied upon as a tax opinion; the description of the consequences contained herein is provided for informational purposes only.

The discussion below covers only certain of the federal and state tax consequences associated with the Plan's implementation. This discussion does not attempt to comment on all aspects of the federal or state tax consequences associated with the Plan, nor does it attempt to

consider various facts or limitations applicable to any particular creditor that may modify or alter the consequences described herein.  This discussion does not address state, local, or foreign tax consequences or the consequences of any federal tax other than federal income tax.

The following discussion is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), the existing, temporary, and proposed regulations promulgated thereunder, and existing judicial decisions and administrative rulings.  In light of the numerous recent amendments to the IRC, no assurance can be given that legislative, judicial, or administrative changes will not be forthcoming that would affect the accuracy of the discussion below.  Any such changes could be material and may apply retroactively to the transactions entered into or completed prior to the enactment or promulgation thereof.

As a result of the numerous uncertainties concerning the income tax consequences of the Plan, there is no assurance of any kind that a particular taxpayer will, in fact, be entitled to the tax treatment described in this section of the Disclosure Document.  CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM, TO THE DEBTOR, AND TO THE ESTATE OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

    B. <u>Federal Income Tax Consequences to the Debtor.</u>

The Debtor has now filed all of the Federal and State of Idaho income tax returns for his taxable years through December 31, 2005.  Based upon his filed returns, the Internal Revenue Service and the State of Idaho have filed Claims in this bankruptcy proceeding.  To the extent

allowed those Claims will be considered a priority pre-petition liability, and will be collectible from the Estate (see subsection C below for a discussion of the Estate).

The Debtor did not make the election under IRC sec. 1398(d)(2)(A) to close his taxable year when his bankruptcy commenced. Because this election was not made, the Debtor's Federal and State of Idaho income tax returns will continue to be filed on a calendar-year basis for 2006 and subsequent years.

Under the terms of the Plan, the Debtor retains certain exempt property and earnings. The taxable effects of those retained items will be reported on the Debtor's individual income tax returns for 2006 and subsequent years.

At the conclusion of the Plan, IRC sec. 1398(i) provides that any tax attributes of the Estate which the Estate does not utilize in computing its federal income tax liability and which are not reduced under the provisions of IRC sec. 108(b)(1) will carry over to the Debtor. As discussed in subsection C below, however, it is improbable that any tax attributes will satisfy those tests and carry over to the Debtor at the conclusion of the Plan.

C. Federal Income Tax Consequences to the Estate.

Under the terms of IRC sec. 1398, filing of the Chapter 11 petition resulted in the creation of a separate estate for federal income tax purposes. The Estate's first taxable year began at the commencement of the Chapter 11 proceedings. The Estate has the right to select its initial taxable year-end, but has not yet done so; its final taxable year will end on the Plan's Effective Date.

The Estate's gross income includes all income which it receives and any non-exempt gross income of the Debtor to which the Estate is entitled under the Bankruptcy Code. Various

deductions are allowed from that gross income, including certain itemized deductions, trade or business expenses, certain administrative expenses, and court fees and costs.

The Estate succeeded to the Debtor's non-exempt property at the commencement of the chapter 11 proceedings. In addition, the Estate also succeeded to the Debtor's tax basis and capital accounts in his non-exempt property and to most of his other tax attributes, including his passive activity loss carryovers, as of January 1, 2006.

The Estate is responsible for filing Federal and State of Idaho income tax returns covering all taxable gains or income related to the property which it acquired, after the application of available tax attributes, and for payment of any resulting tax. Any such income tax liability is an administrative expense of the Estate, and would not become a liability of the debtor if it was not paid by the Estate.

For income tax purposes, the vesting of the Transferred Assets in the Creditors' Trust will be deemed to be two transfers: first, a transfer to the beneficiaries of the Creditors' Trust in satisfaction of the Debtor's obligations to those beneficiaries; and, second, a transfer from those beneficiaries to the Creditors' Trust. Those transfers will be deemed to be in an amount equal to the fair market value of the Transferred Assets, including any intangible assets and legal claims, on the Effective Date, as determined and reported by the Plan Administrator. The Estate will recognize gain or loss on the first deemed transfer on all property deemed transferred, equal to the difference between that fair market value and the Estate's basis in the transferred property.

Implementation of the Plan will result in the discharge of a portion of the Estate's indebtedness. The IRC ordinarily requires recognition of taxable income equal to the amount of any indebtedness discharged during the taxable year. However, when debt discharge occurs in a

bankruptcy case, pursuant to a plan approved by the Bankruptcy Court, IRC sec. 108(a) states that such income recognition is not required.

Amounts so excluded from taxable income, however, result in a reduction of any unused tax attributes under IRC sec. 108(b).  For this reason, the Debtor's share of any unused passive activity loss carry forward not utilized by the Estate will probably be forfeited, rather than being available for carry forward to the Debtor at the conclusion of the Plan.  On the other hand, the amount by which the Estate's discharge of indebtedness exceeds the amount of the forfeited tax attributes will permanently escape taxation.

D. Federal Income Tax Consequences to Certain Creditors.

As stated in subsection C above, for income tax purposes the vesting of the Transferred Assets in the Creditors' Trust will be deemed to be deemed transfers to creditors in their status as beneficiaries of the Creditors' Trust, in satisfaction of the Debtor's obligations to those creditors, followed by deemed transfers from the beneficiaries to the Creditor's Trust.

The first deemed transfer -- from the Estate to the creditors -- will be treated as a recognition event to the beneficiaries for income tax purposes.  Subject to the discussion of interest income below, this deemed transfer should result in reportable bad debt charge-offs or recoveries equal to each beneficiary's tax basis in its cancelled receivable from the Debtor, including accrued but unpaid interest, reduced by the fair market value of each beneficiary's proportionate interest in the Transferred Assets on the Effective Date, as determined by the Plan Administrator.

The second deemed transfer -- from the creditors to the Creditors' Trust -- will be treated as creating grantor trusts, with the beneficiaries treated as the grantors.  This transfer is not a

FIRST AMENDED DISCLOSURE STATEMENT  P -56-
JMM/jib 01936-014/211522   12/14/06

recognition event to the beneficiaries for income tax purposes.  As grantors of such grantor trusts, the creditors will report their pro-rata shares of all items of taxable income, gains and losses of the Creditors' Trust, throughout its entire duration, on their separate Federal income tax returns, and pay any resulting tax liability.  The tax liability will be owing regardless of the extent to which the trustee of the Creditors' Trust has distributed cash to the beneficiaries.

In general, a creditor recognizes ordinary income under the IRC to the extent it receives cash or other property for interest, including original issue discount, or as a payment on account for goods or services, unless under its accounting method such discount, interest or account payment has already been included in its taxable income and not written off as a bad debt deduction.

Under the terms of the Plan, certain creditors could potentially receive original issue discount and/or other interest income subject to these general rules, and these rules should also govern unsecured creditors' receipts of cash settlements.  Because the proper allocation of receipts between principal and interest and the proper timing and amount of any original issue discount recognition under the Tax Code can be affected by numerous factors, creditors must consult their own tax advisors in connection with the application of these general rules to their specific situations.

E.    <u>Other Tax issues</u>.

1.    For federal income tax purposes, it is intended that the creditor's trust class as a Creditors' Trust under Section 301.7704-4(b) as the procedure and administration regulations of the Internal Revenue Code and that such trust is owned by its beneficiaries, the holders of the unsecured claim.  Accordingly, for federal income tax purposes, it is intended that such

beneficiaries be treated as if they had received an undivided interest in the Debtor's transferred assets, and then contributed such interest to the trust. The Plan Administrator shall be responsible for filing all federal, state and local tax returns for the trust. All items of income, deduction, credit or loss of the trust, shall be allocated for federal, state and local tax purposes among the beneficiaries of the trust.

2.       Other tax consequences to Debtor. The vesting of the assets into the trust will be treated as deemed transfers to the beneficiaries of the trust and satisfaction of the Debtor's obligations owed to those beneficiaries. The Debtor's deemed transfers will be deemed to be for an amount equal to the fair market value of the transferred property on the effective date of the Plan as determined and reported by the Plan Administrator. The Debtor will recognize gain or loss on all deemed property transfers, equal to the difference between that fair market value and the Debtor's basis in the transferred property. All federal, state and local taxes incurred as a result shall be paid from the assets distributed to the trust, unless the tax is generated solely from income derived from an exempt asset or portion thereof to be kept by Debtor. Further, all taxes generated from income or liquidation of assets by the Debtor prior to the creation of the trust, shall be paid by the bankruptcy estate assets. Debtor shall pay all federal state and local taxes generated with respect to exempt assets held by Debtor and any income received from those exempt assets.

If the Debtor recognizes a net taxable gain on his property transfers, some or all of that gain may be offset by net operating losses, or other tax attributes of the Debtor. If Debtor's recognized net taxable gain exceeds available net operating loss, the Debtor will pay any resulting tax from the proceeds of the sale of assets prior to distribution of those assets to the creditor trust. If Debtor instead recognizes a net loss from the transfers, that loss may be utilized to offset any other taxable income of the Debtor. Any unused loss will become a carry forward.

The transactions contemplated by the Plan may give rise to the cancellation of indebtedness for the Debtor. Under the Plan, the Debtor will generally realize cancellation of

indebtedness income in an amount equal to the excess of the adjusted issue price of any of its indebtedness exchanged or cancelled over the fair market value of any property vested in the creditor trust.    Because the cancellation of indebtedness income will arise in a course of a proceeding pursuant to Chapter 11 of the Bankruptcy Code, the Debtor will not be required to include such cancellation of indebtedness income in his taxable gross income.    The Debtor, however, will generally be required to reduce certain of his beneficial tax attributes, by the amount of the cancellation of indebtedness income from taxable income from reason of the bankruptcy. The amount of attribute reduction will first be applied to reduce the Debtor's net operating loss, next to reduce certain other tax attributes of the Debtor (including capital loss carry forwards and the tax basis of certain property).

## IDENTIFICATION OF VARIOUS PROFESSIONALS HIRED IN THIS

## BANKRUPTCY PROCEEDING

The following professionals have been hired, subject to approval by the United States Bankruptcy Court, which will be paid from assets of the bankruptcy estate.

1.    The Debtor-in-Possession is represented by Jerry Shulkin, of Shulkin Hutton and Joseph M. Meier, of Cosho Humphrey, LLP.

2.    The Debtor-in-Possession's accountant is Pulliam and Associates, 7235 West Emerald, Suite A, Boise, Idaho 83704.

3.    The Debtor-in-Possession's tax accountant is Eide Bailly, LLP, 877 W. Main Street, Suite 800, Boise, Idaho 83702.

4.    The Debtor-in-Possession has hired an auctioneer, Larry Downs, of Downs Auction Service, 119 N. Midland, Nampa, Idaho 83653.

5.    The Debtor-in-Possession has hired Michael Ballantyne of Thornton Oliver Keller to liquidate real property on behalf of the Debtor, 250 S. Fifth Street, Boise, Idaho 83702.

6.    The Committee is represent by Holland and Hart, namely Larry Prince and Robert Faucher.

7.    The Committee has hired Joe Dawson to act as its accountant, who has also provided the disclosures herein concerning the tax consequences of confirmation of the Plan.

THIS DISCLOSURE STATEMENT of Don J. Simplot is submitted this __14th__ day of December 2006.

SHULKIN HUTTON, INC P.S.

_____
Don J. Simplot
Debtor-in-Possession

_____
Jerry Shulkin
Attorneys for Debtor-in-Possession

COSHO, HUMPHREY, LLP

_____
Joseph M. Meier
Attorneys for Debtor-in-Possession