# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 06-00002-TLM** |
| **DON J. SIMPLOT** | ) | |
| | ) | **MEMORANDUM OF** |
| **Debtor.** | ) | **DECISION** |
| _____ | ) | |

## INTRODUCTION

This chapter 11 case was commenced on January 4, 2006.[1]  The issue

presented is confirmation of the Modified Joint Plan of Reorganization ("Modified

Joint Plan"), Doc. No. 577, proposed by the chapter 11 debtor-in-possession, Don

J. Simplot ("Debtor") and the Official Committee of Unsecured Creditors

("Creditors' Committee") (collectively the "Plan Proponents").

In conjunction with confirmation, the Plan Proponents seek by their

"Motion for Determination under 11 U.S.C § 1127(c) and (d)," Doc. No. 593 (the

"§ 1127 Motion"), a ruling that they were not required to serve creditors with an

amended disclosure statement for the Modified Joint Plan, and that the Modified

Joint Plan be deemed accepted by those creditors who had accepted a prior plan,

Doc. No. 480 (the "First Joint Plan"), advanced by the Plan Proponents.

Only three objections to confirmation of the Modified Joint Plan are raised.

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy
Code, 11 U.S.C. §§ 101-1532, as amended by the Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (2005).

MEMORANDUM OF DECISION - 1

The first is that of the Internal Revenue Service ("IRS").  Doc. No. 600.  The IRS objection was limited, and effectively resolved at hearing, as discussed later in this Decision.

The primary issues before the Court stem from the other two objections to confirmation.  One is by a creditor, DJS Properties, L.P., an Idaho limited partnership ("DJS"), *see* Doc. No. 599, and the other by a non-creditor, the J.R. Simplot Company ("JRSCo"), joined in by certain of its shareholders.  *See* Doc. Nos. 596, 597.  DJS also objects to the § 1127 Motion.  *See* Doc. No. 605.

A confirmation hearing and hearing on the § 1127 Motion were held May 16, 2007 and the matters taken under advisement.  The Court has considered carefully the evidence presented at hearing, the arguments and the briefing of the parties, and applicable authorities.  The Court concludes that all confirmation objections shall be overruled, the § 1127 Motion granted, and the Modified Joint Plan confirmed.  This Decision constitutes the Court's findings and conclusions.  Fed. R. Bankr. P. 7052, 9014.

## BACKGROUND AND FACTS

Virtually all the contentions regarding confirmation of the Modified Joint Plan present legal disputes rather than factual ones, and only an abbreviated recitation of facts need be set out here.

### A.    Debtor and his pre-petition business dealings

Debtor is a 70 year old man retired from active employment.  He pays

MEMORANDUM OF DECISION - 2

monthly support obligations to his ex-wife and their two minor children following a 2005 divorce.  Debtor also has children from prior marriages who are emancipated.

Debtor's present income is derived from Social Security, payments from corporations including director's fees, several deferred compensation plans, an IRA, and other retirement assets.[2]  However, his prebankruptcy income included substantial investment, business and interest income, in amounts far greater than what is projected in schedule I.[3]

At filing, Debtor claimed to hold assets worth $32,404,952 with outstanding liabilities of $53,220,717.  Doc. No. 47 at summary of schedules.[4]

### 1.    JRSCo

Debtor's father, J.R. Simplot, is the founder and chairman emeritus of JRSCo and one of the most successful businessmen in Idaho's history.  JRSCo is a privately held food and agribusiness corporation headquartered in Boise, Idaho with operations in the United States, Canada, Mexico, Australia and China.  Its annual sales are around $3 billion, derived principally from food, fertilizer, turf

---

[2] *See* Doc. No. 47 at schedule I (projecting, from such sources, over $25,300.00 per month in income).

[3] *See*, *e.g.*, Doc. No. 47 at Statement of Financial Affairs, response to question 2.

[4] The schedules indicate unknown values for some assets, and unliquidated amounts for some debts.

MEMORANDUM OF DECISION - 3

and horticultural, cattle feeding, and other enterprises related to agribusiness.[5]

Debtor worked for JRSCo as an executive and officer until he retired in May, 2001 after which he started receiving monthly payments under JRSCo's defined benefit plan as well as two other deferred compensation plans he participated in during his years with the company.  He remained on JRSCo's board of directors until January, 2006.

Debtor held, as of the petition date, 18 shares of JRSCo's Class 'A' voting stock and 39.78 shares of JRSCo's Class 'B' non-voting stock which he valued at $72,552.42 and $155,546.29 respectively.  Doc. No. 47 at sched. B.  The Class 'A' shares are subject to transfer restrictions, but the Class 'B' shares are not.  As discussed below, Debtor acquired another 93.547 shares of Class 'B' stock post-petition, and now holds a total of 133.33 shares in that Class.[6]  Debtor's 18 shares of Class 'A' stock comprises about 23.5% of 76.445 total issued and outstanding shares of that class[7] and his currently held 133.33 shares of Class 'B' stock comprises about .09% of over 153,681 issued and outstanding shares of that class. JRSCo has also issued preferred stock.  Debtor does not own any of it directly, however JRSCo acknowledges that DJS, an entity primarily owned by Debtor,

---

[5] *See* http://www.simplot.com.

[6] At the value per share Debtor used in regard to his prebankruptcy shares of Class 'B' stock, the additional 93.547 shares would be worth $365,747.25. Doc. No. 479 at 33.  The transfer, in fact, was designed to satisfy a $364,959.00 annual payment obligation to Debtor by the DJS II Family Grantor Trust, as discussed *infra*.

[7] *See* Doc. No. 47 at sched. B. *See also* Doc. No. 543 at 3, n.1 (using figure of 22%).

MEMORANDUM OF DECISION - 4

holds about 25% of that JRSCo preferred stock.[8]

## 2.    Other corporations

Debtor served on several corporate boards in addition to JRSCo's.  In 1982, he became a member of the board of directors of Micron Technology, Inc. ("Micron").  In 2003, JRSCo, which owned a large amount of Micron stock, obtained Debtor's agreement to resign from Micron's board.  In consideration for his agreement, JRSCo agreed to pay Debtor $50,000.00 per year for ten years, roughly what he was receiving annually from Micron.

Debtor was also on the board of directors for Impco Technologies ("Impco") until January 2006.  As part of his employment at Impco, Debtor acquired a number of stock options and warrants.[9]  Debtor also participated in Impco's deferred compensation plan.[10]

## 3.    DJS

In 1997, acting on the advice of estate planning professionals, Debtor

---

[8]  Doc. No. 543 at 3, n.1

[9]  The stock and warrants were liquidated post-petition for approximately $1,650,000.00 and the funds are in an "asset sales account" along with the proceeds of other assets liquidated during this chapter 11 case.  Other Impco stock was pledged by Debtor as security for amounts owed American West Bank.  Following stay relief for this creditor, this Impco stock was liquidated, along with stock Debtor owned in another corporation, Quantum Fuel Systems.  Some $1,155,000.00 was received and applied by American West Bank to the secured obligation.  DJS argues it owned this portion of the Impco stock and that it was pledged by Debtor without authorization.

[10]  Impco paid Debtor the amounts due under this plan in a lump sum, and the same were placed in an "exempt account."  Like the asset sales account, the exempt account cannot be accessed without Court order, and is addressed by the Modified Joint Plan.

MEMORANDUM OF DECISION - 5

formed DJS.  He contributed to this limited partnership JRSCo Class 'B' stock as well as substantial real and personal property.  As of the January, 2006 petition date, Debtor owned a 2% general partnership interest and a 73.3576% limited partnership interest in DJS.

DJS purchased and sold assets in the regular course of business since its formation.  As noted above, it presently owns 25% of the outstanding preferred shares of JRSCo.  It also owns and controls real property throughout Idaho, including parcels in Valley, Canyon, Ada, Gooding and Payette Counties.  Among the real estate holdings are those referred to as the Hollow Road Property in Canyon County, the McCall Property in Valley County, and the Boise Condo in Ada County.  These properties, collectively worth several million dollars, were allegedly acquired by DJS.  However, they were all titled in Debtor's name.  Debtor transferred all three to DJS by deeds recorded within ninety days of the bankruptcy filing.

DJS also claims to have an interest in various other properties titled in Debtor's name including three airplane hangars; a marina condo; real property in Mazatlan, Mexico; two other condominiums; real estate contracts; and stock and other ownership interests in several companies.

The values of the real and personal property assets held by DJS are in many cases disputed, as is the question of actual ownership.  The valuation of DJS' stock

MEMORANDUM OF DECISION - 6

holdings in JRSCo is also an open question.[11]  Debtor, however, valued his total interest in DJS at $9,231,174.00 as of the petition date.  Doc. No. 47 at sched. B; Doc. No. 479 at 10.

DJS also owes a debt to Debtor under a promissory note dated June 30, 2004 with an original balance of $9,088,547.00.  The note is payable in annual interest-only installments (of about $225,000.00) until June 30, 2024, when the entire principal is due.  The parties debate the present value of this note, however, Debtor contends it is $4,490,995.00.[12]

### 4.   Family Trust obligation

Debtor sold a 20% limited partnership interest in DJS to an entity called DJS II Family Grantor Trust ("Family Trust") in March, 2000.[13]  Under the agreement, the Family Trust agreed to pay Debtor $5,910,000.00, in 19 annual payments of $364,959.00 until March 31, 2022 when the remaining balance would be paid in full.[14]  The Family Trust's obligation to pay Debtor is secured by the

---

[11]  The Second Amended Disclosure Statement makes a rather oblique reference to the value of the JRSCo 'B' stock and preferred stock held by DJS as having a value "on paper" of approximately $19,806,203.00.  Doc. No. 479 at 33.

[12]  This asset is in addition to the $9,231,000.00 Debtor scheduled as the value of his interest in DJS.  *Id.*

[13]  This thus represents a significant portion of the roughly 27% of the limited partner interests in DJS not directly owned by Debtor at the time of the bankruptcy filing.

[14]  In considering the value of Debtor's limited partner interest in DJS, if the 20% limited partner interest conveyed to the Family Trust was worth $5.9 million under the March, 2000 appraisal and sale, then 73% would be worth some $21.5 million as of that date.

MEMORANDUM OF DECISION - 7

20% interest in DJS.  Debtor values this note at about $5,722,000.00[15] though he

questions its present value given the long term nature of the obligation.[16]

### 5.    Other Debtor assets

In addition to the above assets, Debtor also owned, as of filing in January

2006, real property in Caldwell, Idaho valued at $5,000,000.00 which consisted of

a residence, a 9-hole golf course and other improvements known as the "El Paso

Property," several bank and brokerage accounts worth in excess of $115,000.00, a

rollover IRA worth more than $2,000,000.00, a 13 % interest in a closely held

business called Claremont Realty Company worth perhaps $1,150,000.00 or

more,[17] interests in other corporate entities, several vehicles, boats and airplanes

and over $38,000.00 worth of firearms.  *See* Doc. No. 47 at scheds. A, B.[18]

### B.    Western Washington investments and bankruptcy filings

While serving on Impco's board, Debtor met Doug Toms, a businessman

---

[15]  *See* Doc. No. 479 at 32; Doc. No. 47 at sched. B.

[16]  Payments on the note were current at bankruptcy.  The post-petition March 31, 2006 installment of approximately $365,000.00 was paid by the Family Trust transferring to Debtor 93.579 Class 'B' shares of JRSCo.  According to Debtor, this was consistent with prebankruptcy practice.  Prior to bankruptcy, Debtor and his wife would then gift those shares to their children.  Since this did not occur in 2006, Debtor retains the Class 'B' shares.  Doc. No. 479 at 12.

[17]  The interest in Claremont was scheduled at $889,695.00.  Doc. No. 47.  It was shown in Debtor's liquidation analysis at $1,150,519.00, as a discounted figure from a calculated value of $2,171,025.00.  Doc. No. 479 at 33.

[18]  Valuation of Debtor's holdings is quite complex.  The schedules ascribed a total value of approximately $32,405,000.00 to all assets, with many having "unknown" value.  Doc. No. 47.  The Second Amended Disclosure Statement listed values totaling some $27,000,000.00 (again with several assets' values shown as "unknown") and asserted a "liquidation value" for the estate of approximately $15,083,000.00.  Doc. No. 479 at 30-37.

MEMORANDUM OF DECISION - 8

and former corporate executive who convinced Debtor to invest in a number of

enterprises in western Washington State.  Debtor and Toms later became

acquainted with Bob Brennan, a purported 35-year veteran of the travel industry.

The three men eventually formed a limited liability company called 3DM, LLC,

which in turn owned other entities that managed several hotel properties mainly in

the Pacific Northwest.

Brennan allegedly convinced Debtor and Toms to invest in a cruise ship

company to run seasonal cruises primarily through Alaska's Inside Passage.  In

2002 and 2003, they formed a corporation to acquire and operate three cruise ships

and a cruise company called Glacier Bay Cruiseline.  Another limited liability

company was formed to acquire a fourth vessel.  Brennan, Toms and Debtor

created two more entities in 2004 to acquire a fifth vessel, the Columbia River

Queen.  Debtor allegedly guaranteed millions of dollars in loans in order to

acquire these assets.  However Debtor claims never to have exercised any day-to-

day control over the operations of these various businesses, or to have directly

received any of the loan proceeds.

In September, 2004, Brennan filed a chapter 11 case in the Western District

of Washington.  Debtor and Toms alleged in that case that Brennan illegally

siphoned more than $2,000,000.00 from various entities mentioned above.

Brennan denied the charges but a settlement was reached under which Brennan

agreed to release his ownership interest in a number of these, and other, entities

MEMORANDUM OF DECISION - 9

and businesses.[19]  Thereafter, Toms and Debtor attempted to keep the businesses

afloat.  Debtor advanced hundreds of thousands of dollars to meet payroll and

other obligations, but to no avail.  Businesses closed, creditors seized assets, and

several of the entities filed bankruptcy.

Debtor attempted a workout with various creditors of the businesses to

whom he had provided guarantees.  However, in late 2005 two banks filed suit in

New York and Washington.  Further lawsuits were threatened by other creditors.

Debtor's petition for chapter 11 relief in this District followed.

### C.    The Protective Order

JRSCo is very privately held.  It does not make its financial or operational

details public and did not wish to start doing so as a result of Debtor's bankruptcy.

At the same time, the Creditors' Committee needed to evaluate Debtor's interests

in JRSCo – interests held personally and through his majority ownership of DJS.

On March 2, 2006, the Creditors' Committee filed a motion to compel

Debtor to attend a Fed. R. Bankr. P. 2004 examination and to produce certain

documents, including copies of JRSCo's charter documents, by-laws, board

meeting minutes and various financial information.  *See* Doc. No. 89 at Ex. A.

The motion and related filings drew numerous objections from both JRSCo and

DJS.  The parties eventually stipulated to a lengthy and painstakingly negotiated

protective order covering the Rule 2004 examination and the production of

---

[19] *See* Doc. No. 479 at Appendix G (settlement documents).

MEMORANDUM OF DECISION - 10

documents.  *See* Doc. No. 225 ("Protective Order").[20]

### D.   The First Joint Plan

Debtor filed his first chapter 11 plan on August 31, 2006.  Doc. No. 323.

Following objections to the adequacy of the first disclosure statement, Debtor filed

a first and then a second amended disclosure statement in December, 2006.  *See*

Doc. Nos. 471, 479.  Debtor and the Creditors' Committee then filed the First

Joint Plan on December 29, 2006.  This Court entered an order approving the

second amended disclosure statement on January 3, 2007.  Doc. No. 496.

The First Joint Plan reflected a fundamental agreement between Debtor and

the Creditors' Committee that Debtor's substantial business and other holdings

would be liquidated for the benefit of creditors.  Debtor would retain his exempt

assets as well as other property generating retirement income.[21]  The bulk of

Debtor's non-exempt assets would be transferred to a Creditors' Trust created by a

"Creditors' Trust Agreement" ("CTA") attached to the plan.  Such assets included

all claims, rights, interests, properties and assets of Debtor's estate as of the

"Effective Date" of the plan.[22]  These assets included Debtor's stockholder

---

[20]  This negotiation process and resulting Protective Order also addressed the fact that Debtor not only housed many of his personal books and records at JRSCo but maintained them with the involvement and assistance of JRSCo employees.

[21]  These were "Retained Assets" under the First Joint Plan, but the term was replaced by "Exempt Assets" in the Modified Joint Plan because the latter used "Retained Assets" in a different context.

[22]  The "Effective Date" of the First Joint Plan was the day the confirmation order became
(continued...)

MEMORANDUM OF DECISION - 11

interests in JRSCo, and also included, under the rubric of "Partnership Claims," all claims, rights, interests and defenses of Debtor and his bankruptcy estate in, against and relating to DJS. Debtor also agreed to transfer potential avoidance actions to the Creditors' Trust.

The Trustee of the CTA was, *inter alia*, charged with liquidating the assets transferred to the Creditors' Trust; pursuing, litigating and resolving any causes of action, including avoidance actions, against DJS and other parties; and objecting to creditor claims.[23] The proceeds were to be distributed to the "Beneficiaries," defined under the CTA as the holders of allowed general unsecured claims.

For federal income tax purposes, the Creditors' Trust was classified as a liquidating trust, with the general unsecured creditors being both the grantors and beneficiaries. In other words, they were to be treated as if they had received an undivided interest in Debtor's non-exempt assets and then contributed those interests to the Creditors' Trust.[24]

The conduct of the Trustee (who was also the "Plan Administrator") was

---

(...continued)
final. The same definition of "Effective Date" is used in the Modified Joint Plan. *See* Doc. No. 577 at 9, 33.

[23] Doc. No. 480 at Ex. 1.2.20 (§ 2.2.2).

[24] The disclosure statement discussed the potential tax consequences to creditors. *See* Doc. No. 479 at 55-57. Evidence at the later confirmation hearing in May, 2007 explained that the initially contemplated approach would constitute a taxable event to the Beneficiaries at the time of creation and funding of the Creditors' Trust with the property of the estate, *i.e.*, at confirmation.

MEMORANDUM OF DECISION - 12

subject to oversight by an Executive Board comprised of representatives from the class of unsecured creditors. Liquidation of the assets in the Creditors' Trust was to be completed within four-and-a-half years of the Effective Date, unless the Court approved a longer period. After that, any remaining assets were to be auctioned off within six months.

Among many other provisions, this plan provided that the Protective Order continue to apply after the Effective Date, and the Court retain exclusive jurisdiction over all matters arising out of, and related to, Debtor's chapter 11 case, the Creditors' Trust and the plan.

Under the First Joint Plan, unclassified claims consisting of administrative expenses and priority tax claims as well as an unimpaired class of creditors (Class 1 creditors) would be paid from a cash "Reserve" established at confirmation. There were also four classes of impaired claims. Class 2 consisted of the secured claim of PHH Mortgage Corporation ("PHH"), which asserted a security interest in the El Paso Property. That property was to be sold within a time certain and the proceeds used to satisfy the indebtedness. Class 3 consisted of the secured claim of Diversified Financial Services, LLC ("DFS"). Its collateral was to be sold and the proceeds applied to its claim, with the balance, if any, treated as an unsecured claim. Class 4 consisted of the secured claims of April and John Simplot who were to receive a transfer of the bankruptcy estate's interest in real property referred to as the "Garden City Property" in full satisfaction of their claim

MEMORANDUM OF DECISION - 13

including any unsecured claim.  Finally, Class 5 was comprised of the nonpriority

unsecured creditors, including DJS, who were to receive a pro-rata beneficial

interest in the Creditors' Trust.  Class 6 consisted of Debtor's interests.

Class 2 (PHH Mortgage) rejected the First Joint Plan.  Class 3 (DFS) did

not vote.  Class 4 (April and John Simplot) accepted it.  Class 5 approved the plan

by the requisite majorities in number of balloting creditors and in the dollar

amount of their claims.  *See* § 1126(c).  Unsecured creditors Key Bank and DJS

filed rejecting ballots and objections to confirmation.[25]

Debtor and the Creditors' Committee asked the Court to suspend

consideration of the First Joint Plan to propose modifications.

### E.    Modified Joint Plan

The Modified Joint Plan now pending confirmation was filed on March 28,

2007.  Under it, the position of "Plan Administrator" was eliminated and replaced

with a § 1123(b)(3)(B) "Estate Representative" charged with administering the

assets of the bankruptcy estate.[26]  A "Trustee" would still administer assets of the

Creditors' Trust.  Similar to the First Joint Plan, the roles of "Estate

Representative" and "Trustee" would be filled by the same person, and

---

[25]  The Office of the United States Trustee ("UST") also objected to confirmation, *see*
Doc. No. 527, but changes in the Modified Joint Plan satisfied its concerns, which were limited to
quarterly fee payments, *see id.*  The UST has raised no objections to the Modified Joint Plan.
PHH also objected to confirmation of the First Joint Plan.  *See* Doc. No. 523.  PHH did not object
to confirmation of the Modified Joint Plan which incorporated a subsequent court-approved
settlement, as discussed further below.

[26]  *See* Doc. No. 577 at 4 (§ 1.2.28).

MEMORANDUM OF DECISION - 14

supervision would be provided through an Executive Board.[27]

Debtor's "Partnership Claims" regarding DJS, and his interests in JRSCo would remain in the bankruptcy estate as "Retained Assets" and the Estate Representative would hold and exercise them until they could be liquidated.[28]  In addition, the Modified Joint Plan calls for the filing of a post-confirmation adversary proceeding by the Estate Representative within 60 days of the Effective Date to determine whether the DJS partnership agreement is executory under § 365.  Doc. No. 577 at 19.  Should the Court find that it is, the Modified Joint Plan gives the Estate Representative another 60 days to assume or reject it.[29]  A similar provision governs adjudication of the estate's and JRSCo's "respective positions" in the JRSCo shares and under shareholder agreements.[30]  Debtor's remaining non-exempt assets will be transferred to the Creditors' Trust for liquidation and disbursement.[31]

---

[27]  The Modified Joint Plan provides that the Executive Board will consist of designees from four nonpriority unsecured creditors and identifies them as American West Bank, Foundation Bank, Regal Financial Bank, and Washington Trust Bank.  *Id.* at 22 (§ 5.2.4).

[28]  Under § 5.1.2.2, the Retained Assets are to be administered by the Estate Representative but the proceeds distributed through the Creditors' Trust.  That provision states that "[u]pon the sale, liquidation, or monetization of or other realization upon any of the Retained Assets, the proceeds thereof shall be immediately transferred by the Estate Representative to the Creditors' Trust and upon receipt by the Creditors' Trust any such proceeds shall be treated in all respects as Transferred Assets."  *See* Doc. No. 577 at 17-18.

[29]  Doc. No. 577 at 19.

[30]  *Id.* at 20 (§ 5.1.2.5).

[31]  *Id.* at 21 (§ 5.2.2) (addressing "Transferred Assets").

MEMORANDUM OF DECISION - 15

The Modified Joint Plan modifies the treatment of creditors. Administrative expenses would still be paid from a "Reserve" established by the Estate Representative on the Effective Date.[32]  However, the unclassified priority tax claims would be paid from the Creditors' Trust by the Trustee.  Should any Class 1 (non-tax priority) claims be allowed, they would be paid from the Reserve.

The Class 2 claim of PHH remained impaired.  However, the Modified Joint Plan notes a stipulation was reached between PHH and Debtor for adequate protection payments and conditional § 362 stay relief as to PHH's collateral, the El Paso Property, and this agreement is incorporated into the plan.[33]

DFS (Class 3) foreclosed on its collateral and satisfied the outstanding secured debt.  Therefore, under the Modified Joint Plan, Class 3 is deleted and DFS will receive nothing further on its secured claim.  Treatment of Class 4 remains unchanged, with certain real property to be transferred in full satisfaction of the claim.

The Modified Joint Plan provides that each Class 5 nonpriority unsecured creditor with an allowed claim will receive pro-rata payments from the Creditors' Trust.[34]  It is not anticipated that creditors in this class will be paid in full.

---

[32]  After payments of certain claims and expenses as described in § 5.1.1, remaining funds in the Reserve will be conveyed to the Creditors' Trust.  *Id.* at 17.

[33]  *Id.* at 13 (§ 3.3.1).  Following that negotiated resolution, PHH changed its rejection of the First Joint Plan to an acceptance of the Modified Joint Plan.

[34]  Doc. No. 577 at 14 (§ 3.3.4) (treatment of Class 5), 25 (§ 5.2.11) (Trustee to pay Class
(continued...)

MEMORANDUM OF DECISION - 16

The tax treatment of the Creditors' Trust has changed. Its grantor and beneficiary is now the bankruptcy estate, rather than the creditors. Accordingly, the estate will report all taxable net income, gains and losses from administering Debtor's assets. Furthermore, the Trustee will be responsible for filing all federal, state and local tax returns for both the Creditors' Trust and the bankruptcy estate, and will pay all tax liabilities from the assets of the Creditors' Trust.

The Plan Proponents served the Modified Joint Plan on all creditors, JRSCo, and the UST. Doc. No. 578. Creditors were offered a "red-lined" version of the Modified Joint Plan to show precisely every change made to the First Joint Plan[35] and invited to recast their ballots.

After rejecting the First Joint Plan, PHH (Class 2) filed a ballot accepting the Modified Joint Plan. DFS (Class 3 under the First Joint Plan) did not cast a ballot at any time, however, as noted, that class was eliminated as a secured class once it realized on its collateral. Class 4 cast a second accepting ballot. In Class 5, two creditors, Citicapital and Columbia State Bank, cast ballots accepting the Modified Joint Plan.[36] Key Bank and DJS remained the only rejecting creditors among that class. Including the acceptances of the First Joint Plan, if deemed to be

---

[34](...continued)
5 allowed claims and allowed claims for priority taxes from Creditors' Trust).

[35] Also at times called a "black-lined" version, this document shows all the additions to (by underlining) and deletions from (by strike through) the First Joint Plan. *See* Ex. 103.

[36] Citicapital had also cast a ballot accepting the First Joint Plan, while Columbia State Bank did not vote on the prior plan.

MEMORANDUM OF DECISION - 17

applicable to the Modified Joint Plan, 16 of 18 (88.89%) of the Class 5 creditors

accepted the Modified Joint Plan. The accepting ballots totaled $35,018,022.18

out of the $51,101,618.85 voting or 68.53% of the total dollar amount of claims.[37]

Class 5 thus accepted the Modified Joint Plan. *See* § 1126(c).

**DISCUSSION AND DISPOSITION**

Debtor joined with the Creditors' Committee to jointly propose an initial,

and then modified plan. Both received almost unanimous support. Both plans

provide for Debtor's retention of exempt property and certain other assets, and for

a mechanism by which virtually all of Debtor's non-exempt assets, real and

personal, and his inchoate assets, including claims and causes of action existing

prior to bankruptcy and those arising post-filing under Code avoiding powers, are

to be liquidated or realized upon and the proceeds distributed to creditors. Though

a substantial distribution will occur, the nonpriority unsecured creditors likely will

not be paid in full. Nevertheless, that class of unsecured creditors voted to accept

both the First Joint Plan and the Modified Joint Plan.

The sole outstanding creditor objection to confirmation comes from DJS.[38]

In addition to being a creditor, DJS owes a debt to Debtor's estate. It is also a

---

[37] *See also* Doc. No. 601 (Debtor's summary of balloting under LBR 3019.1).

[38] As noted, there was an objection from the IRS, but as discussed *infra* it is effectively resolved.

MEMORANDUM OF DECISION - 18

prospective litigation defendant.[39]  Debtor created this family limited partnership and owns almost three quarters of its limited partnership interests.  Debtor has actively opposed the position taken by DJS in regard to confirmation.[40]  The other objection to confirmation comes from JRSCo, a non-creditor.[41]  That entity's stake in this matter is based on its desire for continued confidentiality of its business and financial affairs under the Protective Order and/or the plan, as Debtor's stock holdings in JRSCo are liquidated or otherwise realized upon for the benefit of creditors.

### A.    Confirmation

The bankruptcy court has an affirmative duty to ensure a debtor's plan satisfies all of the requirements of § 1129(a).  The court shall confirm a chapter 11 plan if its proponent proves by a preponderance of the evidence either (1) the plan meets all of the § 1129(a) requirements or, (2) if the only requirement not satisfied is § 1129(a)(8), the plan satisfies the "cramdown" alternative of § 1129(b).

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'Ship* (*In re Ambanc La Mesa Ltd.*

---

[39]  *See* Doc. No. 577 at Ex. 1.2.3 (Avoidance Actions), Ex. 1.2.16 (Contested Assets), Ex. 1.2.17 (Conveyed Assets)

[40]  *See*, *e.g.*, Doc. No. 612 (Debtor's brief) at 5 ("[DJS and JRSCo] are not asserting rights as creditors but primarily are constructing road blocks to the ratable liquidation of the Retained Assets to the Debtor's creditors.") (footnote omitted); *see generally id.* at 4-25 (arguing in detail why objections of DJS and JRSCo should be overruled).

[41]  There was a nascent issue as to JRSCo's possible creditor status on the theory that Debtor's JRSCo Documents were or could be construed as executory contracts subject to treatment under § 365, thus creating the potential of a claim.  At the time of the confirmation hearing on the Modified Joint Plan, the parties stipulated that the JRSCo Documents were not executory.

MEMORANDUM OF DECISION - 19

*P'ship*), 115 F.3d 650, 653 (9th Cir. 1997); *United States v. Arnold & Baker*

*Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 654 (9th Cir. BAP 1994).

### 1. Confirmation standards met without contest

The Plan Proponents argue that §§ 1129(a)(6), (7), (10), (11), (12), (13),

(14), (15) and (16) have been satisfied or are inapplicable, and that any issues

related to these provisions under the First Joint Plan have been resolved.

Following its own independent review, the Court agrees and finds the Modified

Joint Plan and/or the Plan Proponents satisfy these nine elements.

### 2. Confirmation objections resolved

#### a. IRS objection

The IRS objected to the Modified Joint Plan pursuant to § 1129(a)(9)(B)

and § 511(b) because it failed to include payment of "gap" interest on the IRS'

priority tax claim.  Doc. No. 600 at 2 (citing *California Bd. of Equalization v.*

*Ward (In re Artisan Woodworkers)*, 225 B.R. 185 (9th Cir. BAP 1998) and

referring to the interest that accrues between the petition date and confirmation).

At hearing, the IRS conceded Debtor is not obligated to provide in the plan for

post-bankruptcy "gap" interest, but argued the interest is non-dischargeable.  *See*

§ 523(a)(1)(A); § 1141(d)(2).[42]  Accordingly, the IRS' counsel stated its

"objection" was not a confirmation issue or something that needed to be addressed

---

[42] *See generally Miller v. United States*, 363 F.3d 999 (9th Cir. 2004) (gap period interest on priority tax claims is nondischargeable).

MEMORANDUM OF DECISION - 20

in the Modified Joint Plan.  Instead, the IRS characterized its pleading as a "reminder" to Debtor that the post-petition interest would constitute a debt notwithstanding payment of the tax claims treated under the plan.

From the IRS' comments at hearing, the Court deems the IRS' objection withdrawn.  If not withdrawn, it will be overruled as not constituting a basis for denial of confirmation.[43]

The only objection raised under § 1129(a)(9) is therefore resolved and that confirmation standard is satisfied.

### b.    DJS objection regarding § 362

Among DJS's several objections is one regarding the language of § 12.5 of the Modified Joint Plan.  *See* Doc. No. 599 at 26.  The relevant text reads: "Notwithstanding the foregoing provisions of this Section 12.5, 11 U.S.C. § 362 shall continue to apply according to its terms."  Doc. No. 577 at 37.  DJS argues this language could be construed as preventing DJS from asserting defenses or counter-claims against Debtor or Debtor's successor(s) in any post-confirmation litigation.  The Plan Proponents acknowledged at hearing that a strict reading would do so, but indicated such an interpretation was unintended.  They asserted the questioned language could be clarified in a confirmation order to resolve DJS's concerns.  The Court will allow the Plan Proponents to make the

---

[43] Debtor acknowledged the IRS' point regarding *Artisan Woodworkers* in submissions and during argument at hearing.  The Court has no objection should the parties wish to clarify the situation through appropriate language in an endorsed confirmation order.

MEMORANDUM OF DECISION - 21

appropriate clarification or modification in a final confirmation order to settle this issue.[44]

### 3.    Standing issues

The Plan Proponents further claim they have met the remaining confirmation standards, § 1129(a)(1) - (5), and satisfy § 1129(a)(8), rendering § 1129(b) inapplicable.  The remaining DJS and JRSCo objections raise questions under or implicate these provisions.  The Plan Proponents, however, question JRSCo's standing to raise any confirmation objections.

Section 1128(b) provides that "A party in interest may object to confirmation of a plan."  Additionally, § 1109(b) provides: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."[45]

JRSCo is not a creditor.  It has not asserted a claim against Debtor or the estate, and it conceded during the confirmation hearing that it had no executory

---

[44]  To the extent the objection reaches farther than this, the Court agrees with Debtor's response to the objection.  *See* Doc. No. 612 at 23-24.  The objection is therefore otherwise overruled.

[45]  A party in interest is not defined in the Code, but this Court has determined that a party in interest is one who has a pecuniary interest in the outcome of a given dispute.  *See, e.g.*, *In re Elias*, 05.2 I.B.C.R. 41, 42, 2005 WL 4705220 (Bankr. D. Idaho 2005); *In re Stone*, 03.2 I.B.C.R.134, 135 (Bankr. D. Idaho 2003).  These holdings are consistent with the standing authorities discussed *infra*.

MEMORANDUM OF DECISION - 22

contract with Debtor that might give it creditor standing. The question is whether it has sufficient party in interest standing to be heard and, if so, on what issues.

*Hasso v. Mozsgai (In re La Sierra Fin. Servs.)*, 290 B.R. 718 (9th Cir. BAP 2002), explained that the doctrine of standing encompasses both constitutional limitations on federal court jurisdiction (*i.e.*, the case or controversy requirements of Article III), and prudential limitations on the court's exercise of that jurisdiction. Constitutional standing requires an injury in fact, *viz.* an invasion of a judicially cognizable interest. 290 B.R. at 726-27.[46] Prudential standing requires that the party's assertions fall within the zone of interests protected by the statute and, further, requires that the litigant assert only its own rights and not those of another party. *Id.* at 727 (citing *Bennett v. Spear*, 520 U.S. 154, 162, 167-68 (1997).[47] The party asserting standing exists bears the burden of proving it. *Id.* at 726. Though sometimes articulated in the cases as principles applicable to standing on appeal, the same propositions apply to a party at the bankruptcy court level.

In *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774 (9th Cir. 1999), the court stated:

To prove an injury in fact under Article III (constitutional standing),

---

[46] *See also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (addressing constitutional standing).

[47] *See also Dunmore v. United States*, 358 F.3d 1107, 1112 (9th Cir. 2004) (addressing prudential standing).

MEMORANDUM OF DECISION - 23

the appellant need only allege an injury "fairly traceable" to the
wrongful conduct; that injury need not be financial. *See Kane v.
Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636,
642 n.2 (2d Cir. 1988). Bankruptcy cases, however, generally affect
the rights of many. *See Tilley v. Vucurevich (In re Pecan Groves of
Ariz.)*, 951 F.2d 242, 245 (9th Cir. 1991) ("Bankruptcy litigation[]
. . . almost always implicates the interests of persons who are not
formally parties to the litigation."). To prevent unreasonable delay,
courts have created an additional prudential standing requirement in
bankruptcy cases: The appellant must be a "person aggrieved" by the
bankruptcy court's order. *See Brady v. Andrew (In re Commercial
W. Fin. Corp.)*, 761 F.2d 1329, 1334 (9th Cir. 1985) ("[W]e have
adopted the 'person aggrieved' test as the appropriate standard for
determining standing to appeal under the Code."); *In the Matter of
Andreuccetti*, 975 F.2d 413, 416-17 (7th Cir. 1992) ("Its purpose is
to insure that bankruptcy proceedings are not unreasonably delayed
by protracted litigation by allowing only those persons whose
interests are directly affected by a bankruptcy order to appeal.")
(citation and internal quotation marks omitted). An appellant is
aggrieved if "directly and adversely affected pecuniarily by an order
of the bankruptcy court"; in other words, the order must diminish the
appellant's property, increase its burdens, or detrimentally affect its
rights. *Fondiller v. Robertson (In Matter of Fondiller)*, 707 F.2d
441, 442 (9th Cir. 1983).

*Id*. at 777. Accordingly, parties may not assert confirmation objections that relate

solely to others,[48] or that go to issues that do not directly and adversely affect them

pecuniarily.

JRSCo is not a creditor and is involved in this case only because Debtor

owns stock in it. That stock is property of his estate and will be liquidated in some

---

[48] *See Stoll v. Quintanar (In re Stoll)*, 252 B.R. 492, 495 (9th Cir. BAP 2000) ("To have
standing a party must assert its own legal rights and interest and cannot rest its claim to relief on
the legal rights or interest of third parties.") (citation omitted); *Reynolds v. Feldman (In re Unger
& Assocs., Inc.)*, 292 B.R. 545, 551 (Bankr. E.D. Tex. 2003) ("The fundamental aspect of
standing is that it focuses on the party seeking to get his complaint before a federal court and not
on the issues he wishes to have adjudicated.") (citation omitted).

MEMORANDUM OF DECISION - 24

fashion so that its value may be distributed to creditors. There is no doubt that JRSCo has some interest in how Debtor's directly and indirectly held shareholder interests are dealt with in this case. At the same time, it is not entirely clear it is a "pecuniary" interest or that there is a threat of direct and adverse impact. The strength of JRSCo's standing arguments obviously vary with the issue involved. Its arguable right to voice objections may be more credible, for example, where the Protective Order's continuation is concerned.[49] Its arguable standing is significantly weaker when JRSCo chooses to opine about plan treatment of creditors, compliance of the plan with confirmation standards generally, whether the disclosure to creditors is adequate under § 1125, or how proceeds of liquidation are to be distributed among creditors.

In large part, JRSCo's objections, arguments and commentary represent either gratuitous input or attempted support of DJS, which has creditor standing, in its objections. The Court concludes that, under the applicable authorities, JRSCo has failed to establish its standing, except in regard to the creation of a § 1123(b)(3)(B) Estate Representative, the perpetuation of the Protective Order, and the scope of the exculpation clauses. For that reason, JRSCo's objections, with those exclusions, will be overruled.[50]

---

[49] The Court found earlier in the case that JRSCo had party in interest standing in connection with the Rule 2004 exam and the protective order issues. It continues to adhere to that view.

[50] That certain of the arguments or issues JRSCo has discussed may otherwise be
(continued...)

MEMORANDUM OF DECISION - 25

### 4.      The § 1127 Motion

Section 1129(a)(1) requires that the plan comply with the "applicable provisions of this title," and § 1129(a)(2) requires a plan proponent similarly comply.  Whereas § 1129(a)(1) focuses on the form and content of the actual plan, § 1129(a)(2) focuses on a plan proponent's activities.

DJS' objections to the § 1127 Motion assert that the Modified Joint Plan and/or the Plan Proponents fail to comply with chapter 11 or Title 11 requirements related to adequacy of disclosure regarding the Modified Joint Plan and balloting on that plan.

### a.      Disclosure and § 1127

Adequacy of disclosure is an essential element for plan confirmation by way of § 1129(a)(2).  *See, e.g., In re Sierra-Cal*, 210 B.R. 168, 176 (Bankr. E.D. Cal. 1997).  The Court previously found that an amended disclosure statement, Doc. No. 479, provided adequate information under § 1125 and could be disseminated to creditors along with the First Joint Plan.  *See* Doc. No. 496 (order).[51]

When the Modified Joint Plan was served on creditors, the accompanying

---

[50](...continued)
addressed by the Court in this Decision is based on either DJS' objection or upon the Court's independent obligation to analyze § 1129 requirements, and is not an indication that JRSCo is found to have standing on those issues.

[51]  This amended (*see* Doc. No. 471) and supplemented (*see* Doc. No. 474) disclosure statement ran 59 pages, and had several hundreds of pages of detailed exhibits.  *See* Doc. No. 479.  It was approved after a significant period of time and contested hearings.

MEMORANDUM OF DECISION - 26

notice of hearing indicated creditors would have the right to change their ballots (but if they did not, the Plan Proponents would tabulate acceptances and rejections based on ballots that had been earlier filed by the creditors as to the First Joint Plan) and that a hearing on confirmation of the Modified Joint Plan would be held on May 16, 2007. Doc. No. 578. It also listed certain pre-hearing deadlines. *Id.* The notice further stated that:

> The Modified Plan enclosed herewith contains various changes [to the First Joint Plan] which you should review in considering your actions regarding this Notice. In the event you would like to receive an electronic version of the Modified Plan, which shows how it was changed from the [First] Joint Plan, please contact [Debtor's counsel or Creditors' Committee counsel; phone and e-mail information for each provided].

*Id.* at 2. This proffer of a red-lined version of the First Joint Plan allowed parties to readily determine what had changed and what had remained the same. *See* Ex. 103.

Through their § 1127 Motion, the Plan Proponents request a finding that they complied with the Code's § 1125 disclosure requirements as mandated by § 1127(c) and that all creditors who submitted ballots accepting the First Joint Plan are deemed to have accepted the Modified Joint Plan under § 1127(d).[52] That

---

[52] Section 1127(c) and (d) state:

(c) The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

(d) Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless,

(continued...)

Motion, an appended brief, and the notice of hearing on the Motion were served on all creditors and parties in interest.  Doc. Nos. 593, 594.

DJS filed the sole objection to the § 1127 Motion.  Doc. No. 605.  DJS claims the changes in the Modified Joint Plan are material and therefore require further, Court-approved disclosure.  Noting that DJS cast rejecting ballots to both the First Joint Plan and the Modified Joint Plan,[53] the Creditors Committee claims DJS lacks standing to object.  In the alternative, it asserts the changes made by the Modified Joint Plan are neither material nor adverse.  Debtor concurs.  *See* Doc. Nos. 618, 619.

Section 1127(a) allows a plan proponent to modify a plan at any time before confirmation so long as the modified plan meets the requirements of §§ 1122 and 1123.  Section 1127(c) requires the proponent of the modification to comply with § 1125 "with respect to the plan as modified."  Plan modifications do not require a new disclosure statement and court approval unless the modifications are material.  *Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 65 (9th Cir. BAP 1988); 7 Collier on Bankruptcy ¶ 1127.03 at 1127-5 to 1127-7 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2006).  The word

---

(...continued)
within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

[53] *See* Doc. Nos. 549, 601 (ballot summaries).  DJS also objected to confirmation of both plans.  Doc. Nos. 542, 599.

MEMORANDUM OF DECISION - 28

"material" in this context has been described as "so affect[ing] a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." *In re Am. Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (quoting 8 Collier on Bankruptcy, ¶ 3019.03 at 3019-3 (15th ed. 1987)).

*Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, (11th Cir. 2006), explained:

> The Bankruptcy Code requires that every holder of a claim or interest receive a court-approved written disclosure statement containing "adequate information" about a proposed plan before its vote on that plan may be solicited. 11 U.S.C. § 1126(b)(2). Even after the vote, a plan proponent may modify a plan before confirmation as long as the plan still satisfies all requirements concerning plan contents and the classification of claims and interests. 11 U.S.C. §§ 1127, 1122, 1123. After notice and a hearing, the bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated. *Id.* § 1127(d); Fed. R. Bankr. P. 3019; *see also In re Am. Solar King Corp.*, 90 B.R. 808, 825 (Bankr. W.D. Tex. 1988). If it does, the claim or interest holder is entitled to a new disclosure statement and another vote. *Solar King*, 90 B.R. at 823.

*Id.* at 1117-18.

The issue of inadequate disclosure was raised in *New Power* by Enron which had asserted a $98 million creditor claim and equity interests amounting to some 44% of one of the consolidated debtors. The creditor claim had been paid by a preconfirmation payment under an approved settlement agreement and by

MEMORANDUM OF DECISION - 29

Enron's realization on collateral.  Enron voted its interest in favor of confirmation.

The initial plan recognized that an examiner had been appointed to evaluate

whether any of the Enron claims should be recharacterized as equity interests.  The

modification filed after balloting and immediately before the confirmation hearing,

according to Enron, expanded the authority of the examiner to consider

recharacterization of the creditor claim that had already been paid.  Enron's

arguments that this was both "material" and "adverse" were rejected.[54]  The court

noted there was "adequate information" about the examiner's appointment and the

risk of recharacterization of claims or interests in the approved disclosure

statement, and:

> Even if that were not sufficient, Enron was an active participant in
> the hearings and briefing related both to the decision to appoint an
> examiner and the determination of the timing and scope of his
> investigations.  Enron clearly had access to adequate information
> regarding the treatment of its claims and interests whether they
> ultimately fell in [the class of creditors or of interests].

*Id.* at 1120-21.  This ruling reflects both the general requirement of materiality and

adversity, and the concept that the objecting party's access to information is

important in evaluating a claim of lack of adequate disclosure regarding the

modification.

　　　*In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 715 (Bankr. M.D. La. 1999),

---

[54] The court noted that the questions of materiality and adversity of treatment are factual
and case-specific.  Certain of the reasons supporting the court's affirmance are not relevant to the
instant case.

MEMORANDUM OF DECISION - 30

is consistent. *Id.* at 730 (quoting *Solar King* with approval and holding that, while

§ 1127(c) requires all modifications satisfy the adequacy-of-disclosure concerns of

§ 1125, it does not necessarily require preparation of a new disclosure statement).

*Cajun Electric* further similarly held:

> These parties who now complain of the lack of disclosure are
> substantial players in this proceeding, and not just ordinary creditors
> who are entitled to rely upon the information disseminated in an
> approved disclosure statement.  The court finds it disingenuous at
> best for these cooperatives to argue that they did not receive
> adequate information regarding their treatment.

*Id.* at 731.

As with the cooperatives in *Cajun Electric* and Enron in *New Power*, DJS

has been an active, informed participant in regard to the two joint plans advanced

by the Plan Proponents.  DJS lacks no information that it now contends to be

critical to enable it to evaluate and respond intelligently on the Modified Joint

Plan.  To the contrary, DJS has manifested in its confirmation briefing and oral

presentation an understanding of the details, nuances, and potential arguments

regarding the Modified Joint Plan.  In fact, when parsed, its objections about

inadequate disclosure regarding the change in approach in the Modified Joint Plan

present matters of legal interpretation and argument, not matters of factually

incomplete or misleading disclosure.

DJS would apparently seek to require, with attendant cost and delay, a

revised disclosure statement summarizing the changes between the First Joint Plan

MEMORANDUM OF DECISION - 31

and the Modified Joint Plan (something already effectively done through the

§ 1127 Motion, the brief, and the proffered red-lined plan served on all parties) and

noting that arguments might be made as to whether the new plan would be

confirmable.  Such an approach is not warranted in this case and on this record.

Not only has DJS failed to show that more disclosure to creditors generally

is necessary, it also lacks standing to object.  In *Citicorp Acceptance Co. v. Ruti-*

*Sweetwater (In re Sweetwater)*, 57 B.R. 354 (D. Utah 1985), the court considered

Citicorp's argument that the plan was so extensively modified that the disclosure

statement was rendered inadequate.  That court found Citicorp lacked standing

because:

> Citicorp was not "aggrieved" by the Bankruptcy Court's ruling [that
> disclosure was adequate].  Citicorp did not vote to accept the Plan.
> Citicorp rejected the Plan as proposed and has rejected it as
> modified.  Additional disclosure would have not affected Citicorp's
> vote.

57 B.R. at 358.

Here, DJS similarly rejected both plans.  The Plan Proponents do not seek

to perpetuate a prior DJS acceptance as a deemed acceptance of the Modified Joint

Plan.  The adequacy of disclosure to support such a deemed acceptance is simply

not an issue for DJS.  Therefore, DJS is not aggrieved.

The Court also notes the overarching context.  Many of the modifications

were made to address earlier objections by DJS, JRSCo, and to a lesser degree,

other creditors or the UST.  The Code is designed to encourage consensual

MEMORANDUM OF DECISION - 32

resolution of claims and disputes through the plan negotiation process, including

preconfirmation modification. *See In re Rhead*, 179 B.R. 169, 176-77 (Bankr. D.

Ariz. 1995). The rules applicable to such modifications should be read and

interpreted consistently to that end. *Id.*; *see also Solar King*, 90 B.R. at 827

(holding that Bankruptcy Rules 3018 and 3019 are "not to be enforced with blind

routine [but] must instead be applied with an eye toward the fundamental

principles of Chapter 11. . . . [These Rules] must not be applied in a wooden,

mechanical fashion, lest it serve only as a device to aid recalcitrant creditors in

their quest to selfishly scuttle otherwise equitable reorganizations on a mere

technicality.").

    The Court finds DJS lacks standing to object under § 1127. If standing

arguably exists, the Court concludes DJS' objections should be denied as lacking

persuasiveness. The modifications are neither material nor adverse. The Modified

Joint Plan does not require additional disclosure. The § 1127 Motion will be

granted.

### b.    PHH's vote in favor of the Modified Joint Plan

    A related issue exists in connection with balloting and plan acceptance.

Granting the § 1127 Motion means the prior accepting ballots are deemed to be

affirmative ballots in favor of the Modified Joint Plan.

    The Class 2 creditor, PHH, rejected the First Joint Plan. It changed its vote

to one in favor of the Modified Joint Plan. The Court finds this change is

MEMORANDUM OF DECISION - 33

acceptable.  Section 1127(d) reaches PHH:

> (d) *Any holder of a claim* or interest *that has* accepted or *rejected a plan* is deemed to have accepted or rejected, as the case may be, such plan as modified, *unless*, within the time fixed by the court, *such holder changes such holder's previous* acceptance or *rejection*.

(Emphasis added).  PHH, as a rejecting creditor, was thus advised by the same notice discussed previously that the prior ballot would stand unless it was changed.  Doc. No. 578.  It changed its rejection to an express acceptance.  Section 1127(d) validates that change.[55]

To the extent § 1127(c) might be implicated, the Court concludes the changes in treatment between the First Joint Plan and the Modified Joint Plan as to PHH are not material or adverse, and do not require additional disclosure of information in order to allow PHH to knowledgeably exercise its judgment to accept or reject the Modified Joint Plan.[56]

---

[55]  Fed. R. Bankr. P. 3019(a) speaks to the ability of a creditor or interest holder to change or withdraw an acceptance or rejection for cause shown and "after notice and a hearing."  This Rule does not require a contrary conclusion on the § 1127(d) issue.  Rule 3019(a) operates, *inter alia*, to prevent undisclosed agreements between debtors and selected creditors under which additional consideration is given in return for a favorable ballot.  Here, the settlement between Debtor and PHH was memorialized in a stipulation filed of record.  *See* Doc. No. 553. Additionally, notice to creditors was provided consistent with the requirements of Fed. R. Bankr. P. 4001(d), advising of the stipulation and providing an opportunity to object.  *See* Doc. No. 554. This occurred in February, 2007.  No objections were filed and the stipulation was approved by Order on March 12, 2007.  Doc. No. 571.  The Modified Joint Plan was filed on March 28, and specifically referred to the stipulation and the Order approving it.  Doc. No. 577 at 13 (§ 3.3.1) (discussing treatment of PHH).  The intent of Rule 3019 is satisfied, without requiring any additional notice or hearing, or any additional showing, before allowing PHH's changed ballot.

[56]  PHH is represented by counsel, and has been served with all pleadings, including those of DJS.  It has not asserted any questions regarding adequacy of disclosure.  Lack of prudential standing bars DJS from raising and advocating issues belonging solely to PHH.

MEMORANDUM OF DECISION - 34

In summary, by reason of the foregoing, Class 2 and Class 5 have accepted the Modified Joint Plan.  Thus, on the record before it, the Court concludes § 1129(a)(8) is satisfied, and § 1129(b) is not at issue.  Further, the Court concludes that the Modified Joint Plan and the Plan Proponents have satisfied § 1129(a)(1) and (2) to the extent those provisions relate to disclosure, solicitation and plan acceptance.

### 5.    Remaining Objections

### a.    Section 1129(a)(1), (2)

### i.    Classification of claims

Section 1129(a)(1) requires, among other things, that the plan comply with § 1122 in classifying claims.  Section 1122(a) states in relevant part that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[57]  Whether a claim is substantially similar to another is a question of fact committed to the bankruptcy court's discretion.  *Steelcase, Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994).  Section 1122(a) does not require "absolute homogeneity" of all claims or interest.  7 Collier at ¶ 1122.03[3][a].  In evaluating whether claims are substantially similar, courts must examine the nature, *i.e.*, the kind, species, or character, of each category of claims.  *Johnston*, 21 F.3d at 327.

---

[57]  *See also* § 1123(a)(4) (requiring the plan to provide the same treatment for each claim or interest of a particular class).

MEMORANDUM OF DECISION - 35

The question of proper claim classification relates to an alleged "secured" claim of DJS.

On May 3, 2006, DJS filed its first proof of claim, a $14,000,000.00 unliquidated, nonpriority, unsecured claim against Debtor. An attachment states the claim is for "any and all sums owed to [DJS] by Debtor" arising from various actions taken by Debtor that affected the partnership. These include: (a) excessive "draws" by Debtor; (b) amounts DJS expended to purchase or maintain assets if it is ultimately determined such assets are Debtor's; (c) "use" expenses; (d) costs and fees incurred in connection with the bankruptcy, the plan, and/or defense of actions; (e) monies paid by DJS in settlement of claims or satisfaction of judgments regarding guarantees it contends represented ultra vires acts by Debtor. *See* Claim No. 24-1

DJS filed an amended proof of claim on April 20, 2007, showing an unliquidated nonpriority unsecured claim and a "secured" claim in the amount of $2,380,195.18.[58] This latter claim is based on DJS' payment to Key Bank of a judgment Key Bank received on two DJS guarantees.[59] Attached to DJS' amended claim is a copy of an order dated March 1, 2007 requiring the

---

[58] The Creditors' Committee has filed an objection to DJS's amended claim. *See* Doc. No. 617. That objection has not been adjudicated.

[59] Key Bank filed a claim, Claim No. 20, on April 20, 2006 in the amount of $2,083,596.67. Attachments indicate promissory notes of August 15, 2003 and May 18, 2004 by Debtor and Toms were guaranteed by DJS, with Debtor signing those guarantees as DJS' general partner.

MEMORANDUM OF DECISION - 36

Multnomah (Oregon) County Clerk to release $2,380,195.18 posted by DJS as

supersedeas in an appeal of judgment in the action brought against it by Key

Bank.  Key Bank has not withdrawn or amended its proof of claim in the case,[60]

nor have Key Bank or DJS filed anything indicating Key Bank's claim has been

assigned.  *See* Fed. R. Bankr. P. 3001(e).[61]  Still, DJS argues it is now subrogated

to Key Bank's claim against Debtor pursuant to § 509(a).

Recall also that DJS is obligated to the estate on a June 30, 2004 note with

a face amount in excess of $9 million and an alleged present value in excess of

$4.5 million.  DJS argues it has a right to "setoff" under § 553 its subrogated Key

Bank position against amounts it owes the estate on the note.  DJS further argues

that, pursuant to § 506(a)(1), it has a secured claim to the extent of that setoff.  *See*

Doc. No. 599 at 5.  DJS concludes that this "secured" claim must be separately

classified under the plan.

Section 509(a) states:

> Except as provided in subsection (b) or (c) of this section, an entity
> that is liable with the debtor on, or that has secured, a claim of a
> creditor against the debtor, and that pays such claim, is subrogated to

---

[60]  That claim is asserted as nonpriority, unsecured in nature.  *See* Claim No. 20.

[61]  Key Bank has sued Debtor alleging nondischargeability under § 523(a).  *See* Adv.No. 07-06023-TLM.  In that suit, Key Bank notes that on March 1, 2007, the Oregon court ordered that of the $2,469,596 deposited by DJS, a sufficient amount be paid to Key Bank to satisfy the then existing judgment amount.  Key Bank notes that DJS continues to prosecute its appeal of the Oregon court's judgment and, if successful, Key Bank would be required to return that money.  In point of fact, Key Bank has sought a stay of its adversary proceeding, Adv. No. 07-06023-TLM, arguing it should not be faced with the burden and expense of litigating nondischargeability contentions while it is unclear if payment by DJS will stand.

MEMORANDUM OF DECISION - 37

the rights of such creditor to the extent of such payment.

Where a party seeks to rely upon subrogation rights, it need not file its own proof

of claim, but may rely on the creditor's proof of claim.  *In re Valley Sports, Inc*.,

92 I.B.C.R. 169, 170 (Bankr. D. Idaho 1992) (citing *In re Watkins Oil Servs., Inc.*,

100 B.R. 7, 12 (Bankr. D. Ariz. 1989)).  Evidence of this transfer should be filed

by the subrogated creditor with the Clerk.  *See* Fed. R. Bankr. P. 3001(e)(2).

Instead of effecting a transfer of Key Bank's unsecured claim under the

Rules, DJS has filed an amended proof of claim which includes the debt owed Key

Bank.[62]  There are at the moment *two* claims of record asserting the same debt.  As

noted above, it appears from the submissions herein and in the Key Bank

adversary proceeding that Key Bank and DJS are both awaiting final resolution of

the state court litigation and one or the other, but not both, will later assert this

claim against the estate.

The right of subrogation is a factual prerequisite to the entire setoff

argument.  The right of subrogation is not yet established and by DJS' own actions

in prosecuting the appeal, is contingent.

Moreover, DJS has not shown that a separately classified secured claim is

required.  Once DJS' liability to the estate is established, any distributions it may

be entitled to on the basis of its own proven claims against the estate, or

---

[62] Debtor argues, *see* Doc. No. 612 at 15, that DJS actually asserts a "subrogated" claim
that is larger than what Key Bank asserted or was paid, raising further questions about the validity
and extent of DJS' claim, questions the Court does not today reach.

MEMORANDUM OF DECISION - 38

distributions it may be entitled to on the basis of its subrogation of Key Bank's

claim (if that matter is finalized) can be urged as a setoff.[63]

At this time, DJS' amended claim is "substantially similar" to the rest of

Class 5 and does not require separate classification. The objection under § 1122

and § 1129(a)(1) will be overruled.

### ii.    Assumption or rejection under § 365

The Modified Joint Plan calls for the filing of an "adversary proceeding"

within 60 days of the plan's Effective Date seeking a declaratory judgment as to

whether the DJS partnership agreement is an executory contract. *See* Doc. No.

577 at 19 (§ 5.1.2.4(d)).[64] Should the Court decide the agreement is executory,[65]

the plan requires the Estate Representative to assume or reject it within 60 days of

a final order memorializing such a decision. *Id*.

DJS asserts that Debtor must decide whether to assume or reject the DJS

---

[63] The Modified Joint Plan preserves the right to assert setoff. *See* Doc. No. 577 at 8 (§ 1.2.58), and 31 (Art. 7.7). The Court makes no findings and reaches no conclusions at this stage regarding the elements, extent, or any other aspect of the setoff contentions.

[64] DJS objects to the plan provision calling for an "adversary proceeding" to determine the status of the DJS partnership agreement as an executory contract. It argues, correctly, that a proceeding to assume or reject is brought by motion and is a contested matter. *See* Fed. R. Bankr. P. 6006(a), 9014. However, what the Plan Proponents are doing is simply recognizing that it must be determined if there is an executory contract to be dealt with in the first place. An adversary proceeding is an acceptable way to gain that initial determination. The Modified Joint Plan contemplates that, if so found, the Estate Representative will promptly file appropriate motions under § 365. The procedure is not a problem.

[65] Though the parties have presented briefing and argument on the question of whether the limited partnership agreement is executory and, if it is, whether it is assumable, such matters are not yet properly before the Court and the Court makes no findings and reaches no conclusions in this regard.

MEMORANDUM OF DECISION - 39

partnership agreement *prior* to confirmation.[66]  In support of its contention, DJS

relies on the language of § 365(d)(2) and § 1123(b)(2).

> Section 1123(b) states:
>
> Subject to subsection (a) of this section, a plan may – . . . (2) subject
> to section 365 of this title, provide for the assumption, rejection, or
> assignment of any executory contract or unexpired lease of the
> debtor not previously rejected under such section[.]

Section 365 governs the treatment of executory contracts in a bankruptcy case.

Specifically, § 365(d)(2) states:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may
> assume or reject an executory contract or unexpired lease of
> residential real property or of personal property of the debtor at any
> time before the confirmation of a plan but the court, on the request
> of any party to such contract or lease, may order the trustee to
> determine within a specified period of time whether to assume or
> reject such contract or lease.

Read together, the two sections allow a chapter 11 debtor to assume or reject an

executory contract before plan confirmation *or* to provide in the plan for

assumption or rejection of an executory contract not previously rejected.

Several courts have allowed debtors to decide post-confirmation whether to

assume or reject an executory contract so long as the plan contains a provision

addressing such post-confirmation action.[67]  And, here, the Modified Joint Plan

---

[66] JRSCo made similar objections.  *See* Doc. No. 596.  However, JRSCo lacks standing to
address the adjudication of the status of the DJS partnership agreement or the question of that
agreement's assumption or rejection under § 365.

[67] *See e.g. Alberts v. Humana Health Plan (In re Greater Southeast Cmty. Hosp. Corp.)*,
327 B.R. 26, 34 (Bankr. D.D.C. 2005) ("The Bankruptcy Code permits questions of assumption
(continued...)

MEMORANDUM OF DECISION - 40

contains sufficiently detailed and clear provisions addressing assumption or

rejection of executory contracts post-confirmation.  Under § 365(d)(2) and

§ 1123(b)(2), the Plan Proponents "may" do this.[68]  Moreover, no party has moved

the Court to set any preconfirmation deadline for the assumption or rejection of

any alleged executory contracts.  *See* § 365(d)(2).[69]

The Court concurs with the cases and authorities noted.  Chapter 11 plans

may provide a process for assumption or rejection of executory contracts post-

confirmation.  In this case, that includes a process for resolving the issue of

whether the DJS partnership agreement is executory at all.  This objection by DJS

will be overruled.

### iii.    The § 1123(b)(3)(B) Estate Representative

DJS and JRSCo object to the creation of an Estate Representative under

§ 1123(b)(3)(B).  The argument is that the Estate Representative provisions violate

---

[67](...continued)
or rejection under a plan to be determined after confirmation of a plan calling for such
post-confirmation determination."); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 699-700 (Bankr.
W.D. Tex. 1988).  *Accord* Andrew M. Thau et. al., *Postconfirmation Liquidation Vehicles
(Including Liquidating Trusts and Postconfirmation Estates): An Overview*, 16 Norton J. of
Bankr. L. and Prac. 2, Art. 4 at 3 (April 2007) (addressing use of so-called "post-confirmation
liquidation vehicles" in chapter 11 cases to "enable confirmation notwithstanding that certain
matters remain[] unsettled").

[68]  The "may" assume or reject language in both § 365(d)(2) and § 1123(b)(2) has been
recently construed as permissive, not mandatory.  *Diamond Z Trailer, Inc. v. JZ, L.L.C. (In re JZ,
L.L.C.)*, 2007 WL 1954035 at *8 (9th Cir. BAP June 18, 2007), *aff'g In re JZ, LLC*, 357 B.R. 816
(Bankr. D. Idaho 2006).

[69]  From the inception of the case in January 2006 to the confirmation hearing in May
2007, DJS did not seek to advance this issue.

MEMORANDUM OF DECISION - 41

§§ 1123(a)(7)[70] and 1129(a)(5)(A)(ii)[71] as being contrary to the interests of

creditors and public policy.  The objectors have failed to cogently support these

best interests and "public policy" contentions.  They have also failed to support

the § 1129(a)(1), (2) and/or (3) arguments related to the use of the Estate

Representative.

The crux of the objection appears to center on a perceived "insurmountable

conflict" of interest created by the Estate Representative assuming Debtor's role as

a JRSCo shareholder and as a limited and/or general partner in DJS.  For example,

DJS contends the Estate Representative will owe fiduciary duties to the

partnership as well as to Debtor's creditors.  As a corollary, DJS argues the Estate

Representative, by being "substituted" as a general partner, will breach the

partnership agreement.

Section 1123(b)(3)(B) states that, subject to § 1123(a):

[A] plan may– provide for – the retention and enforcement by the debtor,
by the trustee, *or by a representative of the estate* appointed for such
purpose, of any such claim or interest[.]

(Emphasis added).  The language of § 1123(b)(3)(B) is broad, encompassing the

---

[70]  Section 1123(a)(7) requires that the plan "contain only provisions that are consistent
with the interests of creditors and equity security holders and with public policy with respect to
the manner of selection of any officer, director, or trustee under the plan and any successor to
such officer, director, or trustee[.]"  This is not itself a confirmation standard, however
compliance is relevant to the confirmation standards of § 1129(a)(1)-(a)(3).

[71]  Section 1129(a)(5)(A)(ii) requires that "the appointment to, or continuance in, such
office of such individual [defined in § 1129(a)(5)(A)(i)] is consistent with the interests of
creditors and equity security holders and with public policy[.]"

MEMORANDUM OF DECISION - 42

retention and enforcement of any "claim or interest" of the debtor.  In order for a

"representative of the estate" to pursue a "claim or interest" they must prove (1)

they have been appointed for such a purpose and (2) they represent the estate.  *In

re Prof'l Inv. Props.*, 955 F.2d 623, 626 (9th Cir. 1992) (citing *In re Sweetwater*,

884 F.2d 1323 at 1327-28 (10th Cir. 1989)).  The first element can be proven by

Court approval of a plan that makes an express provision for such a representative.

The latter determination is made on a case-by-case basis, the crucial inquiry being

whether recovery by the appointed party would benefit the debtor's estate and its

unsecured creditors.  *Sweetwater,* 884 F.2d at 1327.[72]  Here, both prongs of the test

are met.

The appointment of a third party to enforce a debtor's legal rights does not

necessarily effect an "assignment" of claims as that word is traditionally used in

the case law.  *Id.*; *see also Prof'l Inv. Props*, 955 F.2d at 626.  In essence, the

estate retains the rights and the Estate Representative is charged with enforcing

them.  *Sweetwater*, 884 F.2d at 1327.  Creditors, in turn, have the right to share in

any recovery up to the amount of their allowed claim.  *Id.*

Plans have been confirmed with provisions calling for a "designee" with

"all the powers of a § 1123(b)(3)(B)" estate representative to assume or reject,

post-confirmation, a debtor's executory contracts.  *See, e.g., In re Dynamic*

---

[72] *Accord Elk Horn Coal Co. v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.)*,
316 B.R. 495, 500-01 (Bankr. M.D. Tenn. 2004) (noting function is to preserve debtor's causes of
action and rights for benefit of creditors).

MEMORANDUM OF DECISION - 43

*Tooling Sys., Inc.*, 349 B.R. 847, 852-54 (Bankr. D. Kan. 2006).  That case

involved a creditor-proposed plan which included a provision for a

§ 1123(b)(3)(B) estate representative.  Following a discussion of § 1123(b)(2) and

the right of the plan to provide for the assumption or rejection of executory

contracts, and the ability of a plan proponent to appoint a § 1123(b)(3)(B) estate

representative, the court opined:

> If . . . a creditor-proponent could not provide in a plan for a plan
> representative to assume or reject executory contracts, the practical
> results would be nonsensical. Section 1123(b)(2) would have no
> meaning in connection with creditors' plans.  A creditor proponent
> would either have to rely upon the debtor, its obvious adversary, to
> reject any unfavorable or burdensome contracts or the creditor would
> need to seek the appointment of a trustee in the case, triggering an
> additional layer of administrative expense and effort in order to
> propose a liquidation or other alternative to what the debtor has
> offered the creditor body.

*Id*. at 853.  The Court concluded "there is no legal or practical reason to limit the

assumption or rejection rights of a [§ 1123(b)(3)(B)] designee under a creditor's

plan[.]"  *Id*. at 854.

Among DJS and JRSCo's objections is the assertion that the Estate

Representative will be working solely for the benefit of unsecured creditors and

not the "estate" as a whole, and this violates the test described in the case law.

This is a strained argument.  While it is true that Class 5 creditors and priority tax

claims do not comprise the entirety of estate creditors, they will be the only claims

left to pay.  Administrative claims will be paid in full from the Reserve.  There are

MEMORANDUM OF DECISION - 44

no Class 1 priority claims.  The Class 2 secured claim is receiving adequate

protection payments and will ultimately realize on its collateral.  The Class 3

secured claim has been paid in full, and Class 4 claims will be satisfied upon the

transfer of certain real property when the plan is confirmed.  The only creditors left

to satisfy are priority tax claimants and Class 5 nonpriority unsecured creditors.

Together, these last two groups effectively comprise the remainder of the "estate"

creditors.

In conclusion, the Court finds the Estate Representative meets the

requirements of § 1123(b)(3)(B).  The objections under § 1129(a)(5), and the

objections under § 1123(a)(7) implicating § 1129(a)(1), (2) and/or (3), will be

overruled.

### b.    Section 1129(a)(3)

Section 1129(a)(3) requires the plan be proposed "in good faith and not by

any means forbidden by law."  The term "good faith" is not defined.  However, a

plan is proposed in good faith where it achieves a result consistent with the

objectives and purposes of the Code.  *Platinum Capital, Inc. v. Sylmar Plaza, L.P.*

*(In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002).  The requisite

good faith determination is based on the totality of the circumstances.  *Id*.  (citing

*Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (9th Cir. BAP

MEMORANDUM OF DECISION - 45

1988)).[73]

### i.   JRSCo's objection to plan provisions regarding the Protective Order

JRSCo objects to the plan language concerning the continuation of the Protective Order.  *See* Doc. No. 577 at 28-29.  In short, JRSCo argues the Modified Joint Plan "guts" the parties' stipulation reflected in the Protective Order.  Doc. No. 596 at 36.

Section 5.13.1 of the Modified Joint Plan states, "The Protective Order shall continue to apply after the Confirmation Date and the Effective Date to documents disclosed or required to be disclosed pursuant to the Protective Order." However, § 5.13.2 states that information acquired by the Estate Representative either in his role as Estate Representative or Trustee of the Creditors' Trust, "shall not be subject to Protective Order if obtained outside of the Protective Order." Specifically, the Protective Order would not apply to information the Estate Representative acquires in his capacity as the party exercising and enforcing Debtor's shareholder rights in JRSCo.

The Court has considered JRSCo's arguments that this approach to the Protective Order is other than in good faith and that it violates this Court's decisional law on the question of enforcement of settlement agreements.  The Court disagrees with those contentions.

---

[73]  Certain of the issues addressed here could arguably be characterized as § 1129(a)(1) or (a)(2) objections.  The Court's rulings here encompass those other confirmation standards.

MEMORANDUM OF DECISION - 46

The Protective Order addresses documents acquired or possessed by non-JRSCo parties under the terms, conditions and/or processes particularly and specifically described in that Order.  What was negotiated, stands.  The Modified Joint Plan continues the Protective Order precisely as it was entered.

When Debtor filed his petition, he also had rights as a shareholder of JRSCo.  Whatever rights he had to acquire or review documents were outside the Protective Order.  To the extent Debtor is entitled to certain information as a shareholder of JRSCo, the Estate Representative – appointed to exercise Debtor's rights – would be as well.  Concomitantly, the Estate Representative is bound to confidentiality restrictions (if any) applicable to Debtor and in place prior to the entry of the Protective Order.  *See* Doc. No. 577 at 29 (§ 5.13.2).

Based on the record herein and the totality of the circumstances, the Court finds the treatment of the Protective Order in the Modified Joint Plan does not violate § 1129(a)(3).  JRSCo's objection will therefore be denied.

### ii.       Objections to exculpatory clauses

DJS and JRSCo object to the exculpatory clauses in the Modified Joint Plan.  The first such clause is found in § 12.6.1:

> Nothing in this Plan shall release any Person (other than Debtor's estate and the Creditors' Trust) from any claims, obligations, rights, Causes of Action, demands, suits, proceedings or liabilities based on any act or omission arising out of such Person's fraud, breach of fiduciary duty, malpractice, gross negligence or willful misconduct.

Doc. No. 577 at Ex. 1.2.20.  The second, § 12.6.2, applies to the Creditors'

MEMORANDUM OF DECISION - 47

Committee and its members and states:

> To the fullest extent permitted by applicable law, neither the Creditors' Committee, nor any of their respective members, shall have or incur any liability to any holder of a claim against or an Interest in Debtor, or any other party in interest, or any of their respective officers, directors, subsidiaries, affiliates, members, managers, shareholders, partners, representatives, employees, attorneys or agents or any of their respective successors and assigns, for any pre-Confirmation Date act or omission in connection with, relating to, arising out of, the administration of this Chapter 11 case, the solicitation of acceptances of this Plan, and the pursuit of Confirmation of this Plan, except for their fraud, breach of fiduciary duty, willful misconduct, or gross negligence as finally determined by the Bankruptcy Court.

Further, § 6.9 of the CTA releases the Trustee, his Representatives and the

Executive Board members from personal liability and provides for their

indemnification *except* for claims of fraud, breach of fiduciary duty, gross

negligence or willful misconduct.  Section 6.11.1, entitled "Exoneration and

Protection," states:

> Third parties dealing with the Creditors' Trust shall look only to the Creditors' Trust Assets to satisfy any liability incurred by Trustee, Trustee's Representatives or the Executive Board to such parties, except for instances involving fraud, breach of fiduciary duties, gross negligence, or willful misconduct as determined by a court of competent jurisdiction in a Determination.

> The objections on this point are bereft of authority.  However, based on the

totality of the arguments, it is clear the objectors find them "impermissibly

overbroad."

MEMORANDUM OF DECISION - 48

## I.    Exculpation of Creditors' Committee

A committee of creditors holding unsecured claims appointed under

§ 1102(a)(1) has several rights and duties under § 1103(c).  Courts have held that

within this grant of authority comes an implied fiduciary duty to the committee's

constituents, as well as "an implicit grant of limited immunity" to committee

members.  *See In re Drexel Burnham Lambert Group, Inc*., 138 B.R. 717, 722

(Bankr. S.D.N.Y. 1992) (quoting *In re Tucker Freight Lines, Inc*., 62 B.R. 213,

216 (Bankr. W.D. Mich. 1986)).  Following an analysis of § 1103(c) and the cases

interpreting it, *In re PWS Holding Corp*. held that § 1103(c) "limits liability of a

committee to willful misconduct or *ultra vires* acts."  228 F.3d 224, 246 (3rd Cir.

2000).  *See also In re WCI Cable, Inc*., 282 B.R. 457, 476-77 (Bankr. D. Or. 2002)

(approving of reasoning in *PWS Holding Corp*.).

The exculpatory clauses pertaining to the Creditors' Committee in this case

meet the standards enunciated in the case law as they do not extend to breaches of

fiduciary duties, willful, fraudulent or grossly negligent acts or omissions.  Under

the authorities noted, and in the absence of countervailing authorities from DJS,

the objections on this point will be overruled.

## II.    Exculpation of Trustee, Trustee's Representatives and Executive Board members

The next set of exculpation clauses concern the Trustee of the Creditors'

Trust, the Trustee's representatives, and members of the Executive Board.  The

question is whether the exculpation clauses contained in the plan and CTA are

"reasonable." *See In re Metricom, Inc.*, 275 B.R. 364, 369 (Bankr. N.D. Cal.

2002).

Several cases note that exculpation clauses are not *per se* unreasonable,

although they do require scrutiny on a case-by-case basis. *See United Artists*

*Theatre Co., v. Walton*, 315 F.3d 217, 229 (3rd Cir. 2003); *Bodenstein v. KPMG*

*Corporate Fin. LLC (In re DEC Int'l, Inc.*), 282 B.R. 423, 429 (W.D. Wis. 2002*)*.

The Oregon bankruptcy court in *WCI Cable* noted that within the Ninth Circuit,

the cases "appear not to favor exculpation or indemnification provisions that limit

liability for negligence or breaches of fiduciary duty." 282 B.R. at 479.[74]

However, the Third Circuit, in approving an exculpation clause that covered a

financial advisor's negligence, has noted:

> Financial advisors are an essential part of reorganizations. Our
> decision today recognizes the need for safeguards from the
> second-guessing of creditors and, ultimately, the courts. At the same
> time, it assigns courts their accustomed task of evaluating the
> process by which advice is given. If financial advisors take the
> appropriate steps to arrive at a result, the substance of that result
> should not be questioned. So understood, agreements to indemnify
> financial advisors for their negligence are reasonable under § 328(a)

---

[74] *WCI Cable* cites *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir. 1983) ("Although a trustee is not liable in any manner for mistakes in judgment where discretion is allowed, … he is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law …."); *Metricom, Inc.*, 275 B.R. 364 (disapproving broad indemnification and exculpation provision of financial advisor agreement based on no showing of reasonableness, but noting such provisions are not invalid *per se*.); and *In re Mortgage & Realty Tr.*, 123 B.R. 626 (Bankr. C.D. Cal. 1991) (declining to approve provisions of investment advisor agreement providing for indemnification extending only to acts other than negligence, gross negligence or willful misconduct).

of the Bankruptcy Code.

*United Artists Theatre Co.*, 315 F.3d at 234.  In coming to its decision, that court

considered how the professional at issue would be expected to perform under

applicable state law.  *Id*. at 229-30.  Other courts have considered whether such

clauses are customary in the market for those professionals.  *See In re Aloha*

*Airgroup, Inc*., 2005 WL 1156092 at *1-2 (Bankr. D. Haw. Feb. 24, 2005)

(approving under § 328(a) employment of financial advisor with a waiver of

claims made for ordinary negligence).

Neither Debtor nor the Creditors' Committee presented any evidence of

"industry custom."  However, § 6.9 of the CTA states the "Trustee, Trustee's

Representatives and the members of the Executive Board shall satisfy the standard

of care applicable to trustees under Idaho Code § 15-7-302."  That statute states:

> Except as otherwise provided by the terms of the trust, the trustee
> shall observe the standards in dealing with the trust assets that would
> be observed by a prudent man dealing with the property of another,
> and if the trustee has special skills or is named trustee on the basis of
> representations of special skills or expertise, he is under a duty to
> use those skills.

A trustee may be liable for damages under this statute for breach of fiduciary duty.

*See Kolouch v. First Sec. Bank (In re Kolouch)*, 911 P.2d 779, 788 (Idaho Ct. App.

1996).  And, as noted, the exculpation clauses do not purport to exclude claims for

fraud, gross negligence or willful misconduct.

Based on the foregoing, the Court finds the exculpation clause covering the

MEMORANDUM OF DECISION - 51

Trustee, his Representatives and the Executive Board members to be reasonable under the circumstances.  DJS' objections will be overruled.

### c.    Section 1129(a)(4)[75]

Section 1129(a)(4) requires:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

Professionals employed by a chapter 11 debtor or a creditors committee must have their employment approved by the court, *see* § 327(a), and their compensation is subject to court approval on notice and hearing, *see* §§ 330, 331. This situation exists until the plan is confirmed and becomes effective, after which the reorganized debtor is generally free to perform the plan without continued bankruptcy court supervision.  *In re WorldCom, Inc.*, 351 B.R. 130, 133 (Bankr. S.D.N.Y. 2006).  This would include retaining professionals without bankruptcy court approval of their employment or compensation, unless provided otherwise in the confirmed plan.[76]

---

[75] There is no objection raised under § 1129(a)(4) except by JRSCo.  Doc. No. 596 at 18-19.  JRSCo lacks standing on this issue.  The Court must still address, though, whether § 1129(a)(4) is met.

[76] Post-confirmation jurisdiction might exist, for example, to resolve disputes over such compensation.  *See Armstrong World Indus.* 348 B.R. 136, 207 (Bankr. D. Del. 2006); *see also WorldCom*, 351 B.R. at 133 (noting post-confirmation jurisdiction requires nexus and plan provision for retention and exercise).

MEMORANDUM OF DECISION - 52

Thus in *Beal Bank v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 689 (D.

Mass. 2000), the court held that, following confirmation, a reorganized debtor may

employ professionals as it deems necessary based on the fact that a reorganized

debtor is no longer subject to the bankruptcy court's jurisdiction except to the

extent mandated by the confirmed plan. The court cited *Heartland Fed. Sav. &*

*Loan v. Briscoe Enters. Ltd., II (In re Briscoe Enters. Ltd. II),* 138 B.R. 795, 809

(N.D. Tex. 1992), *rev'd on other grounds*, 994 F.2d 1160 (5th Cir. 1993). *Briscoe*

*Enterprises* held that, once a plan becomes effective, "[t]he reorganized debtor is a

new entity not subject to the jurisdiction of the bankruptcy court, except as

provided in the plan. Therefore, approval of fees for post-confirmation services is

not required. 11 U.S.C. § 1129(a)(4) calls for approval of fees for

pre-confirmation services[.]" *See also Lisanti v. Lubetkin (In re Lisanti Foods,*

*Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) (holding that while § 1129(a)(4) requires

approval of fees for pre-confirmation services, a plan may allow for payment of

post-confirmation fees in the ordinary course of business without bankruptcy court

approval); *In re Stations Holding Co.,* 2002 WL 31947022, at *3 (Bankr. D. Del.

Sept. 30, 2002) (confirming under § 1129(a)(4) a plan requiring bankruptcy court

approval for fees "to the extent of services provided before the Confirmation

Date"); *In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989)

(holding that "to the extent . . . fees are attributable to pre-Effective Date services,

Court approval is required before any payment of the fees is made under the

MEMORANDUM OF DECISION - 53

plan."). *See also* 4 W. Norton, Norton Bankr. L. and Prac. 2d § 92:11 (2007) (noting that § 1129(a)(4) "may not apply to attorney's fees incurred postconfirmation, on the rationale that a reorganized debtor is no longer a "debtor" subject to Code § 330. However, if the plan calls for continuing court supervision of postconfirmation attorney's fees, Code § 1129(a)(4) may apply." (footnote omitted)).

The Modified Joint Plan meets these requirements. Estate professionals' employment and their compensation through the Effective Date are subject to Court approval on notice and hearing.[77] After the Effective Date, compensation arrangements are controlled by the Modified Joint Plan and the CTA. Section 11.1.2 of the Modified Joint Plan specifically provides that after the Effective Date, the payment of fees of professionals retained by the Debtor, Trustee of the Creditors' Trust, Estate Representative or Executive Board "shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court." *See* Doc. No. 577 at 35.[78]

The process has been clearly described, and has been accepted by the balloting of the creditors on the Modified Joint Plan. The Court will appropriately exercise authority over all pre-Effective Date employment and compensation of

---

[77] *See* Doc. No. 577 at 39 (§ 14.1.2).

[78] *See also* Doc. No. 577 at 20 (§ 5.1.2.6), 22 (§ 5.2.6), 23 (§ 5.2.7), 24 (§ 5.2.9), 25 (§ 5.2.12) (provisions relating to post-confirmation/post-Effective Date employment and compensation of professionals); *Id*. at 34-36 (Art. XI regarding post-confirmation retention of jurisdiction); *see also id.* at Ex. 1.2.20 (CTA) at § 6.17, § 6.19.

MEMORANDUM OF DECISION - 54

estate-retained professionals.  The Modified Join Plan and CTA provide in

exhaustive detail a process for dealing with post-Effective Date employment,

services and compensation.  The Court retains jurisdiction to resolve disputes.

The requirements of § 1129(a)(4), as interpreted by case law and treatise, are met.

### d.    Miscellaneous and renewed objections

As noted, JRSCo has limited standing to object.  Its litany of objections has

been reviewed, and except as addressed above, none implicate JRSCo's pecuniary

interests or otherwise satisfy the standards for the Court to entertain them.  They

will be denied.

DJS has also raised other objections.  Some of these the Plan Proponents

have characterized with derision as nothing more than "wish list" items DJS

would like to see in a plan.  Others are "renewals" of objections DJS raised with

the First Joint Plan.  Regardless of how they might be characterized, the Court has

reviewed them all, and determines that they are not weight-bearing and do not

support denial of confirmation.  They are denied without discussion.

## CONCLUSION

All objections of DJS and JRSCo will be overruled.  The § 1127 Motion

will be granted.  The Court concludes that Debtor has satisfied all of the § 1129(a)

confirmation elements and the Modified Joint Plan will be confirmed.  The Plan

Proponents shall submit an appropriate order, consistent with the foregoing and

MEMORANDUM OF DECISION - 55

addressing the modifications or clarifications noted.

DATED:  August 28, 2007



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 56