# AMENDED AND RESTATED
# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## DJS PROPERTIES L.P.,

## AN IDAHO LIMITED PARTNERSHIP

PREPARED BY:

D. JOHN THORNTON & ASSOCIATES, P.A.
THE GOLDEN EAGLE AT FOREST RIVER
1101 WEST RIVER STREET, SUITE 340
P.O. BOX 7156
BOISE, ID 83707-1156
208/344-8600

DS 0568

# TABLE OF CONTENTS

* * * * * *

PAGE

ARTICLE 1    GENERAL PROVISIONS; INFORMATION FOR CERTIFICATE . . . . . . . . . . . . . . 1

ARTICLE 2    DEFINITIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 3    CAPITAL CONTRIBUTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 4    DISBURSEMENTS, ALLOCATIONS OF INCOME,
LOSSES AND OTHER ITEMS AMONG THE PARTNERS, ETC.  . . . . . . . . . . . . 10

ARTICLE 5    RIGHTS AND DUTIES OF THE GENERAL PARTNER . . . . . . . . . . . . . . . . . . 19

ARTICLE 6    TERMINATION OF A GENERAL PARTNER  . . . . . . . . . . . . . . . . . . . . . . 26

ARTICLE 7    RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS . . . . . . . . . . . . . . . . 28

ARTICLE 8    DISSOLUTION AND TERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE 9    BOOKS, RECORDS AND REPORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARTICLE 10   FISCAL AFFAIRS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 11   TRANSFERS; PURCHASE OF INTERESTS  . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 12   AMENDMENTS OF PARTNERSHIP DOCUMENTS . . . . . . . . . . . . . . . . . . . . 40

ARTICLE 13   MEETING AND VOTING RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ARTICLE 14   POWER OF ATTORNEY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE 15   ADDITIONAL PROVISIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

DS 0569

# AMENDED AND RESTATED
# AGREEMENT OF LIMITED PARTNERSHIP
# OF
# DJS PROPERTIES L.P.,
# AN IDAHO LIMITED PARTNERSHIP

\* \* \* \* \* \*

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is made effective as of the 6th day of March, 2000, by and between DON J. SIMPLOT, as the General Partner, and DON J. SIMPLOT, MICHAEL LLOYD SIMPLOT, DEBBIE SIMPLOT MCDONALD, CINDY SIMPLOT HAROIAN, JOHN DON SIMPLOT, APRIL SIMPLOT GWIN, JOHN RALSTIN SIMPLOT, MICHAEL LLOYD SIMPLOT, CUSTODIAN FOR ERIC MICHAEL SIMPLOT AND BREANNE ELIZABETH SIMPLOT, MINOR CHILDREN, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT, DEBBIE SIMPLOT MCDONALD, CUSTODIAN FOR PATRICK HENRY MCDONALD, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT, and CINDY SIMPLOT HAROIAN, CUSTODIAN FOR ANDREW CORTLAND HAROIAN, SAMANTHA ERIN HAROIAN, ISABELLE MORGAN HAROIAN AND JULIAN JAMES HAROIAN, MINOR CHILDREN, UNDER THE UNIFORM TRANSFERS TO MINORS ACT, as the Limited Partners, and such other Partners as may be added pursuant to the terms hereof.

## ARTICLE 1
## GENERAL PROVISIONS;
## INFORMATION FOR CERTIFICATE

**1.1    CONTINUATION OF THE PARTNERSHIP.** The General Partner and the Limited Partners hereby agree to continue the operations of the Partnership pursuant to the provisions of the Act, the terms and conditions set forth in this Amended and Restated Agreement and consistent with past practices. The General Partner shall from time to time execute or cause to be executed all such certificates and other documents, and do or cause to be done all such filings, recordings, publishing and other acts as the General Partner deems necessary or appropriate to comply with the requirements of law for the operation of the Partnership in all jurisdictions in which the Partnership shall desire to conduct business.

**1.2    NAME OF THE PARTNERSHIP.** The name of the Partnership is DJS PROPERTIES L.P., or such other name as shall be selected from time to time by the General Partner upon written notice to the Limited Partners.

**1.3    PURPOSE.** The primary purposes of the Partnership are: (a) to provide for sophisticated centralized management and development of the assets contributed by the Partners and accumulated by the Partnership; and (b) to enhance the respective financial positions of the Partners by establishing a significant capital base and pursuing short and long term investment, reinvestment, diversification and development strategies which will assist the Partnership in obtaining its asset growth, business and investment objectives during the term of the Partnership.

obtaining its asset growth, business and investment objectives during the term of the Partnership. Notwithstanding the above stated primary purposes, the Partnership shall be entitled to engage in any lawful business or investment activity as allowed under the Act. The Partnership shall own and operate the business, investment, real estate and/or other financial interests described in Schedule A attached hereto, or later acquired by the Partnership, participate in such developments, investments, loans, or acquisitions as the General Partner deems appropriate pursuant to the terms of the Agreement, and do and perform all things necessary or incidental to or connected with or growing out of such activities.

**1.4** **OFFICE OF THE PARTNERSHIP.** The office of the Partnership shall be located at P.O. Box 27, Boise, Idaho 83707, or such other place or places in the State of Idaho as the General Partner may from time to time designate by notice to the Limited Partners. In addition, the Partnership may maintain such other offices, including the primary office, as the General Partner deems advisable in Idaho or other jurisdictions.

**1.5** **TERM.** The formation of the Partnership shall commence no later than the filing of the Partnership's Certificate in the office of the Secretary. Prior to the filing of the Certificate, any activities of the Partnership shall constitute the activities of a general partnership. The Partnership shall be dissolved upon the happening of the earliest of any of the following events:

      **(a)**    December 31, 2050;

      **(b)**    Upon the lapse of ninety (90) days after the occurrence of an event resulting in the termination of the General Partner status of the last remaining General Partner if a Majority of remaining Partners fail to consent in writing to the election of a General Partner to continue the Partnership's business;

      **(c)**    All of the Partners elect to dissolve the Partnership; or

      **(d)**    Entry of decree of judicial dissolution pursuant to Idaho Code § 53-245.

**1.6** **GENERAL PARTNER.** The name of the General Partner is DON J. SIMPLOT.

**1.7** **AMENDMENT TO CERTIFICATE OF LIMITED PARTNERSHIP.** The General Partner shall cause an amendment to the Certificate to be filed in the office of the Secretary whenever required by Idaho Code § 53-209. In addition, the General Partner shall take any other action that may be required or advisable to maintain the Partnership as a limited partnership existing under the Act.

**1.8** **REGISTERED AGENT FOR SERVICE OF PROCESS.** The name and address of the agent for service of process on the Partnership is Ronald N. Graves, 999 Main Street, Suite 1300, Boise, Idaho 83702.

**DS 0571**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 2

## ARTICLE 2
### DEFINITIONS

Unless otherwise expressly provided herein or unless the context otherwise requires, the terms with initial capital letters in this Partnership Agreement shall be defined as follows:

**2.1**   **"ACT"** shall mean the Idaho Uniform Limited Partnership Act, codified at Title 53 Chapter 2, of the Idaho Code, and any corresponding provisions of succeeding law.

**2.2**   **"ADJUSTED CAPITAL ACCOUNT DEFICIT"** means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i) a credit to such Capital Account of any amounts that such Partner is obligated to restore pursuant to any provision of this Agreement, or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations § 1.704-2(g)(1) and § 1.704-2(i)(5); and (ii) a debit to such Capital Account of the items described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**2.3**   **"ADJUSTED CAPITAL CONTRIBUTION"** shall mean, with respect to each Partner as of a given date, such Partner's Capital Contribution pursuant to Sections 3.1 or 3.2 reduced by (a) any Distributions made to such Partner prior to such date, and (b) any special allocation of Partnership losses or deductions to such Partner pursuant to Section 4.2(c)(1) that are necessary to reflect the underlying economic arrangement of the Partners. In the event the assets of the Partnership are revalued pursuant to Section 4.4(b)(2), the Adjusted Capital Contributions of the Partners and Assignees shall be adjusted to reflect such revaluation.

**2.4**   **"AFFILIATE"** shall mean any Person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, another Person or entity as such term is defined by the Securities and Exchange Commission.

**2.5**   **"AGREEMENT"** shall mean this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

**2.6**   **"ASSIGNEE"** shall mean a Permitted Transferee to whom a Partner has made a Transfer of all or a portion of an Interest, provided that the Person has not been admitted to the Partnership as a Substituted General Partner or Substituted Limited Partner pursuant Sections 5.8 or 7.4. An Assignee is not permitted to become or exercise any rights as a Partner, including but not limited to voting rights, the ability to access the books and records of the Partnership or to Transfer an the Interest, and is entitled to receive only, to the extent of the Interest assigned, the Distributions and allocations of Partnership income and loss to which the Assignee's predecessor would have been entitled.

**DS 0572**

### 2.7    "CAPITAL ACCOUNT" AND "DRAWING ACCOUNT"

(a)    "CAPITAL ACCOUNT" shall mean the Capital Account to be maintained for each of the Partners in accordance with Treasury Regulations § 1.704-1(b)(2)(iv), which: (1) shall be increased by (i) the Capital Contributions of a Partner and (ii) allocations to a Partner of Partnership income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulations § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulations § 1.704-1(b)(4)(i) and (2) shall be decreased by (i) Distributions to a Partner, (ii) allocations to a Partner of expenditures of the Partnership of the type described in Code § 705(a)(2)(B), and (iii) allocations of Partnership loss and deductions (or items thereof), including loss and deduction described in Treasury Regulations § 1.704-1(b)(2)(iv)(g), but excluding items described in (2)(ii) above and loss or deduction described in Treasury Regulations § 1.704-1(b)(4)(i) or (b)(4)(iii), and (3) shall be otherwise adjusted in accordance with the additional rules set forth in Treasury Regulations § 1.704-1(b)(2)(iv).

(b)    "DRAWING ACCOUNT" shall mean the Drawing Account maintained for Partners who have either received a draw or made negative draws pursuant to Sections 3.2(b) and 4.1(b), and shall be equal to the sum of the outstanding draws received by the Partner or made by the Partner to the Partnership. A Drawing Account may have a debit or credit balance; however, no interest shall be paid to a Partner or due from a Partner on the basis of the debit or credit balance of a Partner's Drawing Account.

At the end of each year, the General Partner shall notify each Partner of the balance in each Partner's Capital Account and Drawing Account. The Capital Account and Drawing Account for each Partner shall be segregated on the Partnership's books; provided, however, that for tax accounting and reporting purposes, the Capital Account and the debit balance or credit balance of the Drawing Account for each Partner may be combined. For purposes of calculating liquidating Distributions, in accordance with Sections 4.1(c) and 8.4(c) the Capital Account and Drawing Account of each Partner shall be combined.

### 2.8    "CAPITAL CONTRIBUTION" means, with respect to each Partner, the amount of cash and the fair market value of other assets contributed, or deemed to have been contributed through the use of a nominee agreement in accordance with Section 3.6, by such Partner to the capital of the Partnership (net of liabilities secured by such contributed property that the Partnership is considered to assume or take subject to under Code § 752) as described in Sections 3.1 or 3.2; provided, however, that negative draws received from a Partner shall not be considered Capital Contributions.

### 2.9    "CERTIFICATE" means the certificate of limited partnership and any amendment thereto described in Section 1.7.

### 2.10    "CODE" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of succeeding law.

**DS 0573**

**2.11** **"DEFAULTING PARTNER"** means any Partner who has taken any action, voluntary or involuntary, that is in material contravention of this Agreement, including, but not limited to making a Transfer of an Interest to a Person who is not a Permitted Transferee or who is not otherwise in compliance with Articles 5, 6, 7 and 11. A Defaulting Partner shall be treated as an Assignee immediately upon the occurrence of the event resulting in the Partner becoming a Defaulting Partner.

**2.12** **"DISTRIBUTABLE CASH"** means, with respect to any fiscal period, any cash receipts received by the Partnership from operations in the ordinary course of business and investing activities, including, without limitation, income from invested Reserves, but only after deducting Operating Cash Expenses, debt service and other payments made in connection with any loan to the Partnership made by Persons who are not Partners, capital expenditures of the Partnership, and amounts set aside for the creation or addition to Reserves, as determined in the sole discretion of the General Partner. Distributable Cash does not include Capital Contributions or proceeds from the exchange, conversion, sale or refinancing of Partnership assets.

**2.13** **"DISTRIBUTIONS"** refer to cash or to other property, from any source, disbursed to Partners by the Partnership pursuant to Article 4, but shall not include any payments to the Partners made under the provisions of Sections 4.1(a)(1)(A), 4.1(a)(2)(A), 4.1(b), 5.2 or 5.3.

**2.14** **"GENERAL PARTNER"** means DON J. SIMPLOT, and any other Person who is admitted or elected as an additional General Partner pursuant to the terms of this Agreement. Reference to "General Partner" shall be to DON J. SIMPLOT initially, and if other General Partners are later added, to any one of the General Partners.

**2.15** **"IDAHO CODE"** means the Idaho Code, including corresponding provisions of succeeding law.

**2.16** **"INTEREST"** means the entire ownership interest of a Partner in the Partnership at a particular time, including the Adjusted Capital Contribution, Capital Account, Drawing Account and Percentage Interest of the Partner, and the right of such Partner to any and all benefit to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

**2.17** **"LIMITED PARTNERS"** refer to Persons who are admitted to the Partnership as a limited partner. Reference to a "Limited Partner" shall be to any one of the Limited Partners.

**2.18** **"LINEAL DESCENDANTS" AND "LINEAL ANCESTORS"** shall be defined in common law and shall include adopted individuals who were lawfully adopted prior to attaining the age of eighteen (18).

**2.19** **"MAJORITY OF THE PARTNERS, GENERAL PARTNERS OR LIMITED PARTNERS"** means the vote of the Partners who own, in the aggregate, more than fifty percent (50%) of the total outstanding Percentage Interests of the Partners entitled to vote. Each Partner shall have a

**DS 0574**

number of votes equal to the Percentage Interest of such Partner. The Percentage Interests held by Assignees (including Assignees who are Defaulting Partners) shall not be included in the calculation of the total outstanding Percentage Interests for voting purposes.

**2.20** **"OPERATING CASH EXPENSES"** means, with respect to any fiscal period, the amount of cash disbursed in the ordinary course of operations of the Partnership during such period, including, without limitation, all cash expenses, legal and accounting fees, taxes, and repair and maintenance expenses.

**2.21** **"PARTNERS"** refer collectively to the General Partner and the Limited Partners (including any Substituted General or Limited Partner), and reference to a "Partner" shall be to any one of the Partners. The term "Partners" shall not include Assignees, except to the extent the reference is made with respect to the rights of an Assignee to receive Distributions and allocations of Partnership income and loss and Transfers of Interests; provided, however, that the term Partners shall not include any other successors (including successors of a bankrupt General Partner as described in Section 6.3) of a Partner that have not been admitted as either a Substituted General or Limited Partner. The term "Initial Partners" shall include only those Partners identified in the preamble above and shall not include transferees of the Initial Partners.

**2.22** **"PARTNERSHIP"** refers to DJS PROPERTIES L.P., the partnership governed by this Agreement.

**2.23** **"PERCENTAGE INTEREST"** means each Partner's Adjusted Capital Contributions when compared to the total respective Adjusted Capital Contributions of all the Partners. In the event the ratio of Adjusted Capital Contributions changes during any fiscal year due to an additional Capital Contribution by a Partner, the determination of each Partner's Percentage Interest shall be made monthly. For purposes of the monthly determination of each Partner's Percentage Interest, any Capital Contributions made during the month shall be taken into account at the beginning of the next monthly period. In the event a Partner makes a Transfer of all or a portion of such Partner's Interest, or a Partner receives a Distribution from the Partnership, the determination of the Partners' relative Percentage Interests shall be calculated as if the Transfer or Distribution occurred on the last day of the month in which such event occurred. The initial Percentage Interests of the Partners shall be as set forth on Schedule B hereto.

**2.24** **"PERMITTED TRANSFEREE"** means the following:

      **(a)** A Person who is a Partner at the time of the subject Transfer;

      **(b)** The Lineal Descendants or Lineal Ancestors of a Partner;

      **(c)** A trust for the benefit of the Partner, the Partner's spouse or Lineal Descendants or Lineal Ancestors of a Partner;

**DS 0575**

(d)     The estate of a deceased Partner or guardian of an incapacitated Partner but only to the extent that the ultimate beneficiaries or guardian would qualify as Permitted Transferees under Sections 2.24(a), (b) or (c);

(e)     An entity at least fifty-one percent (51%) of the voting interests and at least seventy-five percent (75%) of the equity of which is owned by Persons who would qualify as Permitted Transferees under Section 2.24(a), (b), (c) or (d);

(f)     In the event of a dissolution of an entity which owns an Interest, the beneficiaries of a trust, or equity owners of a corporation, limited liability company or partnership but only to the extent that the successors would qualify as Permitted Transferees under Sections 2.24(a), (b), (c), (d), or (e); and

(g)     A Person who does not qualify as a Permitted Transferee within Sections 2.24(a), (b), (c), (d), (e) or (f), but who has satisfied the requirements of Section 11.2, and only to the extent that the subject Interest was purchased by the Person.

**2.25** **"PERSON"** means any individual, partnership, limited liability company, corporation, trust or other entity.

**2.26** **"REFINANCING"** means any refinancing or borrowing by the Partnership, secured by the Partnership's assets, other than borrowing in connection with the formation of the Partnership.

**2.27** **"RESERVES"** means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which may be maintained by the Partnership for any Partnership purpose including, but not limited to, working capital, future investments and to pay taxes, insurance, debt service, or other costs or expenses of the Partnership, as determined in the sole discretion of the General Partner.

**2.28** **"SALE"** means any transaction (other than the receipt of Capital Contributions) of the Partnership not in the ordinary course of business or investing activity, including, without limitation, sales (including condemnations), exchanges or other dispositions of real or personal property, recoveries of damage awards and insurance proceeds (other than business interruption insurance proceeds), but excluding any Refinancing.

**2.29** **"SALE OR REFINANCING PROCEEDS," "SALE PROCEEDS" OR "REFINANCING PROCEEDS"** as the context requires, means any cash receipts of the Partnership arising from a Sale or Refinancing, less the following:

(a)     The amount necessary for the payment of all debts and obligations of the Partnership related to the particular Sale or Refinancing;

(b)     Amount deemed necessary in the sole discretion of the General Partner to complete any diversification or reinvestment strategy; and

**DS 0576**

(c)     The amount that the General Partner, in its sole discretion, determines to be appropriate to provide Reserves to pay Operating Cash Expenses, taxes, insurance, debt service on loans made by Persons who are not Partners, repairs, replacements or renewals, or other costs or expenses of the Partnership (including costs of improvements or additions in connection with the property).

**2.30**   **"SECRETARY"** means the Idaho Secretary of State.

**2.31**   **"SUBSTITUTED GENERAL PARTNER"** means a Person to whom a General Partner has made a Transfer of all or a portion of an Interest, and who has been admitted to the Partnership as a General Partner pursuant to the terms of this Agreement.

**2.32**   **"SUBSTITUTED LIMITED PARTNER"** means a Person to whom a Limited Partner has made a Transfer of all or a portion of an Interest, and has been admitted to the Partnership as a Limited Partner pursuant to the terms of this Agreement.

**2.33**   **"TRANSFER"** means (a) to directly or indirectly sell, gift, assign, pledge or otherwise encumber, voluntarily or involuntarily, all or any part of an Interest, (b) any event which impacts the beneficial or legal title or ownership of an Interest, and (c) any event which results in a deemed transfer of an Interest under Code § 2704. A Transfer of an Interest will also be treated as occurring upon the change in the ownership of an entity who is a Partner that results in the entity failing to satisfy the definition of a Permitted Transferee under Section 2.24(e).

**2.34**   **"TREASURY REGULATIONS"** means the regulations promulgated under the Code, as amended, including corresponding provisions of succeeding regulations.

## ARTICLE 3
### CAPITAL CONTRIBUTIONS

**3.1**   **LIMITED PARTNERS.**

(a)     **INITIAL CAPITAL CONTRIBUTIONS.** The initial Capital Contributions made by the Limited Partners shall be set forth on Schedule C hereto. No Limited Partner shall be required to make any additional Capital Contributions to the Partnership.

(b)     **VOLUNTARY ADDITIONAL CONTRIBUTIONS; NEGATIVE DRAWS.** In addition to making the initial Capital Contribution set forth in Section 3.1(a), the Limited Partners may, upon notice of a voluntary Capital Contribution call given as provided below by the General Partner, make voluntary additional Capital Contributions to the Partnership. Any voluntary Capital Contribution call made pursuant to this Section shall be made available to all the Partners in proportion to the Percentage Interests held by each. In order to make a voluntary Capital Contribution call, the General Partner shall give to each Limited Partner written notice of the amount of the call. Any Limited Partner who elects to make a voluntary additional Capital Contribution shall pay such amount to the

Partnership within sixty (60) days after notice of the call. If any Partner elects not to make an additional Capital Contribution, the General Partner shall give written notice to the Partners who elected to make additional Contributions and those Partners shall have thirty (30) days from the date of the receipt of the written notice in which to elect to contribute their pro rata share of the additional Capital Contribution not made by such Partner. Amounts received by the Partnership as negative draws from a Partner shall not be treated as a Capital Contribution and shall be repaid, without interest, in the sole discretion of the General Partner; provided, however, that all outstanding negative draws from a Limited Partner shall be payable upon the liquidation of such Limited Partner's Interest if the Partnership continues, or upon the dissolution of the Partnership in accordance with Article 8.

**3.2    GENERAL PARTNER.**

(a)    **CAPITAL CONTRIBUTIONS.** The initial Capital Contributions made by the General Partner shall be set forth on Schedule C hereto.

(b)    **ADDITIONAL CAPITAL CONTRIBUTIONS; NEGATIVE DRAWS.** In accordance with the obligation of a general partner under the Act, the General Partner shall contribute to the Partnership any amounts necessary or appropriate for the Partnership to pay, when due, any costs, expenses or liabilities of the Partnership to the extent the Partnership is unable to satisfy its debts and obligations, except as provided in Section 3.4. Amounts received by the Partnership as negative draws from a General Partner shall not be treated as a Capital Contribution and shall be repaid without interest in the sole discretion of the General Partner; provided, however, that all outstanding negative draws from a General Partner shall be payable upon the liquidation of such Partner's Interest if the Partnership continues, or upon the dissolution of the Partnership in accordance with Article 8.

(c)    **MINIMUM ADJUSTED CAPITAL CONTRIBUTIONS OF THE GENERAL PARTNER.** The aggregate Adjusted Capital Contributions, as determined in accordance with Section 2.3, of the General Partner must at all times be at least equal to one percent (1%) of the total Adjusted Capital Contributions of the Partnership. Whenever a Limited Partner makes a Capital Contribution, the General Partner must immediately contribute, to the extent necessary, sufficient capital to insure that the General Partner's Adjusted Capital Contribution satisfies the one percent (1%) floor above. Each General Partner shall contribute on a pro rata basis determined in accordance with their Percentage Interests. This Section 3.2(c) is intended to ensure that the Percentage Interests (including Limited Partner Percentage Interests held by the General Partner) of the General Partner, taken together in each material item of Partnership income, gain, loss, deduction or credit, is equal to at least one percent (1%) of each such item at all times during the existence of the Partnership.

**3.3    INTEREST.** No Partner shall be entitled to receive interest on the Partner's Capital Contribution, Capital Account or Drawing Account.

**DS 0578**

**3.4** **LIMITATION ON ADDITIONAL CAPITAL CONTRIBUTIONS.** Notwithstanding Sections 3.1 or 3.2, no Partner shall make any Capital Contribution to the Partnership if such a Capital Contribution would either (a) cause a deemed transfer of all or a portion of an Interest under Code § 2704 or Treasury Regulations promulgated thereunder or (b) cause the Partnership to be treated as an investment company under Code § 721(b) or applicable Treasury Regulations. In the event that either provision of the preceding sentence should prevent a Capital Contribution, instead of making such Capital Contribution, the Partner shall instead be deemed to have made a negative draw to the Partnership.

**3.5** **FORM OF CONTRIBUTION.** The Capital Contribution of a Partner may be in cash, other tangible property, intangible property or labor or services actually performed. Valuation of all Capital Contributions is subject to Section 4.6(a).

**3.6** **CONTRIBUTIONS VIA NOMINEE AGREEMENT.** The General Partner may accept direct transfers of title to property to the Partnership as Capital Contributions or in the sole discretion of the General Partner, Capital Contributions may be made via a written nominee agreement transferring beneficial title to the Partnership followed by a transfer of legal title of the property that is the subject of the nominee agreement to the Partnership as soon as reasonably practical.

### ARTICLE 4
### DISBURSEMENTS, ALLOCATIONS OF INCOME,
### LOSSES AND OTHER ITEMS AMONG THE PARTNERS, ETC.

**4.1** **DISBURSEMENTS TO THE PARTNERS.**

(a) **CASH DISTRIBUTIONS.**

(1) **DISTRIBUTABLE CASH.** Distributable Cash will be annually paid (as soon as is reasonably practicable after the close of the calendar or fiscal year, as the case may be) to the Partners of record as of the close of the year, in accordance with the following:

(A) First, to the Partner(s) in such amount, if any, as is necessary to make principal payments in accordance with the terms of any loan made to the Partnership by a Partner or Partners;

(B) Second, ten percent (10%) of the remaining Distributable Cash to the Partners in accordance with their Percentage Interests; and

(C) Third, the balance of the Distributable Cash shall be disbursed only in the event and in the amounts determined by the sole discretion of General Partner.

**DS 0579**

Notwithstanding the foregoing, in the event a Partner should breach the terms of this Agreement, the Partnership may offset the damages caused by such Partner against any amount to be distributed to such Partner pursuant to this Section 4.1(a).

(2)     **CERTAIN SALES OR REFINANCING PROCEEDS.** In the event that Sale or Refinancing Proceeds are available for disbursement (other than in the event of a dissolution of the Partnership or a sale of all or substantially all of the Partnership's property which is in connection with an asset investment or diversification strategy of the Partnership), it is the Partners' intention that the General Partner, in its sole discretion, consider whether a disbursement of such proceeds should be made. If the General Partner determines that all or any portion of such Sale or Refinancing Proceeds shall be disbursed, Distributions shall be made in accordance with the following:

(A)     First, to the Partner(s) in such amount, if any, as is necessary to make principal payments in accordance with the terms of any loan made to the Partnership by a Partner or Partners; and

(B)     Second, to the Partners in accordance with their Percentage Interests.

Notwithstanding the foregoing, in the event a Partner should breach the terms of this Agreement, the Partnership may offset the damages caused by such Partner against any amount to be distributed to such Partner pursuant to this Section 4.1(a).

(3)     **TIMING.** Distributions, other than in partial or complete liquidation of a Partner's Interest, shall be deemed made as of the last day of the fiscal year of the Partnership for all purposes.

(b)     **DRAWS.** Notwithstanding the foregoing, the General Partner may disburse cash of the Partnership as draws in the amounts and to such Partners as the General Partner shall determine in its sole discretion. Any such draw need not be in accordance with the Partners' Percentage Interests. Amounts received by a Partner as a draw shall not be treated as a Distribution from the Partnership except to the extent provided in Section 4.1(c) in liquidation of a Partner's Interest or Article 8 upon dissolution of the Partnership.

(c)     **LIQUIDATION OF A PARTNER'S INTEREST.** Upon the agreement of a Partner and in the sole discretion of the General Partner, the Partnership shall disburse Partnership assets to the Partner in partial or full liquidation of the Partner's Interest; provided, however, that prior to a General Partner receiving a Distribution in partial or full satisfaction of the General Partner's Interest, a Majority of the remaining Partners must consent to the Distribution. In determining the amount of cash or property to be received

**DS 0580**

by a Partner in partial or full liquidation of the Partner's Interest, the debit balance, if any, of the Partner's Drawing Account shall be taken into account in a manner similar to that provided in Section 8.4 with respect to the Distributions upon dissolution of the Partnership. Notwithstanding the foregoing, no Partner shall have the right to demand that a Distribution be made in full or partial liquidation of such Partner's Interest. All liquidating Distributions shall be accounted for in accordance with Code §§ 731, 736, 737, 741, 751 and any other applicable authority.

      **(d)**    **DISSOLUTION OF THE PARTNERSHIP.**  Notwithstanding the foregoing, Distributions upon the dissolution of the Partnership shall be made to each Partner in the manner set forth in Article 8. All Distributions upon dissolution of the Partnership shall be accounted for in accordance with Code §§ 731, 736, 737, 741, 751 and any other applicable authority.

      **(e)**    **LIMITATIONS ON DISTRIBUTIONS AND DRAWS.**  A Partner may not receive a Distribution or draw from the Partnership to the extent that, after giving effect to the Distribution or draw, all liabilities of the Partnership, other than liabilities to Partners on account of their Partnership Interests, exceed the fair market value of the Partnership assets.

**4.2**    **ALLOCATION OF INCOME AND LOSSES.**

      **(a)**    **ALLOCATION OF INCOME.**  Except as set forth in Section 4.2(c) below and on Schedule D attached hereto, income and income exempt from federal income tax for each fiscal year of the Partnership shall be allocated for all purposes to the Partners in accordance with their Percentage Interests.

      **(b)**    **ALLOCATION OF LOSSES.**  Except as set forth in Section 4.2(c) below and on Schedule D attached hereto, losses and expenditures not deductible in computing federal income tax for each fiscal year of the Partnership shall be allocated for all purposes to the Partners in accordance with their Percentage Interests. The items of loss and deduction allocated pursuant to this Section 4.2(b) shall not exceed the maximum amount of such items of loss and deduction that can be so allocated without causing any Limited Partner who is not also a General Partner to have an Adjusted Capital Account Deficit. In the event some but not all of the Limited Partners would otherwise have Adjusted Capital Account Deficits as a consequence of an allocation of losses pursuant to this Section 4.2(b), the limitation set forth in the preceding sentence shall be applied on a Partner by Partner basis so as to allocate the maximum permissible losses to each Partner under Treasury Regulations § 1.704-1(b)(2)(ii)(d). All losses in excess of the limitations set forth in this Section 4.2(b) for Limited Partners, shall be allocated to the General Partner.

**DS 0581**

(c)    SPECIAL ALLOCATIONS.

(1)    ALLOCATIONS TO REFLECT ECONOMIC ARRANGEMENT OF
PARTNERS.  Notwithstanding the provisions of Sections 4.2(a) and (b) requiring
Partnership income and losses to be allocated in accordance with the Partners'
Percentage Interests, the Partners understand that special allocations of Partnership
tax items, including but not limited to income, gain, loss, credits and deductions,
may be necessary to accurately reflect the underlying economic arrangement of the
Partners.  In the event one or more Partners believe that such an allocation is
necessary, the General Partner shall present the allocation for approval by a
Majority of the Partners.  Allocations approved in this manner, if any, shall be set
forth on Schedule D attached hereto.

(2)    MINIMUM GAIN CHARGEBACK.  Except as otherwise provided in
Treasury Regulations § 1.704-2(f) notwithstanding any other provision of this
Section 4.2, if there is a net decrease in Partnership Minimum Gain, as defined in
Treasury Regulations §§ 1.704-2(b)(2) and 1.704-2(d), during any Partnership
fiscal year, each Partner shall be specially allocated a pro rata portion of items of
Partnership income and gain for such year (and, if necessary, subsequent years) in
an amount equal to such Partner's share of the net decrease in Partnership
Minimum Gain, determined in accordance with Treasury Regulations § 1.704-2(g).
Allocations pursuant to the previous sentence shall be made in proportion to the
respective amounts required to be allocated to each Partner pursuant thereto.  The
items to be so allocated shall be determined in accordance with Treasury
Regulations §§ 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 4.2(c)(2) is intended
to comply with the minimum gain chargeback requirement in Treasury Regulations
§ 1.704-2(f) and shall be interpreted consistently therewith.

(3)    PARTNER MINIMUM GAIN CHARGEBACK.  Except as otherwise
provided in Treasury Regulations § 1.704-2(i)(4), notwithstanding any other
provision of this Section 4.2, if there is a net decrease in Partner Nonrecourse Debt
Minimum Gain (as defined below) attributable to a Partner Nonrecourse Debt (as
defined in Treasury Regulation § 1.704-2(b)(4)) during any fiscal year, each
Partner who has a share of the Partner Nonrecourse Debt Minimum Gain
attributable to such Partner Nonrecourse Debt, determined in accordance with
Treasury Regulations § 1.704-2(i)(5), shall be specially allocated a pro rata portion
of items of Partnership net operating income and gain for such fiscal year (and, if
necessary, subsequent fiscal years) in an amount equal to such Partner's share of
the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such
Partner Nonrecourse Debt, determined in accordance with Treasury Regulations
§ 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in
proportion to the respective amounts required to be allocated to each Partner
pursuant thereto.  The items to be so allocated shall be determined in accordance
with Treasury Regulations §§ 1.704-2(i)(4) and 1.704-2(j)(2).  This Section
4.2(c)(3) is intended to comply with the minimum gain chargeback requirement in

DS 0582

Treasury Regulations § 1.704-2(i)(4) and shall be interpreted consistently therewith. For purposes of this Agreement, "Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations § 1.704-2(i)(3).

(4)    **QUALIFIED INCOME OFFSET.** In the event any Limited Partner who is not also a General Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), § 1.704-1(b)(2)(ii)(d)(5), or § 1.704-1(b)(2)(ii)(d)(6), a pro rata portion of items of Partnership gross income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Limited Partner as quickly as possible, provided that an allocation pursuant to this Section 4.2(c)(4) shall be made only if and to the extent that such Limited Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4.2(c) have been tentatively made as if this Section 4.2(c)(4) were not in the Agreement.

(5)    **GROSS INCOME ALLOCATION.** In the event any Limited Partner who is not also a General Partner has a deficit Capital Account at the end of any Partnership fiscal year which is in excess of the sum of: (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations § 1.704-2(g)(1) and § 1.704-2(i)(5), each such Limited Partner shall be specially allocated a pro rata portion of items of Partnership gross income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c)(5) shall be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4.2(c) have been made as if Section 4.2(c)(4) hereof and this Section were not in the Agreement.

(6)    **NONRECOURSE DEDUCTIONS.** Nonrecourse Deductions, as that term is defined in Treasury Regulations § 1.704-2(b)(1), for any fiscal year or other period shall be specially allocated among the Partners in proportion to their Percentage Interests.

(7)    **PARTNER NONRECOURSE DEDUCTIONS.** In accordance with Treasury Regulations § 1.704-2(i)(1), any Partner Nonrecourse Deductions, as that term is defined in Treasury Regulations §§ 1.704-2(i)(1) and 1.704-2(i)(2), for any fiscal year or other period shall be specially allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable.

DS 0583

(8)    **CODE § 754 ADJUSTMENTS.**  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code §§ 734(b) or 743(b) is required pursuant to Treasury Regulations §§ 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining the Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in accordance with their Percentage Interests in the event Treasury Regulations § 1.704-1(b)(2)(iv)(m)(2) applies, or to the Partner to whom the Distribution was made, in the event Treasury Regulations § 1.704-1(b)(2)(iv)(m)(4) applies.

(9)    **CURATIVE ALLOCATIONS.**    The allocations set forth in Sections 4.2(c)(2) through 4.2(c)(8) (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 4.2(c)(9).  Therefore, notwithstanding any other provision of this Article 4 (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of the Agreement and all Partnership items were allocated pursuant to Sections 4.2(a) and 4.2(b).  In exercising their sole discretion under this Section 4.2(c)(9), the General Partner shall take into account future Regulatory Allocations under Sections 4.2(c)(2) and 4.2(c)(3) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.2(c)(6) and 4.2(c)(7).

(d)    **MANDATORY TAX ALLOCATIONS UNDER CODE § 704(C).**  Notwithstanding anything to the contrary in this Section 4.2, any income, gain, loss, or deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take into account any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and the fair market value of that property at the time it was contributed to the Partnership in the manner provided by and to the full extent required by Code § 704(c) and the Treasury Regulations thereunder; provided, however, with respect to any such property, the Capital Accounts of the Partners shall be adjusted in accordance with Treasury Regulations § 1.704-1(b)(2)(iv)(g) or any successor provision for allocations of depreciation, depletion, amortization, and gain or loss, as computed for book purposes.  Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant

to this Section 4.2(d) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of profits, losses, or other items, or distributions pursuant to any provision of this Agreement.

**4.3    CERTAIN ESTATE AND GIFT TAX PROVISIONS.**

(a)    **CODE § 2701.** The Partners intend that the rights of all Interests in the Partnership as to income and capital shall not differ, that nonlapsing differences between General and Limited Partners shall exist only with regard to management rights and limitations on liability, and that therefore all Interests in the Partnership shall be of the same class within the meaning of Code § 2701(a)(2)(B) and Treasury Regulation § 25.2701-l(c)(3), and shall be construed accordingly. The Partners also intend that no Partner, acting individually or in concert with an "applicable family member[(s)]," as that term is defined for purposes of Code § 2701, shall have the right to alter the liability of a transferee of an Interest within the meaning of Treasury Regulation § 25.2701-1(c)(3), and if any Partner is nonetheless found to have such a right, it is hereby waived. The Partners further intend that no Interest shall carry a liquidation, put, call, or conversion right, the exercise or nonexercise of which affects the value of a transferred Interest under Code §§ 2701(b)(1)(B) and 2701(c)(2)(A) and Treasury Regulations § 25.2701-2(b)(2), and if any Partner is nonetheless found to have such a right, it is hereby waived.

(b)    **CODE § 2703.** The Partners acknowledge that they have considered the provisions of Code § 2703, and in that connection, have examined potential valuation methods for Interests to be purchased hereunder, including without limitation the liquidation and going concern value of the Partnership, anticipated changes in the value of the Partnership, as well as similar arrangements entered into by persons in arms-length, bona fide business transactions in the same line of business. The Partners intend that the rights and restrictions created hereunder, including without limitation Section 11.3, shall not be a device to Transfer Interests to the natural objects of a Partner's bounty for less than full and adequate consideration and that the Agreement not be so construed. Accordingly, the Partners intend that this Agreement comport with and meet the requirements of Code § 2703(b) and Treasury Regulation § 25.2703-1(b), so that the value of the Interests, for purposes of gift, estate, and generation skipping transfer taxes, and for state law, shall be determined with regard to the provisions of this Agreement.

(c)    **CODE § 2042.** Notwithstanding any authority of the General Partner or any Limited Partner granted by this Agreement or under the Act, if the occasion arises whereupon the Partnership becomes the owner of an insurance policy on the life of any Partner, the insured Partner shall have no authority (i) to vote, (ii) to otherwise act on behalf of the Partnership, or (iii) to possess or exercise any "incidents of ownership" with respect to such policy. If the insured Partner is the sole General Partner, then a special General Partner shall be appointed by a Majority of the remaining Partners solely for the purpose of exercising the incidents of ownership on behalf of the Partnership with respect to a specified insurance policy owned by the Partnership. Such General Partner and the

**DS 0585**

subject insurance policies shall be set forth on Schedule E attached hereto. The purpose of this limitation is to insure that none of the "incidents of ownership," within the meaning of Code § 2042(2) and Treasury Regulation § 20.2042-1, associated with the policy are attributed to the insured Partner. These "incidents of ownership" relate to any power associated with the economic benefit of the policy and include without limitation the power to (i) change the beneficiary, (ii) surrender or cancel the policy, (iii) assign the policy, (iv) revoke an assignment, (v) pledge the policy for a loan, or (vi) obtain from the insurer a loan against the surrender value of the policy. This Agreement shall be construed to provide that the insured Partner shall have no such incidents of ownership of a life insurance policy on the insured Partner's life, either individually or in their capacity as a Partner.

(d)    **PARTNERSHIP POWERS REGARDING INSURANCE ON LIFE OF A PARTNER.** With respect to an insurance policy owned by the Partnership on the life of any Partner or spouse of any Partner, notwithstanding any provision in this Agreement to the contrary, neither the Partnership nor any Partner or combination thereof, shall have the authority on behalf of the Partnership to (i) assign the policy, (ii) pledge the policy for a loan, or (iii) obtain from the insurer a loan against the surrender value of the policy except as provided in Section 5.1(s).

**4.4    DETERMINATION ADJUSTMENTS.**

(a)    **COMPUTATION OF INCOME AND LOSS.** The income and loss of the Partnership shall be determined at the end of each fiscal year of the Partnership and at such other time as the General Partner shall determine. Except as provided in Section 4.4(b), the income and loss of the Partnership shall be determined and calculated in accordance with federal income tax rules and principles, including Code § 706(d) as it relates to the varying interests of the Partners.

(b)    **ADJUSTMENTS TO INCOME AND LOSS.** For purposes of computing income or loss on the disposition of a Partnership asset or for purposes of determining the cost recovery, depreciation or amortization deduction with respect to any asset, the Partnership shall use such asset's book value determined in accordance with Treasury Regulations § 1.704-1(b). Consequently, each asset's book value shall be equal to its adjusted basis for federal income tax purposes, except as follows:

(1)    The initial book value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the General Partner;

(2)    The book value of all Partnership assets and the gross amount of all draws to Partners shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as to the following items: (i) in connection with the acquisition of an Interest by a new or existing Partner for more than a *de minimis* capital contribution; (ii) in connection with the dissolution of the

**DS 0586**

Partnership as defined in Treasury Regulations § 1.704-1(b)(2)(ii)(g); or (iii) in connection with a more than *de minimis* Distribution to a retiring or a continuing Partner as consideration for its Interest. In the event of any revaluation of any Partnership assets hereunder, the drawing accounts of the Partners shall be treated as assets of the Partnership equal in value to the gross amount of the draws and the Capital Accounts of the Partners shall be adjusted and allocated in accordance with the Percentage Interests of the Partners, including continuing adjustments for depreciation, to the extent provided in Treasury Regulations § 1.704-1(b)(2)(iv)(f), to reflect such revaluation; and

(3)     If the book value of an asset has been determined pursuant to this Section 4.4(b), such book value shall thereafter be used, and shall thereafter be adjusted by depreciation or amortization, if any, taken into account with respect to such asset, for purposes of computing income or loss.

4.5     **ALLOCATION BETWEEN ASSIGNOR AND ASSIGNEE.** For all purposes, the portion of the income or losses of the Partnership for any fiscal year of the Partnership during which a Partner makes a Transfer of all or a portion of its Interest, that is allocable in respect of such Interest, shall be apportioned between the transferring Partner and the Assignee on the basis of actual performance of the Partnership during the months of the fiscal year that each is the owner thereof. The Partnership shall determine the portion of its income or loss attributable to each month of the fiscal year using a one-month convention and employing a reasonable interim closing of the books method.

4.6     **CAPITAL ACCOUNTS.**

(a)     If the parties hereto are not able to agree on the fair market value of any property contributed to or distributed by the Partnership, the Partnership's accounting firm shall determine such value. The Partnership's accounting firm may hire such experts or obtain such appraisals as it deems appropriate in arriving at the fair market value of such property.

(b)     It is the intent of the Partnership that the Capital Accounts of all Partners be determined and maintained in accordance with the principles of Treasury Regulations § 1.704-1(b) at all times throughout the full term of the Partnership. In the event the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership or any Partner), are computed in order to comply with such Regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner from operations or upon the dissolution of the Partnership. The General Partner also shall: (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Treasury

**DS 0587**

Regulations § 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events (for example, the acquisition by the Partnership of oil or gas properties) might otherwise cause this Agreement not to comply with Regulations § 1.704-1(b). The parties acknowledge that any adjustments to the Capital Accounts will be made in order to comply with certain income-tax provisions of the above-referenced Treasury Regulations only, and all Interests in the Partnership are intended to be of the same class within the meaning of Code § 2701(a)(2)(B).

## ARTICLE 5
## RIGHTS AND DUTIES OF THE GENERAL PARTNER

**5.1    MANAGEMENT AND CONTROL.**  Subject to Sections 4.3(c) and (d), the General Partner shall have exclusive management and control of the business of the Partnership, and all decisions regarding the management and affairs of the Partnership shall be made by the General Partner. The General Partner shall have all the rights and powers of a general partner as provided in the Act and as otherwise provided by law.  Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in its sole judgment, are necessary, proper or desirable to carry out the aforementioned duties and responsibilities including, but not limited to, the right, power and authority from time to time to do those things specified elsewhere in this Agreement and the following:

(a)    To expend the capital and revenues of the Partnership in furtherance of the business and investment strategies of the Partnership;

(b)    To retain non-income producing assets within the Partnership and to develop long-term investment strategies that may or may not result in short-term income to the Partnership;

(c)    To acquire, improve, manage, charter, operate, sell, transfer, exchange, encumber, pledge, borrow against and dispose of any real, personal or intangible property of the Partnership;

(d)    To form subsidiary entities including, but not limited to, single member limited liability companies owned by the Partnership;

(e)    To cause the Partnership to reimburse a General Partner for reasonable out-of-pocket expenses actually incurred by the General Partner in connection with the Partnership's business including, but not limited to, any expense incurred in the organization of the Partnership or in connection with the offer and/or sale of Interests;

(f)    Employ and dismiss from employment any and all employees, agents, independent contractors, investment advisors, management companies or professionals, attorneys and accountants, including Affiliates of a General Partner;

**DS 0588**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P 19

(g)    Subject to Section 10.4, to enter into notes, lending, security agreements/arrangements, nominee agreements, voting trusts, deeds of trust, credit arrangements, management agreements and any other similar or related agreement or arrangement involving the real, personal or intangible property of the Partnership as the General Partner deems necessary or appropriate to accomplish the purposes of the Partnership;

(h)    To borrow money on a secured or unsecured basis from individuals, banks and other lending institutions in order to finance or refinance Partnership assets, to meet other Partnership obligations, to provide Partnership working capital and for any other Partnership purposes; to execute promissory notes, deeds of trust and assignments of Partnership property and such other security instruments as a lender of funds may require to secure repayment of such borrowing; to change, substitute, or amend such borrowing as, in their judgment, is in the best interest of the Partnership, and to execute any and all documents which may be required by the bank or other financial institution or other source to establish an escrow, trust agreement, or trust account with the bank, institution or other source for the receipt of funds, sale proceeds and other payments and the disbursements thereof to service such loan(s);

(i)    To enter into margin agreements/arrangements, short and long sales, and hedging agreements/arrangements with respect to marketable and nonmarketable securities;

(j)    Subject to Section 5.3, to borrow monies from a General Partner at commercially reasonable rates, or allow any Affiliate of a General Partner to loan monies to the Partnership at commercially reasonable rates for use by the Partnership in its operations, the aggregate amount of which shall become an obligation of the Partnership to a General Partner or such Affiliate, and shall be repaid with interest to such General Partner or such Affiliate out of gross receipts of the Partnership before any Distributions to the Partners, in accordance with Section 4.1 hereof (provided, however, that notwithstanding any other provision herein, the Partners acknowledge that any such repayment shall be treated as a payment of interest or principal with respect to such loan, as the case may be, rather than a return of Capital Contributions to such Partner), with no prepayment charge or penalty permitted on such a loan, and such amounts shall constitute a loan to the Partnership by such General Partner or the Affiliate of such General Partner and not a Capital Contribution;

(k)    To purchase at the expense of the Partnership such liability, casualty, property, and other insurance as the General Partner, in its sole discretion, deems advisable to protect the Partnership's assets against loss or claims of any nature; provided, however, that the General Partner shall not be liable to the Partnership or to other Partners for failure to purchase any insurance or if coverage should prove inadequate;

(l)    To the extent that funds of the Partnership are, in the sole discretion of the General Partner, not required for the conduct of the Partnership's business, temporarily invest the excess funds in the manner set forth in Section 10.2;

**DS 0589**

**(m)**    To sue and be sued, complain, defend, settle or compromise with respect to any claim in favor of or against the Partnership, in the name and on behalf of the Partnership;

**(n)**    To prosecute and protect and defend or cause to be protected and defended all patent, patent rights, trade names, trademarks and service marks, and all applications with respect thereto that may be held by the Partnership;

**(o)**    To enter into, execute, amend, supplement, acknowledge and deliver any and all contracts, agreements, licenses or other instruments necessary, proper or desirable to carry out the purposes of the Partnership;

**(p)**    To determine, in accordance with Section 2.12, the Partnership's Distributable Cash;

**(q)**    To appoint or remove by Majority vote one or more of the General Partners, if more than one should then be acting, to act as a Managing Partner or Partners who shall have the power to exercise on behalf of the Partnership all of the rights and powers given hereunder to the General Partner, without the consent or vote of the remaining General Partners, if more than one should then be acting. In the event of such an appointment, the remaining General Partners hereby agree to execute such powers of attorney and/or other documentation as may reasonably be required for such managing Partner or Partners to carry out the General Partners' management duties and powers consistent with this Agreement;

**(r)**    To make loans of Partnership assets/funds and to pledge Partnership assets to secure loans to other entities;

**(s)**    Subject to Sections 4.3(c) and (d), to enter into insurance arrangements and agreements including, but not limited to, split dollar agreements/arrangements, nonqualified deferred compensation arrangements, and any other insurance arrangement deemed appropriate; and

**(t)**    To invest in stock subject to Rule 144 and similar restrictions imposed by the Securities and Exchange Commission and to invest in stock qualifying for preferred treatment under Code § 1202.

**5.2    COMPENSATION; REIMBURSEMENT.**  The General Partner shall be entitled to receive fair compensation for managing the business interests and assets of the Partnership and performing other duties contemplated by this Agreement. In addition, the General Partner shall be entitled to receive: (a) its respective share of Distributions of Partnership funds as set forth in Articles 4 and 8; (b) reimbursement for amounts expended as set forth in Section 5.1(e); and (c) payments pursuant to contracts entered into as provided in Section 5.3. A General Partner shall have the right to waive any right to compensation under this Section 5.2.

**DS 0590**

**5.3    CONTRACTS WITH A GENERAL PARTNER OR AFFILIATE.**

(a)    Subject to the conditions set forth in Section 5.3(b), the General Partner may, on behalf of the Partnership, enter into contracts with itself, any other General Partner later acting, or any Affiliate of a General Partner.

(b)    Any agreements, contracts, or arrangements between the Partnership and a General Partner or any of its Affiliates whereby the General Partner or its Affiliate shall render any services to the Partnership, make loans to the Partnership, or sell or lease goods to the Partnership, shall be subject to the following conditions:

(1)    The compensation, interest rate, price or fee paid to a General Partner or any such Affiliate must be comparable and competitive with the compensation, interest rate, price or fee of any other person who is rendering comparable services, lending money or selling or leasing comparable goods which could reasonably be made available to the Partnership and shall be on competitive terms; and

(2)    Any such agreements, contracts and arrangements shall be embodied in a written contract which describes the subject matter thereof and all compensation to be paid therefor.

(c)    A General Partner or its Affiliates may purchase property in the name of the Partner or Affiliate, and assume loans in connection therewith, and hold title thereto for the purpose of facilitating the acquisition of such property or the borrowing of money or obtaining financing for the Partnership if purchased by the Partnership for a price no greater than the cost of such property to the General Partner or its Affiliate, and provided there is no difference in the interest rate on the loans secured by the property at the time acquired by the General Partner or its Affiliate and the time acquired by the Partnership, nor any other benefit arising out of such transaction to the General Partner or its Affiliate apart from compensation otherwise permitted by this Agreement.

(d)    The validity of any transaction, agreement or payment involving the Partnership and a General Partner or any Affiliate of a General Partner otherwise permitted by the terms of this Agreement shall not be affected by reason of the relationship between the Partnership and a General Partner or such Affiliate of the General Partner.

**5.4    RIGHT OF PUBLIC TO RELY ON AUTHORITY OF A GENERAL PARTNER.** Any person dealing with the Partnership or a General Partner may rely upon a certificate signed by a General Partner as to: (a) the identity of any General Partner or Limited Partner hereof; (b) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by a General Partner or in any other manner germane to the affairs of the Partnership; (c) the persons who are authorized to execute and deliver any instrument or document of the Partnership; or (d) any act

**DS 0591**

or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

**5.5**   **OBLIGATIONS OF THE GENERAL PARTNER.**  The General Partner shall:

    **(a)**   Devote to the Partnership and apply to the accomplishment of Partnership purposes so much of its time and attention as in its judgment is reasonably necessary to manage properly the affairs of the Partnership; provided, however, that General Partner is at all times specifically permitted to engage in any other business ventures and investment activities, including such activities as may be deemed to be in competition with the Partnership and any conflict of interest which may result shall be resolved by the General Partner using its best business judgment;

    **(b)**   Cause the Partnership to have workmen's compensation, employer's liability, public liability and property damage insurance in an amount required by law or believed by of the General Partner to be adequate, whichever is greater;

    **(c)**   Maintain a Capital Account and Drawing Account for each Partner;

    **(d)**   Cause the Partnership to carry out the obligations of the Partnership;

    **(e)**   Keep or cause to be kept the books and records required by Section 9.1; and

    **(f)**   Prepare and file the tax returns required by Section 9.3.

    **5.6**   **LIABILITY; INDEMNIFICATION.**  No General Partner nor any of its agents shall be liable to the Partnership or the other Partners for any act, omission or other matter, whether based upon errors of judgment, negligence, or other fault, in connection with the business or affairs of the Partnership so long as the Person against whom liability is asserted acted in good faith on behalf of the Partnership and in a manner reasonably believed by such Person to be within the scope of its authority under this Agreement, but only if such action or failure to act does not constitute gross negligence or willful misconduct.  The Partnership agrees to indemnify each General Partner and its agents to the fullest extent permitted by law and to save and hold them harmless from and in respect of all: (a) fees (including attorney fees), costs, and expenses incurred in connection with or resulting from any claim, action, or demand against the General Partner, the Partnership or any of the agents of either of them that arise out of or in any way relate to the Partnership, its properties, business, or affairs; and (b) such claims, actions, liabilities, demands and any losses or damages resulting from such claims, actions and demands, including amounts paid in settlement or compromise of any such claim, action, liability or demand; provided, however, that this indemnification shall apply only so long as the Person against whom a claim, action or demand is asserted has acted in good faith on behalf of the Partnership or the General Partner and in a manner reasonably believed by such Person to be within the scope of its authority under this Agreement, but only if such action or failure to act does not constitute gross negligence or willful misconduct.  The termination of any action, suit, or proceeding by judgment, order,

**DS 0592**

settlement, or upon a plea of *nolo contendere* or its equivalent, shall not create a presumption that any Person acted with gross negligence or willful misconduct.

### 5.7   TRANSFER OF A GENERAL PARTNER'S INTEREST.

(a)   Subject to any restrictions on transferability required by law or contained elsewhere in this Agreement, a General Partner may Transfer all or a portion of an Interest to a Permitted Transferee, provided:

(1)   The Permitted Transferee consents in writing in a form satisfactory to all the remaining Partners to be bound by the terms of this Agreement and acknowledges its status as an Assignee;

(2)   If requested by a Majority of any remaining Partners, an opinion from counsel for the Partnership is delivered to the Partnership at the expense of the transferring Partner stating that, in the opinion of said counsel, such Transfer would not jeopardize the status of the Partnership as a partnership for federal income tax purposes, would not cause the termination of the Partnership under Code § 708, and would not violate, nor cause the Partnership to violate, any applicable law or governmental rule or regulation, including without limitation, any applicable federal or state securities law; and

(3)   Anything herein to the contrary notwithstanding, in no event shall an assignment of a General Partner's Interest be made to a minor, incompetent, tax-exempt entity or a nonresident alien.

(b)   Any Permitted Transferee, including a Permitted Transferee who is already a Partner, that succeeds to the Interest of a General Partner as permitted by the terms hereof shall be considered an Assignee only with respect to the Interest transferred, shall have no rights as a Partner, and shall have only those rights conferred on an Assignee by applicable law; provided, however, that such Assignee may be admitted as a Substituted General Partner or Substituted Limited Partner in accordance with Sections 5.8 and 7.4.

(c)   Any purported Transfer of any Interest to a Person who is not a Permitted Transferee shall be null and void and of no force or effect whatsoever.  Any General Partner attempting to make a Transfer to a Person who is not a Permitted Transferee shall be considered a Defaulting Partner with respect to their entire Interest.

(d)   Each General Partner agrees that it will, upon request of the remaining Partners, execute such certificates or other documents and perform such acts as the Partner deem appropriate after a Transfer of an Interest to preserve the limited liability status of the Partnership under the laws of the jurisdictions in which the Partnership is doing business.

**DS 0593**

**(e)**    Each General Partner agrees that it will pay all reasonable expenses, including attorneys' fees, incurred by the Partnership in connection with such assignment.

**(f)**    General Partner, by executing this Agreement, hereby covenants and agrees that it will not, in any event, Transfer any Interest unless, in the opinion of counsel to the Assignee (which counsel and opinion shall be satisfactory to counsel for the Partnership), such Interest may be Transferred in compliance with then-applicable federal and state statutes.

**(g)**    Anything herein to the contrary notwithstanding, the Partnership and the Partners shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all aspects, and shall incur no liability for Distributions made in good faith to it, until such time as a written assignment that conforms to the requirements of this Article 5 has been received by the Partnership and accepted by the Partners.

**5.8    ADMISSION OF SUBSTITUTED GENERAL PARTNER.**

**(a)**    No Assignee shall be or become a Substituted General Partner or Substituted Limited Partner unless and until all the Partners in writing consent to the admission of such Person as a Substituted General Partner or Substituted Limited Partner, which consent may be withheld in the sole discretion of each Partner.

**(b)**    Each Assignee, as a condition to its admission as a Substituted General Partner or Substituted Limited Partner, shall execute and acknowledge such instruments, in form and substance satisfactory to a Majority of the Partners, as the Partners shall deem necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted General Partner or Substituted Limited Partner to be bound by all the terms and provisions of this Agreement with respect to the Interest acquired.  All reasonable expenses, including attorneys' fees, incurred by the Partnership in this connection shall be borne by such Assignee.

**(c)**    Any Assignee who is admitted to the Partnership as a Substituted General Partner or Substituted Limited Partner shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

**(d)**    Unless and until an Assignee becomes a Substituted General Partner or Substituted Limited Partner, such Assignee shall not be entitled to vote with respect to such Interest and shall have only those rights conferred on an Assignee by applicable law.

**(e)**    The effective date of admission of a Substituted General Partner or Substituted Limited Partner shall be the date designated by a Majority of the Partners in writing to the Substituted General Partner or Substituted Limited Partner, which shall not be later than the first day of the month next following the date upon which all the Partners have given their written consent to such substitution.

**DS 0594**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 25

**5.9 ADMISSION OF ADDITIONAL GENERAL PARTNERS.** Additional General Partners may be admitted to the Partnership upon the written consent of all the Partners, which consent may be withheld in the sole discretion of each Partner, and upon receipt of such Capital Contribution as a Majority of the Partners may require.

**5.10 FIDUCIARY DUTIES.** NOTWITHSTANDING ANY PROVISIONS OF THIS AGREEMENT OR UNDER THE ACT WHICH GRANT THE GENERAL PARTNER THE ABILITY TO TAKE CERTAIN ACTIONS, VOTE AND MAKE CERTAIN DECISIONS IN ITS DISCRETION, SOLE DISCRETION OR OTHERWISE, EACH GENERAL PARTNER SHALL INDIVIDUALLY MANAGE AND CONTROL THE AFFAIRS OF THE PARTNERSHIP TO THE BEST OF ITS ABILITY, AND SHALL USE ITS BEST EFFORTS TO CARRY OUT THE PURPOSES OF THE PARTNERSHIP FOR THE BENEFIT OF THE PARTNERSHIP AND ALL THE PARTNERS. IN EXERCISING ITS POWERS, EACH GENERAL PARTNER RECOGNIZES ITS FIDUCIARY RESPONSIBILITIES UNDER THE ACT AND THIS AGREEMENT TO THE PARTNERSHIP AND THE PARTNERS. EACH GENERAL PARTNER SHALL INDIVIDUALLY HAVE FIDUCIARY RESPONSIBILITY IN THE STRUCTURING OF PARTNERSHIP TRANSACTIONS AND FOR THE SAFEKEEPING AND USE OF ALL FUNDS AND ASSETS OF THE PARTNERSHIP, WHETHER OR NOT THE FUNDS OR ASSETS ARE IN THE GENERAL PARTNER'S IMMEDIATE POSSESSION AND CONTROL. THE GENERAL PARTNER SHALL NOT EMPLOY, OR PERMIT ANOTHER TO EMPLOY, SUCH FUNDS OR ASSETS IN ANY MANNER EXCEPT IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT AND THE ACT.

## ARTICLE 6
### TERMINATION OF A GENERAL PARTNER

**6.1 LIMITATION ON RIGHT TO WITHDRAW OR PARTITION.** No General Partner shall be entitled to withdraw from the Partnership prior to the dissolution of the Partnership in accordance with Section 1.5 and Article 8. Further, no General Partner shall have the right to unilaterally: (a) bring an action for partition against the Partnership with regard to any of its property; or (b) cause the termination of the Partnership by court decree or as may be permitted by the Act, such rights being specifically waived by the General Partner.

**6.2 REMOVAL OF A GENERAL PARTNER.** Upon a vote of General and Limited Partners holding ninety percent (90%) of the aggregate Percentage Interests held by the General and Limited Partners, including any Percentage Interests of the General Partner subject to the vote, a General Partner may be removed upon a showing of fraud, gross negligence or breach of fiduciary duties in the discharge of such Partner's duties as a General Partner which materially impacts the operations or assets of the Partnership. Written notice of such determination setting forth the effective date of such removal shall be served upon such General Partner, and as of the effective date, shall terminate all of such Partner's rights and powers as the General Partner.

**6.3 ATTEMPTED WITHDRAWAL, DISSOLUTION OR BANKRUPTCY.** Upon the dissolution, bankruptcy or attempted withdrawal of a General Partner, all of such Partner's rights and powers as a General Partner shall be terminated.

**DS 0595**

## 6.4    INTEREST OF A GENERAL PARTNER.

(a)    Upon the dissolution, removal, attempted withdrawal or bankruptcy of a General Partner if the business of the Partnership is not continued in accordance with Section 1.5, then the Partnership shall be dissolved and the Partnership assets distributed in accordance with Article 8.

(b)    Upon the dissolution, removal, attempted withdrawal or bankruptcy of a General Partner where the business of the Partnership is continued in accordance with Section 1.5, the following provisions shall apply:

(1)    In the event of a dissolution of an entity that is a General Partner the successors to the Interest shall be treated as Assignees only to the extent that they are Permitted Transferees described in Section 2.24(g). Any successors who are not Permitted Transferees shall have no rights as either Partners or Assignees and shall be treated as Defaulting Partners for purposes of Section 11.3. Upon the expiration of the four- (4-) year period set forth in Section 11.3, the successors who were not Permitted Transferees shall be entitled to continue as Assignees only to the extent that the subject Interest was not purchased by the Partnership or the remaining Partners.

(2)    In the event of the removal or attempted withdrawal of a General Partner, the terminated General Partner shall continue as an Assignee and shall be treated as a Defaulting Partner for purposes of Section 11.3.

(3)    In the event of the bankruptcy of a General Partner, notwithstanding any other provision herein, the successor (if any) to such Interest shall have only those rights conferred by applicable law, shall have no rights or status as a Partner or as an Assignee, but shall be subject to the provisions of Section 11.3 as if the successor was a Defaulting Partner. Upon the expiration of the four- (4-) year period set forth in Section 11.3, to the extent the Interest was not purchased by the Partnership or the remaining Partners, the successor shall not be entitled to continue as an Assignee and shall have only those rights granted by applicable law.

6.5    INDEMNITY. A terminated General Partner shall be indemnified by the Partnership from any Partnership liabilities except to the extent any such liabilities: (a) arose prior to termination of the Partner's General Partner status; or (b) arise subsequent to such termination and result from the gross negligence, wilful misconduct or breach of fiduciary duties by the terminated Partner.

6.6    TERMINATION OF EXECUTORY CONTRACTS WITH THE TERMINATED GENERAL PARTNER OR AFFILIATES. All executory contracts between the Partnership and a terminated General Partner or any Affiliate thereof (unless such Affiliate is also an Affiliate of a continuing General Partner) may be terminated by the Partnership effective upon sixty (60) days' prior

**DS 0596**

written notice of such termination to the terminated General Partner. The terminated General Partner or any Affiliate (unless such Affiliate is also an Affiliate of a continuing General Partner) thereof may also terminate and cancel any such executory contract effective upon sixty (60) days' prior written notice of such termination and cancellation given to the Partnership.

**6.7     DEATH OR INCAPACITY OF A GENERAL PARTNER.** The death or incapacity of a General Partner shall terminate the Partner's status as a General Partner, but shall not cause a dissolution of the Partnership. The estate or guardian of a deceased or incapacitated General Partner shall continue as an Assignee of the Partner only to the extent that the estate or guardian qualifies as a Permitted Transferee described in Section 2.24(d). To the extent that the estate or guardian does not qualify as a Permitted Transferee described in Section 2.24(d), the estate or guardian shall have no rights as either a Partner or Assignee and shall be treated as a Defaulting Partner for purposes of Section 11.3. Upon the expiration of the four- (4-) year period set forth in Section 11.3, the successors who were not Permitted Transferees shall be entitled to continue as Assignees only to the extent that the subject Interest was not purchased by the Partnership or the remaining Partners.

## ARTICLE 7
### RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

**7.1     NO PARTICIPATION IN MANAGEMENT.** No Limited Partner (other than a General Partner who is also a Limited Partner) shall take part in the management of the Partnership's business, transact any business in the Partnership's name or have the power to sign documents or otherwise bind the Partnership. Limited Partners shall have the power to vote only with respect to those matters specifically identified in this Agreement.

**7.2     LIMITATION OF LIABILITY.** Pursuant to the Act, no Limited Partner shall have any personal liability whatever in its capacity as a Limited Partner for the debts or losses of the Partnership beyond the amount contributed by such Partner to the capital of the Partnership as set forth in Section 3.1.

**7.3     TRANSFER OF A LIMITED PARTNER'S INTEREST.**

(a)     Subject to any restrictions on transferability required by law or contained elsewhere in this Agreement, a Limited Partner may Transfer all or a portion of its Interest to a Permitted Transferee, provided:

(1)     The Permitted Transferee consents in writing in form satisfactory to all the remaining Partners to be bound by the terms of this Agreement and acknowledges its status as an Assignee;

(2)     If requested by the General Partner, an opinion from counsel for the Partnership is delivered to the Partnership at the expense of the transferring Partner stating that, in the opinion of said counsel, such Transfer would not jeopardize the status of the Partnership as a partnership for federal income tax purposes, would

**DS 0597**

not cause the termination of the Partnership under Code § 708, and would not violate, nor cause the Partnership to violate, any applicable law or governmental rule or regulation, including without limitation, any applicable federal or state securities law; and

(3)     Anything herein to the contrary notwithstanding, in no event shall an assignment of a Limited Partner Interest be made to a minor (except in trust or pursuant to the Uniform Transfers to Minors Act, Uniform Gift to Minors Act or other applicable act), incompetent or a nonresident alien.

(b)     Any Person, including a Person who is already a Partner, that succeeds to the Interest of a Limited Partner as permitted by the terms hereof shall be considered an Assignee only with respect to the Interest transferred, shall have no rights as a Partner, and shall have only those rights conferred on an Assignee by applicable law; provided, however, that such Assignee may be admitted as a Substituted Limited Partner with respect to the Interest transferred in accordance with Section 7.4.

(c)     Any purported Transfer of any Interest to a Person who is not a Permitted Transferee shall be null and void and of no force or effect whatsoever. Any Limited Partner attempting to make a Transfer to a Person who is not a Permitted Transferee shall be considered a Defaulting Partner with respect to their entire Interest.

(d)     Each Limited Partner agrees that it will, upon request of the General Partner, execute such certificates or other documents and perform such acts as the General Partner deems appropriate after an assignment of that Limited Partner's Interest to preserve the limited liability status of the Partnership under the laws of the jurisdictions in which the Partnership is doing business. For purposes of this Section 7.3, any Transfer of any Interest, whether voluntary or by operation of law, shall be considered an assignment.

(e)     Each Limited Partner agrees that it will pay all reasonable expenses, including attorneys' fees, incurred by the Partnership in connection with such assignment.

(f)     Each of the Limited Partners, by executing this Agreement, hereby covenants and agrees that it will not, in any event, Transfer any Interest unless, in the opinion of counsel to the Assignee (which counsel and opinion shall be satisfactory to counsel for the Partnership), such Interest may be Transferred in compliance with then-applicable federal and state statutes.

(g)     Anything herein to the contrary notwithstanding, the Partnership and the General Partner shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all aspects, and shall incur no liability for Distributions made in good faith to it, until such time as a written assignment that conforms to the requirements of this Article 7 has been received by the Partnership and accepted by the General Partner.

**DS 0598**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 29

**7.4    ADMISSION OF SUBSTITUTED LIMITED PARTNERS.**

(a)    No Assignee shall be or become a Substituted Limited Partner unless and until all the Partners in writing consent to the admission of such Person as a Substituted Limited Partner, which consent may be withheld in the sole discretion of each Partner.

(b)    Each Assignee, as a condition to its admission as a Substituted Limited Partner, shall execute and acknowledge such instruments, in form and substance satisfactory to the General Partner, as the General Partner deems necessary or desirable to effectuate such admission and to confirm the agreement of the Substituted Limited Partner to be bound by all the terms and provisions of this Agreement with respect to the Interest acquired. All reasonable expenses, including attorneys' fees, incurred by the Partnership in this connection shall be borne by such Assignee.

(c)    Any Assignee who is admitted to the Partnership as a Substituted Limited Partner shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

(d)    Unless and until an Assignee becomes a Substituted Limited Partner, such Assignee shall not be entitled to vote with respect to such Interest and shall have only those rights conferred on an Assignee by applicable law.

(e)    The effective date of admission of a Substituted Limited Partner shall be the date designated by the General Partner in writing to the Substituted Limited Partner, which shall not be later than the first day of the month next following the date upon which all the Partners have given their written consent to such substitution.

**7.5    INDEMNIFICATION AND TERMS OF ADMISSION.** Each Assignee shall indemnify and hold harmless the Partnership and every other Partner against any claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of or arising from any actual or alleged misrepresentation or misstatement of facts or omission to state facts by such Assignee in connection with its admission as a Substituted Limited Partner, against expenses for which the Partnership or such other Partner has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred by the Partnership or such other Person in connection with such action, suit or proceeding.

**7.6    LIMITATION ON RIGHT TO WITHDRAW OR PARTITION.** No Limited Partners shall be entitled to unilaterally withdraw from the Partnership or compel Distributions from the Partnership in liquidation of their Interest, prior to the dissolution of the Partnership in accordance with Section 1.5 and Article 8. Further, no Limited Partner shall have the right to: (a) bring an action for partition against the Partnership with regard to any of its property; or (b) cause the termination of the Partnership by court decree or as may be permitted by the Act, such rights being specifically waived by the Limited Partners.

**DS 0599**

**7.7   INTEREST OF A LIMITED PARTNER.** Upon the dissolution, bankruptcy, attempted withdrawal, death or incapacity of a Limited Partner the Partnership shall continue, all of such Partner's rights and powers as a Limited Partner shall be terminated and the following provisions shall apply with respect to the Limited Partner's successor, if any:

**(a)**   In the event of a dissolution of an entity that is a Limited Partner the successors to the Interest shall be treated as Assignees only to the extent that they are Permitted Transferees described in Section 2.24(g). Any successors who are not Permitted Transferees shall have no rights as either Partners or Assignees and shall be treated as Defaulting Partners for purposes of Section 11.3. Upon the expiration of the four- (4-) year period set forth in Section 11.3, the successors who were not Permitted Transferees shall be entitled to continue as Assignees only to the extent that the subject Interest was not purchased by the Partnership or the remaining Partners.

**(b)**   In the event of an attempted withdrawal of a Limited Partner, the terminated Limited Partner shall continue as an Assignee and shall be treated as a Defaulting Partner for purposes of Section 11.3.

**(c)**   In the event of the bankruptcy of a Limited Partner, notwithstanding any other provision herein, the successor (if any) to such Interest shall have only those rights conferred by applicable law, shall have no rights or status as a Partner or as an Assignee, but shall be subject to the provisions of Section 11.3 as if the successor was a Defaulting Partner. Upon the expiration of the four- (4-) year period set forth in Section 11.3, to the extent the Interest was not purchased by the Partnership or the remaining Partners, the successor shall not be entitled to continue as an Assignee and shall have only those rights granted by applicable law.

**(d)**   The estate or guardian of a deceased or incapacitated Limited Partner shall continue as an Assignee of the Partner only to the extent that the estate or guardian qualifies as a Permitted Transferee described in Section 2.24(d). To the extent that the estate or guardian does not qualify as a Permitted Transferee described in Section 2.24(d), the estate or guardian shall have no rights as either a Partner or Assignee and shall be treated as a Defaulting Partner for purposes of Section 11.3. Upon the expiration of the four- (4-) year period set forth in Section 11.3, the successors who were not Permitted Transferees shall be entitled to continue as Assignees only to the extent that the subject Interest was not purchased by the Partnership or the remaining Partners.

**7.8   ADMISSION OF ADDITIONAL LIMITED PARTNERS.** Additional Limited Partners may be admitted to the Partnership upon the written consent of all the Partners, which consent may be withheld in the sole discretion of each Partner, and upon receipt of such Capital Contribution as the General Partner may require.

**7.9   DISSENTING LIMITED PARTNERS.** The Limited Partners are aware that the terms of this Agreement permit certain amendments of the Agreement to be effective and certain other actions to be taken or omitted by or with respect to the Partnership, in each case with the approval

**DS 0600**

of less than all of the Limited Partners. Each Limited Partner agrees that the General Partner, with full power of substitution, is hereby authorized and empowered to execute, acknowledge, make, swear to, verify, consent to, deliver, record, file, and/or publish, for and on the behalf, in the name, place, and stead of each such undersigned Limited Partner, any and all instruments and documents which may be necessary or appropriate to permit such amendment to be lawfully made or action lawfully taken or omitted, regardless of whether such Limited Partner has approved such amendment or action.

## ARTICLE 8
## DISSOLUTION AND TERMINATION

**8.1** **ASSUMPTION OF AGREEMENTS.** No vote to dissolve the Partnership pursuant to Section 1.5 shall be effective unless, prior to or concurrently with such vote, there shall have been established procedures for the assumption of the Partnership's obligations under the agreements in force immediately prior to such vote regarding dissolution and, in the event there are no remaining General Partners, there shall have been an irrevocable appointment of another Person, selected by a Majority of the Limited Partners, as an agent who shall be empowered to give and receive notices, reports and payments under such agreements and hold and exercise such other powers as are necessary to permit all other parties to such agreements to deal with such agent as if the agent were the sole owner of the Partners' Interests.

**8.2** **DISSOLUTION.** The Partnership shall be dissolved upon the occurrence of any of the events identified in Section 1.5. No Partner shall have the right to dissolve or terminate the Partnership for any reason other than as set forth in Section 1.5.

**8.3** **ALLOCATION OF INCOME AND LOSS.** Income and loss of the Partnership following the date of dissolution, including but not limited to gain and loss upon the sale of all or substantially all of the Partnership assets, shall be determined in accordance with the provisions of Sections 4.2 and 4.6 and shall be credited or charged to the Capital Accounts of the Partners in the same manner as income and loss of the Partnership would have been credited or charged if there were no dissolution.

**8.4** **DISTRIBUTIONS.** Upon dissolution under Section 1.5, the Partnership shall be liquidated and wound up by the General Partner (or in the event there is no remaining General Partner, any Person elected by a Majority of the Limited Partners) and, in connection therewith, the Partnership's property shall be sold (and any Partner may be a purchaser of all or any portion thereof), and proceeds of such sale and other assets of the Partnership (including additional contributions by Partners) shall be applied and distributed in the order of priority set forth in Sections 8.4(a), 8.4(b), and 8.4(c) below.

    **(a)** Payment shall be made by the Partnership to creditors, including Partners who are creditors and Partners with outstanding negative draws, to the extent otherwise permitted by law, in satisfaction of liabilities to the Partnership other than liabilities for Distributions to Partners;

**DS 0601**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 32

    **(b)**    The General Partner shall apply payments to the setting up of any Reserves that the General Partner deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership; such Reserves shall be segregated for the purpose of disbursing such Reserves in payment of any of the aforementioned contingencies, and, at the expiration of such period as the General Partner deems advisable, for distribution of the balance thereafter remaining in the manner as provided in Section 8.4(c) hereof;

    **(c)**    By the end of the taxable year in which the dissolution occurs (or, if later, within ninety (90) days after the date of such dissolution) an amount equal to any draws of the remaining Partners determined pursuant to Section 4.1(b) and the remaining money and property of the Partnership shall initially be allocated among the Partners in proportion to the positive balances of their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year during which the dissolution occurs (other than those made pursuant to this Section 8.4(c)). The remaining Partnership assets shall be distributed to the Partners in accordance with the liquidation allocation; provided, however, that Partners who received draws from the Partnership shall have such draws treated as if such amounts were received by such Partners as Distributions in liquidation of the Partnership. Notwithstanding the foregoing, as provided in Section 4.6(b), the Partners acknowledge that adjustments to the Partners' respective Capital Accounts intended to comply with certain income-tax provisions of the Treasury Regulations, and all Interests in the Partnership are intended to be of the same class within the meaning of Code § 2701(a)(2)(B).

A reasonable time shall be allowed for the orderly winding up of the business of the Partnership and discharge of liabilities to creditors to enable the General Partner to realize maximum benefit from the disposition of the Partnership's assets and to minimize the normal losses attendant upon a winding up. No Partner shall have any right to demand or receive property other than cash upon dissolution or termination of the Partnership. Each Partner shall look solely to the assets of the Partnership for all Distributions upon dissolution and, except as provided in Section 8.6, shall have no recourse therefor against any other Partner.

    **8.5**    **DEFICIT CAPITAL ACCOUNT OF A LIMITED PARTNER.** If any Limited Partner has a deficit Capital Account balance upon dissolution of the Partnership or liquidation of such Interest (after giving effect to all Capital Contributions, Distributions, draws, and allocations for all taxable years, including the year during which such dissolution occurs), such Limited Partner shall have no obligation to make any contribution to the capital of the Partnership with respect to such deficit, and such deficit shall not be considered a debt owed to the Partnership or any other Partner for any purpose whatsoever.

    **8.6**    **DEFICIT CAPITAL ACCOUNT OF A GENERAL PARTNER.** If any General Partner has a deficit Capital Account balance upon dissolution of the Partnership or liquidation of such General Partner's Interest (after giving effect to all Capital Contributions, Distributions, draws and allocations for all taxable years, including the year in which such dissolution or liquidation occurs), such General Partner shall make a Capital Contribution to the Partnership in an amount

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 33

sufficient to eliminate such deficit by the end of the taxable year in which the dissolution or liquidation occurs (or, if later, within ninety (90) days after the date of such dissolution or liquidation).

**8.7    CANCELLATION.**    Upon compliance with the foregoing distribution plan, the General Partner, or if none, the Limited Partners, shall file a Certificate of Cancellation and the Partnership shall cease to exist.

**ARTICLE 9**
**BOOKS, RECORDS AND REPORTS**

**9.1    BOOKS AND RECORDS.**    The General Partner shall maintain the records required by Idaho Code § 53-205.

**9.2    DELIVERY AND INSPECTION BY LIMITED PARTNERS.**

(a)    All of the Initial Partners, as defined in Section 2.21 above, and each future Limited Partner with at least a ten percent (10%) Percentage Interest, but not Assignees, shall have the right, upon reasonable request, to do each of the following:

(1)    Inspect and copy during normal business hours any of the Partnership records required to be maintained by Section 9.1; and

(2)    Obtain from the General Partner, promptly after becoming available, a copy of the Partnership's federal, state, and local income tax or information returns for each year.

(b)    The General Partner shall send to each Partner and Assignee as soon as reasonably possible after the end of each taxable year the information necessary to complete their federal and state income tax returns.

**9.3    TAX RETURNS.**    The General Partner, at the Partnership's expense, shall cause to be prepared tax returns for the Partnership and shall further cause such returns to be timely filed with the appropriate authorities.

**9.4    DESIGNATION AND DUTIES OF TAX MATTERS PARTNER.**

(a)    **DESIGNATION OF TAX MATTERS PARTNER.**    DON J. SIMPLOT shall be the "Tax Matters Partner" of the Partnership as provided in Treasury Regulations pursuant to Code § 6231, unless such Partner, at any time, elects to not be the Tax Matters Partner or so designates another General Partner.    Each Partner, by the execution of this Agreement, consents to such designation of the Tax Matters Partner and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public office, such documents as may be necessary or appropriate to evidence such consent.

**DS 0603**

**(b)     DUTIES OF TAX MATTERS PARTNER.**

**(1)**     To the extent and in the manner provided by applicable law and regulations, the Tax Matters Partner shall furnish the name, address, profits interest, and taxpayer identification number of each Partner to the Secretary of the Treasury or its delegate.

**(2)**     To the extent and in the manner provided by applicable law and regulations, the Tax Matters Partner shall keep each Partner informed of the administrative and judicial proceedings for the adjustment at the Partnership level of any item required to be taken into account by a Partner for income tax purposes (such administrative proceeding referred to hereinafter as a "tax audit" and such judicial proceedings referred to hereinafter as "judicial review").

**(3)**     If the Tax Matters Partner, on behalf of the Partnership, receives a notice of final partnership administrative adjustment with respect to a tax audit of the Partnership from the Secretary of the Treasury, the Tax Matters Partner shall, within five (5) business days of receiving such notice, forward a copy of such notice to the Partners who hold or held an interest in the profits or losses of the Partnership, as applicable, for the taxable year to which the notice relates.

**(c)     EXPENSES OF TAX MATTERS PARTNER.**  The Partnership shall indemnify and reimburse the Tax Matters Partner for all reasonable expenses, including legal and accounting fees, claims, liabilities, losses, and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Partners.  The payment of all such expenses shall be made before any Distributions are made or any discretionary Reserves are set aside by the General Partner.  Neither the General Partner nor any other person shall have any obligation to provide funds for such purpose.  The taking of any action and the incurring of any reasonable expense by the Tax Matters Partner in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the Tax Matters Partner and the provisions on exculpation and indemnification set forth in Section 5.6 of this Agreement shall be fully applicable to the Tax Matters Partner in its capacity as such.

**9.5     TAX ELECTIONS.**  The General Partner shall have the authority to cause the Partnership to make any election required or permitted to be made for income tax purposes if the General Partner determines, in its sole discretion, that such election is in the best interests of the Partnership and its Partners.  The General Partner, in its sole discretion, may cause the Partnership to make, in accordance with Code § 754, a timely election to adjust the basis of Partnership property described in Code §§ 734 and 743.

DS 0604

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 35

## ARTICLE 10
### FISCAL AFFAIRS

**10.1    FISCAL YEAR.** The fiscal year of the Partnership shall be December 31 or another tax year required by Code § 706.

**10.2    PARTNERSHIP FUNDS.** The funds of the Partnership shall be deposited in such bank account or accounts, or invested in such interest-bearing or noninterest-bearing investments, including, without limitation, checking and savings accounts, certificates of deposit and time or demand deposits in commercial banks, banker's acceptances, securities issued by money market mutual funds, savings and loan association deposits, U.S. government securities and securities guaranteed by U.S. government agencies, as the General Partner shall, in its sole discretion, determines. Such funds shall not be commingled with funds of any other Person, unless such funds are separately accounted for. Withdrawals therefrom shall be made upon such signatures the General Partner may designate.

**10.3    ACCOUNTING DECISIONS.** All decisions as to accounting principles, except as specifically provided to the contrary herein, shall be made by the General Partner.

**10.4    LOANS BY THE PARTNERSHIP TO A GENERAL PARTNER.** The Partnership shall not, without the prior written consent of a Majority of the Partners make any loans to the General Partner or an Affiliate of the General Partner, except for: (1) purchase-money financing in connection with the sale of Partnership assets; and (2) loans which do not exceed Two Hundred Thousand Dollars ($200,000.00). The terms of any such loans shall be in accordance with Section 5.3(b).

## ARTICLE 11
### TRANSFERS; PURCHASE OF INTERESTS

**11.1    RESTRICTIONS ON TRANSFERABILITY.** To further the purposes of the Partnership and preserve the investment goals of the Partners, it is the intention and agreement of the Partners to maintain control over both the identity of the Partners and the relative allocation of the Percentage Interests among the Partners. To ensure that control is maintained, the Partners agree to restrict the Transfer of Interests as more specifically set forth in Articles 5, 6, 7 and 11, which in general provide that no Partner shall have the unilateral ability to confer Partner status upon another Person, all transferees shall be treated as Assignees unless and until admitted as a Substituted Limited Partner or Substituted General Partner by all of the Partners and, to the extent that a transferee is not a Permitted Transferee, the right of first refusal provisions set forth in this Article 11 shall be applicable. Any Transfer not satisfying the conditions to transfer set forth in this Agreement shall be void. In no event, shall any Transfer pursuant to Article 11 relieve the transferor of any of its obligations under this Agreement.

**11.2    RIGHT OF FIRST REFUSAL.** In addition to the other limitations and restrictions set forth in this Agreement, no Partner may Transfer all or any part of an Interest (the "Offered

DS 0605

Interest") to a Person who is not a Permitted Transferee unless such Partner (the "Seller") first offers to sell the Offered Interest pursuant to the terms of this Section 11.2.

(a)   **LIMITATION ON TRANSFERS.**  No Transfers may be made under this Section 11.2 unless the Seller has received a bona fide written offer (the "Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Interest for a purchase price (the "Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer shall be in writing signed by the Purchaser and shall be irrevocable for a period ending no sooner than the day following the end of the Second Offer Period as hereinafter defined.

(b)   **FIRST OFFER (OFFER TO PARTNERSHIP).**

(1)   **FIRST OFFER NOTICE.**  Prior to making any Transfer that is subject to the terms of this Section 11.2, the Seller shall give to the Partnership and the other Partners a written notice (the "Offer Notice") which shall include a copy of the Purchase Offer and an offer (the "First Offer") to sell the Offered Interest to the Partnership for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer, provided that the First Offer shall be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, without regard to any security (other than the Offered Interest) to be provided by the Purchaser for any deferred portion of the Offer Price and the Offer Notice shall provide the Partnership with the opportunity to set off against the Offer Price any amounts owed by the Partner to the Partnership.

(2)   **OFFER PERIOD.**  The First Offer shall be irrevocable for a period (the "Offer Period") ending at 11:59 p.m., local time at the Partnership's principal office, on the ninetieth (90th) day following the date of the Offer Notice.

(3)   **ACCEPTANCE OF FIRST OFFER.**  At any time during the Offer Period, the Partnership by the General Partner, in its sole discretion, may accept the First Offer by giving written notice of such acceptance to the Seller.  If the Partnership accepts the First Offer with respect to all of the Offered Interest, the First Offer shall be deemed to be accepted.  If the Partnership does not accept the First Offer as to all of the Offered Interest during the Offer Period, the First Offer shall be deemed to be rejected in its entirety.

(4)   **CLOSING OF PURCHASE PURSUANT TO FIRST OFFER.**  If the First Offer is accepted, the closing of the sale of the Offered Interest shall take place within thirty (30) days after the First Offer is accepted or, if later, the date of closing set forth in the Purchase Offer.  The Seller and the Partnership shall execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Interest pursuant to the terms of the First Offer and this Section 11.2.

**DS 0606**

(c)   SECOND OFFER (OFFER TO PARTNERS) IF FIRST OFFER REJECTED.

(1)   SECOND OFFER NOTICE.  If the First Offer is not accepted in the manner herein above provided, the Seller shall give the other Partners a written notice (the "Second Offer Notice") which shall include an offer (the "Second Offer") to sell the Offered Interest to the other Partners (the "Second Offerees") for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer, provided that the Second Offer shall be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Interest) to be provided by the Purchaser for any deferred portion of the Offer Price.

(2)   SECOND OFFER PERIOD.  The Second Offer shall be irrevocable for a period (the "Second Offer Period") ending at 11:59 p.m., local time at the Partnership's principal office, on the sixtieth (60th) day following the date of the Second Offer Notice.

(3)   ACCEPTANCE OF SECOND OFFER.  At any time during the Second Offer Period, the Second Offerees may accept the Second Offer by giving written notice of such acceptance to the Seller and the Partnership.  If more than one Second Offeree accepts (the "Accepting Second Offerees") the Second Offer, each such Accepting Second Offeree shall have the right to purchase a portion of the Offered Interest equal to the proportion that its Percentage Interest bears to all the Percentage Interests of all Accepting Second Offerees.  If the Accepting Second Offerees accept the Second Offer with respect to all of the Offered Interest, the Second Offer shall be deemed to be accepted.  If the Accepting Second Offerees do not accept the Second Offer as to all of the Offered Interest during the Second Offer Period, the Second Offer shall be deemed to be rejected in its entirety.

(4)   CLOSING OF PURCHASE PURSUANT TO SECOND OFFER.  If the Second Offer is accepted, the closing of the sale of the Offered Interest shall take place within thirty (30) days after the Second Offer is accepted or, if later, the date of closing set forth in the Purchase Offer.  The Seller and the Accepting Second Offeree(s) shall execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Interest pursuant to the terms of the Second Offer and this Section 11.2.

(d)   SALE PURSUANT TO PURCHASE OFFER IF SECOND OFFER REJECTED.  If the Second Offer is not accepted in the manner hereinafter provided, the Seller may sell the Offered Interest to the Purchaser at any time within sixty (60) days after the last day of the Second Offer Period, provided that such sale shall be made on terms no more favorable to the Purchaser than the terms contained in the Second Purchase Offer and provided further that such sale complies with the other terms, conditions, and restrictions

**DS 0607**

of this Agreement that are applicable to sales of Interests and are not expressly made inapplicable to sales occurring under this Section 11.2. If the Offered Interest is not sold in accordance with the terms of the preceding sentence, the Offered Interest shall again become subject to all of the conditions and restrictions of this Agreement.

**11.3   PURCHASE OF DEFAULTING PARTNER'S INTEREST.** If any Partner attempts to Transfer an Interest in contravention to the terms of this Agreement, the Partnership shall have the right to withhold any Distributions of the Defaulting Partner until such default is cured. Secondly, for a four- (4-) year period following the event of default, the non-defaulting Partners and/or the Partnership shall also have the right to purchase all or a portion of the Defaulting Partner's Interest as provided herein. In addition, the Defaulting Partner shall hold their entire Interest as an Assignee unless and until admitted as a Substituted General Partner or Substituted Limited Partner.

(a)   **OPTION EXERCISE.** During the four- (4-) year period referenced above, the non-defaulting Partners shall have, on a pro-rata basis determined in accordance with their Percentage Interests, the first option to purchase the Defaulting Partner's Interest. Such option shall be exercised in a writing delivered to the Defaulting Partner and the Partnership within three (3) years of the event of default. If the non-defaulting Partners fail to elect to purchase the entire Interest of the Defaulting Partner, the Partnership may elect within the remainder of the above-referenced four- (4-) year period to purchase any portion of the Defaulting Partner's Percentage Interest which is not purchased by the non-defaulting Partners. Such option shall be exercised in a writing delivered to the Defaulting Partner within four (4) years of the event of default.

(b)   **PURCHASE PRICE.** The purchase price (the "Purchase Price") for the Defaulting Partner's Interest shall be equal to ninety percent (90%) of the fair market value of such Interest as determined by the Partnership's accounting firm. The fair market value of the Defaulting Partner's Interest shall be primarily determined on the basis of the historical cash flow generated by the Partnership without consideration for unusual nonrecurring items of income and expense. The accountants may hire such experts as they determine to be required to value assets of the Partnership. While all appropriate valuation factors shall be considered, the ultimate determination of value shall reflect the continuing nature of the Partnership as a going concern and not be based upon its liquidation value. The accounting firm shall also take into consideration other factors and valuation principles that it deems appropriate, including relative Capital Account balances and adjustments for lack of marketability and lack of control. The Partnership's accountants may hire such other experts as they deem appropriate in arriving at the value of the Defaulting Partner's Interest. All costs incurred in arriving at the valuation of the Interest shall be paid by the Defaulting Partner.

(c)   **TERMS OF PAYMENT.** Closing of a purchase under this Section 11.3 shall occur within ninety (90) days after the Purchase Price is determined under Section 11.3(b) above. Each purchaser shall pay such portion of the total Purchase Price as is attributable to the portion of the Defaulting Partner's Interest acquired by such purchaser. The

**DS 0608**

Purchase Price payable by each purchaser shall be paid as follows: (a) ten percent (10%) down payment payable at closing; and (b) the balance payable in nine (9) equal annual installments, with the first payment due on the first day of the first month after the month in which closing of the Purchase occurs and on such date each year thereafter. The Purchase Price shall be payable with interest at a rate equal to the prime rate as published in the Wall Street Journal minus one percent (1%), on the date of purchase, and adjusted annually on the anniversary date of the first annual installment; provided, however, that in no event shall such interest rate exceed ten percent (10%).

(d) **CONTINUATION AS AN ASSIGNEE.** If the Partnership or the remaining Partners do not elect to purchase all of the Defaulting Partner's Interest, the Defaulting Partner shall continue as an Assignee and the Partnership shall have the right to continue withholding the Defaulting Partner's share of Partnership distributions until the General Partner determines that the default has been adequately cured.

## ARTICLE 12
### AMENDMENTS OF PARTNERSHIP DOCUMENTS

**12.1 AMENDMENTS IN GENERAL.** Except as otherwise provided in this Agreement, this Agreement may be amended only with the consent of all the Partners.

**12.2 AMENDMENTS WITHOUT CONSENT OF LIMITED PARTNERS.** In addition to any amendments otherwise authorized herein, amendments may be made to this Agreement from time to time by the General Partner, without the consent of any of the Limited Partners: (a) to add to the duties or obligations of the General Partner or to surrender any right or power granted to the General Partner herein, for the benefit of the Limited Partners; (b) to correct any error or resolve any ambiguity in or inconsistency among any of the provisions hereof, or to make any other provision with respect to matters or questions arising under this Agreement which are not inconsistent with the provisions of this Agreement; (c) to delete or add any provision of this Agreement required to be so deleted or added by any state securities commission or similar governmental authority for the benefit or protection of the Limited Partners; (d) to add to or change the name of the Partnership; and (e) to comply with income tax modifications in the Code and/or Treasury Regulations, as such modifications apply to partnerships. In the event such an amendment is made by the General Partner, written notice thereof containing the text of the amendment shall be provided by the General Partner to each Limited Partner within thirty (30) days of such amendment.

**12.3 AMENDMENTS AFTER CHANGE OF LAW.** This Agreement and any other Partnership documents may be amended, if necessary, by a Majority of the General Partners without the consent of the Limited Partners if there occurs any change that permits or requires an amendment of this Agreement under the Act or of any other Partnership document under applicable law, so long as no Partner is adversely affected (or consent is given by such Partner). In the event such an amendment is made by a Majority of the General Partners, written notice thereof containing the text of the amendment shall be provided by the General Partners to each Limited Partner within thirty (30) days of such amendment.

**DS 0609**

**12.4    LIMITED PARTNERS' EXECUTION OF AMENDMENTS.**  The Limited Partners hereby agree to execute an amendment to this Agreement whenever the execution of an amendment to this Agreement is requested by the General Partner and such amendment has been approved as required herein, and they agree to execute such other instruments and documents and to perform such other acts, as may be required to comply with the Act for the valid formation and existence of the Partnership as a limited partnership thereunder, whenever the execution or performance thereof shall be requested by the General Partner, all within ten (10) days after the request by the General Partner.

**12.5    LIMITATION ON AMENDMENTS.**  Notwithstanding any other provision of this Agreement, this Agreement shall not be amended if (a) the amendment will cause a lapse that is treated as a transfer of all or a portion of an Interest within the meaning of Code § 2704(a) or Treasury Regulations promulgated thereunder; (b) such amendment would result in Transfers of Interests in the Partnership being subject to the provisions of Code § 2704(b) or Treasury Regulations promulgated thereunder; or (c) the amendment results in a change to the Agreement that is contrary to the intention of the Partners with respect to the purpose of the Partnership.

**ARTICLE 13**
**MEETING AND VOTING RIGHTS**

**13.1    NOTICE OF MEETING OF PARTNERS.**

(a)    Upon the written request of the holders of twenty five percent (25%) or more of the Percentage Interests of the Partnership, excluding Percentage Interests held by Assignees, the General Partner shall call a meeting of the Partners.  Notice of such meeting shall be given within twenty (20) days after, and the meeting shall be held within thirty (30) days after, receipt of such request.  The General Partner may also call a meeting of the Partners on its own initiative by giving notice of such meeting not less than fourteen (14) and not more than sixty (60) days prior to the meeting.  Any such notice shall state the time, place, and briefly, the purpose of the meeting, which shall be held at a reasonable time and place.  Any Limited Partner with at least a ten percent (10%) Percentage Interest may obtain a list of the name, address, and Percentage Interest owned by each Limited Partner upon written request to the General Partner.  If a meeting is adjourned to another time or place, and if an announcement of the adjournment of time or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting. No notice of the time, place or purpose of any meeting of Partners need be given to any Partner who attends in person or who is represented by proxy at that meeting, except for a Partner attending a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business on the ground that the meeting is not lawfully called or convened, or to any Partner entitled to such notice who, in a writing executed and filed with the records of the meeting, either before or after the time thereof, waives such notice.

**DS 0610**

(b)     For the purpose of determining the Partners entitled to notice of, or to vote at, any meeting of the Partners, or any adjournment or postponement thereof, or to vote by written consent without a meeting, the Partner or Partners requesting such meeting or vote may fix, in advance, a date as the record date for any such determination of Partners. Such date shall not be more than sixty (60) days nor less than ten (10) days before any such meeting or submission of a matter to the Partners for a vote by written consent. If no record date is fixed for such determination of Partners, the date on which notice of the meeting or submission of the matter to the Partners for a vote by written consent is mailed should be the record date for such determination of Partners.

### 13.2  VOTING RIGHTS AND PROCEDURE.

(a)     Each Partner is entitled to a number of votes equal to such Partner's Percentage Interest.

(b)     A Majority of the Partners of each class (General or Limited, but excluding Assignees) entitled to vote, shall constitute a quorum.

(c)     Each Partner may authorize any Person or Persons to act by proxy with respect to any matter in which a Partner is entitled to participate whether by waiving notice of any meeting or voting or participating at a meeting; provided, however, that a Person who is a General Partner may not delegate or assign their rights or obligations as a General Partner except as provided in Section 5.1(q). Every proxy must be signed by the Partner. No proxy shall be valid after the expiration of twelve (12) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Partner executing it, but the Partnership may rely on any properly executed proxy delivered to it until it receives written notice from the Partner in question that said proxy has been revoked.

(d)     Any matter for which the approval or consent of the Partners is required or for which the Partners are authorized to take action under this Agreement or under applicable law may be approved or action may be taken by the Partners without a meeting and shall be as valid and effective as an action taken by the Partners at an assembled meeting, if written consents to such action by the Partners are signed by the Partners owning Percentage Interests constituting in the aggregate the Percentage Interest required to approve or otherwise authorize such action and such written consents are delivered to a General Partner.

(e)     Personal presence of the Partners shall not be required at any meeting, provided an effective written consent to or rejection of the action proposed to be taken at such meeting is submitted to a General Partner. Attendance by a Partner and voting in person at any meeting, shall revoke any written consents or rejections of such Partner submitted with respect to action proposed to be taken at such meeting.

**DS 0611**

**(f)**    At each meeting of Partners, a Majority of the Partners present or represented by proxy may adopt rules which are not inconsistent with this Agreement for the conduct of such meeting.

**13.3    MEETINGS BY CONFERENCE TELEPHONE.** Partners may participate in meetings by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time. Participation in a meeting by such means shall constitute presence in person at such meeting.

## ARTICLE 14
## POWER OF ATTORNEY

**14.1    POWER OF ATTORNEY IN GENERAL.** The Limited Partners, by their execution hereof, jointly and severally, hereby make, constitute, and appoint the General Partner as their true and lawful agents and attorneys-in-fact, with full power of substitution, in their name, place, and stead to make, execute, sign, acknowledge, swear by, record, and file on behalf of them and on behalf of the Partnership: (a) all certificates and other instruments deemed advisable by the General Partner to permit the Partnership to become or to continue as a limited partnership or partnership wherein the Limited Partners have limited liability in the jurisdictions where the Partnership may be doing business; (b) all instruments that effect a change or modification of the Partnership in accordance with this Agreement, including without limitation the substitution of Assignees as Substituted Limited Partners pursuant to Section 7.4; (c) all conveyances and other instruments deemed advisable by the General Partner to effect the dissolution and termination of the Partnership; (d) all fictitious or assumed name certificates required or permitted to be filed on behalf of the Partnership; and (e) all other instruments which may be required or permitted by law to be filed on behalf of the Partnership.

**14.2    EFFECT OF TRANSFER OF A LIMITED PARTNER'S INTEREST.** The foregoing power of attorney:

**(a)**    Is coupled with an interest and shall be irrevocable and survive the incapacity of each Limited Partner;

**(b)**    May be exercised by the General Partner either by signing separately as attorney-in-fact for each Limited Partner or, after listing all of the Limited Partners executing an instrument, by a signature acting as attorney-in-fact for all of them; and

**(c)**    Shall survive the delivery of an assignment by a Limited Partner of its Interest; except that, where the Assignee of the Interest of such Limited Partner has been approved for admission to the Partnership as a Substituted Limited Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge, and file any instrument necessary to effect such substitution.

**DS 0612**

**14.3   COOPERATION.**  Each Limited Partner and Substituted Limited Partner shall execute and deliver to the General Partner, within five (5) days after receipt of the General Partner's request therefor, such further designations, powers of attorney, and other instruments as the General Partner deems necessary.

**14.4   TERMINATION.**  The appointment of General Partner as the attorney-in-fact pursuant to this power of attorney automatically shall terminate at such time as the General Partner ceases to be a General Partner and from such time shall be effective only as to the continuing or Substituted General Partner(s) designated or elected pursuant to this Agreement.

### ARTICLE 15
### ADDITIONAL PROVISIONS

**15.1   NOTICES.**  Any notice, offer, consent, or other communication required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been sufficiently given or made when delivered personally to the party (or an officer of the party) to whom the same is directed, or (except in the event of a mail strike) five (5) days after being mailed by first-class mail, postage prepaid, if to the Partnership, to the offices described in Section 1.4, or if to a Partner, to the address set forth on Schedule F, or to the last known address of a Partner, if the Partner has changed its address. Any Partner may change its address for purposes of this Article by giving written notice of such change to the Partnership, such change to become effective on the tenth (10th) day after such notice is given.

**15.2   GOVERNING LAW; SUCCESSORS; SEVERABILITY.**  This Agreement shall be governed by the laws of the State of Idaho as such laws are applied by Idaho courts to agreements entered into and to be performed in Idaho by and between residents of Idaho and shall, subject to the restrictions on transferability set forth herein, bind and inure to the benefit of the heirs, executors, personal representatives, successors, and assigns of the parties hereto. If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected thereby.

**15.3   ENTIRE AGREEMENT.**  This Agreement constitutes the entire agreement among the parties; it supersedes any prior agreement or understanding among them, oral or written, all of which are hereby canceled. This Agreement may not be modified or amended other than pursuant to Article 12.

**15.4   SEPARATE PROPERTY.**  It is the intent and agreement of the parties to this Agreement that the Interests in the Partnership shall retain the same character (separate or community) as the consideration provided in exchange for the Interests. Interests which may in the future be held by or on behalf of a transferee of the Partners and all Capital Contributions made by the transferees shall be and remain the separate property of the transferee, together with the rents, income, issues and profits therefrom, and appreciation therein, and that, except as otherwise provided herein, no spouse of such a transferee shall have any interest in the subject matter of this Agreement.

**DS 0613**

**15.5   SCHEDULES INCORPORATED BY REFERENCE.** All schedules attached to this Agreement are by this reference incorporated into the terms of this Agreement. Notwithstanding the foregoing, in the event of any conflict between the terms of this Agreement and the terms of any attached schedule, the terms of this Agreement shall control.

**15.6   ARBITRATION.** Any dispute, controversy or claim arising out of, in connection with, or relating to, this Agreement or any breach or alleged breach of this Agreement, shall, upon request of any party involved, be submitted to, and be settled by arbitration in Boise, Idaho pursuant to the rules then in effect of the American Arbitration Association (or at any other place or under any other form of arbitration mutually acceptable to the parties so involved). Any award rendered shall be final and conclusive upon the parties and a judgment on such award may be entered in the highest court of the forum, state or federal, having jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of their respective own experts, evidence and counsel's fees.

**15.7   HEADINGS, ETC.** The headings in this Agreement are inserted for convenient reference only and shall not affect interpretation of this Agreement. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and the pronouns stated in the neuter gender shall include the masculine, the feminine, and the neuter.

**15.8   NO WAIVER.** The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

**15.9   COUNTERPARTS.** This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**15.10   OTHER BUSINESS ACTIVITIES; DISCLOSURE, WAIVER.** Each of the Partners understands that the other Partners, or the Affiliates of that respective Partner, may be interested, directly or indirectly, in various other businesses not undertaken by the Partnership. Each Partner also understands that the conduct of the business of the Partnership may involve business dealings with such other businesses or undertakings. The Partners agree that the creation of the Partnership and the assumption by each of the Partners of their respective duties under this Agreement shall be without prejudice to their rights (or the rights of their Affiliates) to have such other interests and activities and to receive and enjoy profits or compensation from such matters, and each Partner waives any rights the Partner might otherwise have to share or participate in such other interests or activities of the other Partners or their Affiliates. The Partners may engage in or possess any interest in any other business venture of any nature or description independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage, or development of real property or other business interests and neither the Partnership nor the other Partners shall have any right by virtue of this Agreement in and to such venture or the income or profits derived from such venture. Each Partner shall annually give notice to the other Partners of the Partner's other interest, or the interest of any of

**DS 0614**

the Partner's Affiliates, in any other business or undertaking which proposes to enter into any business transactions with the Partnership which may result in a substantial conflict of interest.

**15.11  GENERAL AND LIMITED PARTNERS' WARRANTIES.**  The General Partner and Limited Partners represent and warrant to all the other Partners and the Partnership that such Partner:

> **(a)**    Has sufficient knowledge and expertise in business and real estate matters to enable such Partner to evaluate the merits and risks of entering into and investing in the Partnership and has had an opportunity to review any information such Partner has desired regarding the proposed activities of the Partnership;

> **(b)**    Has received various documents, including without limiting the generality of the foregoing, this Agreement and the documents attached as exhibits to this Agreement, has read such documents and has become familiar with the terms and provisions of such documents; and

> **(c)**    Has been provided the opportunity to consult with independent accountants and legal counsel with respect to entering into and investing in the Partnership.

**15.12  VENUE.**  In the event that any suit is brought arising out of or in connection with this Agreement, following the arbitration proceedings required in Section 15.6, the parties consent to the jurisdiction of, and agree that sole venue will lie, in the state and/or federal courts located in Boise, Idaho.

**15.13  FURTHER ASSURANCE.**  The Limited Partners will execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purpose of this Agreement.

**15.14  CREDITORS.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of any of the Partners or the Partnership.

**15.15  REMEDIES.**  The rights and remedies of the Partners hereunder shall not be mutually exclusive, and the exercise of any right to which it is entitled shall not preclude the exercise of any other right it may have.

**15.16  AUTHORITY.**  Each individual executing this Agreement on behalf of a partnership, corporation, or other entity warrants that it is authorized to do so and that this Agreement will constitute the legally binding obligation of the entity which it represents.

**DS 0615**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL AND
LIMITED PARTNER:

_DON J. SIMPLOT_

ADDITIONAL LIMITED
PARTNERS:

MICHAEL LLOYD SIMPLOT

DEBBIE SIMPLOT MCDONALD

CINDY SIMPLOT HAROIAN

JOHN DON SIMPLOT

APRIL SIMPLOT GWIN

JOHN RALSTIN SIMPLOT

MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC
MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT

DS 0616

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL AND
LIMITED PARTNER:

_____
DON J. SIMPLOT

ADDITIONAL LIMITED
PARTNERS:

_____
MICHAEL LLOYD SIMPLOT

_____
DEBBIE SIMPLOT MCDONALD

_____
CINDY SIMPLOT HAROIAN

_____
JOHN DON SIMPLOT

_____
APRIL SIMPLOT GWIN

_____
JOHN RALSTIN SIMPLOT

_____
MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC
MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT

**DS 0617**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL AND
LIMITED PARTNER:

_____
DON J. SIMPLOT

ADDITIONAL LIMITED
PARTNERS:


_____
MICHAEL LLOYD SIMPLOT


_____
DEBBIE SIMPLOT MCDONALD


_____
CINDY SIMPLOT HAROIAN


_____
JOHN DON SIMPLOT


_____
APRIL SIMPLOT GWIN


_____
JOHN RALSTIN SIMPLOT


_____
MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC
MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT


**DS 0618**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL AND
LIMITED PARTNER:

_____
DON J. SIMPLOT

ADDITIONAL LIMITED
PARTNERS:

_____
MICHAEL LLOYD SIMPLOT

_____
DEBBIE SIMPLOT MCDONALD

_____
CINDY SIMPLOT HAROIAN

_____
JOHN DON SIMPLOT

_____
APRIL SIMPLOT GWIN

_____
JOHN RALSTIN SIMPLOT

_____
MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC
MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT

**DS 0619**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL AND
LIMITED PARTNER:

_____
DON J. SIMPLOT

ADDITIONAL LIMITED
PARTNERS:

_____
MICHAEL LLOYD SIMPLOT

_____
DEBBIE SIMPLOT MCDONALD

_____
CINDY SIMPLOT HAROIAN

_____
JOHN DON SIMPLOT

_____
APRIL SIMPLOT GWIN

_____
JOHN RALSTIN SIMPLOT

_____
MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC
MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT

**DS 0620**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL AND
LIMITED PARTNER:

_____
DON J. SIMPLOT

ADDITIONAL LIMITED
PARTNERS:

_____
MICHAEL LLOYD SIMPLOT

_____
DEBBIE SIMPLOT MCDONALD

_____
CINDY SIMPLOT HAROIAN

_____
JOHN DON SIMPLOT

_____
APRIL SIMPLOT GWIN

_____
JOHN RALSTIN SIMPLOT

_____
MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC
MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT

**DS 0621**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

GENERAL AND
LIMITED PARTNER:

_____
DON J. SIMPLOT

ADDITIONAL LIMITED
PARTNERS:

_____
MICHAEL LLOYD SIMPLOT

_____
DEBBIE SIMPLOT MCDONALD

_____
CINDY SIMPLOT HAROIAN

_____
JOHN DON SIMPLOT

_____
APRIL SIMPLOT GWIN

_____
JOHN RALSTIN SIMPLOT

_____
MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC
MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT

**DS 0622**

_____

MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR
BREANNE ELIZABETH SIMPLOT, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

_____

DEBBIE SIMPLOT MCDONALD AS CUSTODIAN FOR
PATRICK HENRY MCDONALD, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

_____

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
ANDREW CORTLAND HAROIAN, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

_____

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
SAMANTHA ERIN HAROIAN, A MINOR CHILD, UNDER
THE IDAHO UNIFORM TRANSFERS TO MINORS ACT

_____

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
ISABELLE MORGAN HAROIAN, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

**DS 0623**

MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR
BREANNE ELIZABETH SIMPLOT, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

_Debbie Simplot McDonald._

DEBBIE SIMPLOT MCDONALD AS CUSTODIAN FOR
PATRICK HENRY MCDONALD, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
ANDREW CORTLAND HAROIAN, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
SAMANTHA ERIN HAROIAN, A MINOR CHILD, UNDER
THE IDAHO UNIFORM TRANSFERS TO MINORS ACT

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
ISABELLE MORGAN HAROIAN, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

**DS 0624**

MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR
BREANNE ELIZABETH SIMPLOT, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

DEBBIE SIMPLOT MCDONALD AS CUSTODIAN FOR
PATRICK HENRY MCDONALD, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
ANDREW CORTLAND HAROIAN, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
SAMANTHA ERIN HAROIAN, A MINOR CHILD, UNDER
THE IDAHO UNIFORM TRANSFERS TO MINORS ACT

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR
ISABELLE MORGAN HAROIAN, A MINOR CHILD,
UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS
ACT

CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR JULIAN
JAMES HAROIAN, A MINOR CHILD, UNDER THE
IDAHO UNIFORM TRANSFERS TO MINORS ACT

**DS 0625**

STATE OF IDAHO            )
                         ss.
COUNTY OF ADA            )

On this 6ᵗʰ day of MARCH_____, 2000, before me, the undersigned Notary Public in and for said State, personally appeared DON J. SIMPLOT, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of Idaho
Residing at _Nampa, Idaho_
My commission expires:_11-13-01_

STATE OF IDAHO            )
                         ss.
COUNTY OF ADA            )

On this ____ day of _____, 2000, before me, the undersigned Notary Public in and for said State, personally appeared MICHAEL LLOYD SIMPLOT, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and to be the Custodian of ERIC MICHAEL SIMPLOT and BREANNE ELIZABETH SIMPLOT, Minor Children, under the Idaho Uniform Transfers to Minors Act, and acknowledged to me that he executed the same in his individual capacity and for and in behalf of said Minor Children.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of Idaho
Residing at _____
My commission expires:_____

**DS 0626**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 49

STATE OF IDAHO            )
                         ss.
COUNTY OF ADA            )

On this 4th day of _March_____, 2000, before me, the undersigned Notary Public in and for said State, personally appeared DON J. SIMPLOT, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of Idaho
Residing at _Nampt, Idaho_
My commission expires: _11-13-01_

STATE OF IDAHO            )
                         ss.
COUNTY OF ADA            )

On this 4TH day of _April_____, 2000, before me, the undersigned Notary Public in and for said State, personally appeared MICHAEL LLOYD SIMPLOT, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and to be the Custodian of ERIC MICHAEL SIMPLOT and BREANNE ELIZABETH SIMPLOT, Minor Children, under the Idaho Uniform Transfers to Minors Act, and acknowledged to me that he executed the same in his individual capacity and for and in behalf of said Minor Children.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of Idaho
Residing at _Boise, Id_
My commission expires: _June 3, 2003_

**DS 0627**

STATE OF IDAHO       )
                      ) SS.

COUNTY OF ADA      )

      On this _23_ day of _March_ ,2000, before me, the undersigned Notary Public in and for said State, personally appeared DEBBIE SIMPLOT McDONALD, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and to be the Custodian of PATRICK HENRY McDONALD, a Minor Child, under the Idaho Uniform Transfers to Minors Act, and acknowledged to me that she executed the same in her individual capacity and for and in behalf of said Minor Child.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of Idaho
Residing at _Boise Id_
My commission expires: _9/28/2004_

STATE OF IDAHO       )
                      ) SS.

COUNTY OF ADA      )

      On this _____ day of _____ ,2000, before me, the undersigned Notary Public in and for said State, personally appeared CINDY SIMPLOT HAROIAN, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and to be the Custodian of ANDREW CORTLAND HAROIAN, SAMANTHA ERIN HAROIAN and ISABELLE MORGAN HAROIAN, Minor Children, under the Idaho Uniform Transfers to Minors Act, and acknowledged to me that she executed the same in her individual capacity and for and in behalf of said Minor Children.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of Idaho
Residing at _____
My commission expires: _____

**DS 0628**

STATE OF IDAHO             )
                                          SS.
COUNTY OF ADA           )

On this 30th day of March ,2000, before me, the undersigned Notary Public in and for said State, personally appeared JOHN DON SIMPLOT, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

_Brenda Helgeson_

NOTARY PUBLIC, State of Idaho,
Residing at _Nampa, Idaho_
My commission expires: _11/13/01_

STATE OF IDAHO             )
                                          SS.
COUNTY OF ADA           )

On this _____ day of _____ ,2000, before me, the undersigned Notary Public in and for said State, personally appeared APRIL SIMPLOT GWIN, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of Idaho
Residing at _____
My commission expires: _____

**DS 0629**

STATE OF IDAHO     )
                 ss.
COUNTY OF ADA     )

On this _____ day of _____,2000, before me, the undersigned Notary Public in and for said State, personally appeared JOHN DON SIMPLOT, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

_____
NOTARY PUBLIC, State of Idaho
Residing at _____
My commission expires:_____

STATE OF IDAHO     )
                 ss.
COUNTY OF ADA     )

On this _31_ day of _March_,2000, before me, the undersigned Notary Public in and for said State, personally appeared APRIL SIMPLOT GWIN, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

_____
NOTARY PUBLIC, State of Idaho
Residing at _Boise, Id_
My commission expires:_2/4/05_

**DS 0630**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP · P. 51

STATE OF _____ )
                          ss.
COUNTY OF _____ )

On this _____ day of _____,2000, before me, the undersigned Notary Public in and for said State, personally appeared JOHN RALSTIN SIMPLOT, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year first above written.

NOTARY PUBLIC, State of _____
Residing at _____
My commission expires:_____

**DS 0631**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 52

# SCHEDULE A
# PARTNERSHIP PROPERTY
# MARCH 31, 2000
## * * * * * *

|  | Fair Market Value @ 3/31/00 |
|---|---|
| **ASSETS** | |
| **CURRENT ASSETS[1]** | |
| Cash | $ 341,739 |
| Accounts Receivables | 29,691 |
| Prepaid Expenses | 11,414 |
| Homeseekers Receivable | 1,115,815 |
| Energy Release Receivable | 500,000 |
| **INVESTMENTS IN STOCKS** | |
| J. R. Simplot Company[2] | |
| Class B (2,119 shares) @ $7,956 per share | 16,859,400 |
| Preferred Stock (114,285 shares) @$92.31 per share | 10,549,713 |
| Merrill Lynch | 26,161,560 |
| First Security | 4,671,385 |
| Brookstreet Investors | 1,081,750 |
| PaineWebber | 20,205 |
| Deutsche Banc | 26,670 |
| PCS School | 131,150 |
| IMPCO Common | 6,465,016 |
| Bar-U-Inc.[3] | 107,325 |
| ENTECH | 8,000 |
| NEUTRON Corporation | 10,000 |
| ML Investment Company[3] | 3,106,206 |
| Tandy (8 shares) | 394 |
| T-Bills | 108,088 |
| Mutual Funds | 2,143,964 |
| Commodities | 82,380 |
| Options | 5,125 |
| TOTAL | 71,538,312 |
| **PARTNERSHIPS** | |
| Aberdeen Storage, L.P.[3] | 135,885 |
| Lake Forest Office, L.P.[3] | 584,159 |
| ENTECH Development | 21,198 |
| Piper Pub & Grill | 14,904 |
| Craflin Apartments | 16,039 |
| Sunny Slope Orchards[3] | 88,763 |
| Columbia Developments[3] | 582,624 |
| Commonwealth Investors III | 17,739 |
| Sandpiper Restaurants of Arizona | 242 |
| Fruitland Acres | 18,714 |
| Western Capital Assoc. | 167,850 |
| Merrill Lynch Select Hedge Fund | 300,775 |
| TOTAL | 1,948,892 |
| **PROPERTY PLANT AND EQUIPMENT[4]** | |
| Land | 2,672,050 |
| Buildings | 1,083,266 |
| Equipment | 42,575 |
| Accumulated Depreciation | (177,030) |
| TOTAL PP&E | 3,620,861 |
| **TOTAL ASSETS** | $ 78,304,724 |
| **LIABILITIES & EQUITY** | |
| **CURRENT LIABILITIES** | |
| Interest Payable | $ 371,466 |
| Property Tax Payable | 12,012 |
| TOTAL CURRENT LIABILITIES | 383,468 |
| **NONCURRENT LIABILITIES** | |
| Margin - Merrill Lynch | 2,575,069 |
| Margin Loan - Brookstreet | 377,095 |
| Margin Loan - Merrill Lynch | 7,906,098 |
| Margin Loan - FSB | 8,999,645 |
| Loan - J.R. Simplot Company | 1,800,000 |
| Loan - J.R. Simplot Trust | 2,405,955 |
| Other Long-Term Liabilities | 11,000 |
| Real Estate Mortgages | 128,052 |
| TOTAL NONCURRENT LIABILITIES | 24,202,914 |
| **CAPITAL** | |
| Shareholders' Capital | 54,718,342 |
| TOTAL CAPITAL | 54,718,342 |
| **TOTAL LIABILITIES & CAPITAL** | $ 78,304,724 |

Notes:

[1] Based on actual account balances as of March 31, 2000.

[2] Value of Class B and Preferred Shares based on valuation by Houlihan Lokey Howard & Zukin, as of March 31, 2000.

[3] Interests valued by Doug Zandersmith as of December 31, 1999. These values reflect a 30 percent minority discount.

[4] Real estate values based upon review of assessed values and comparable sales.

**DS 0632**

# SCHEDULE B
## PERCENTAGE INTERESTS
### NOVEMBER 28, 2000
**\* \* \* \* \* \***

| PARTNERS/ASSIGNEES: | GENERAL | LIMITED | TOTAL |
|---|---|---|---|
| DON J. SIMPLOT | 2.0% | 74.8847% | 76.8847% |
| MICHAEL LLOYD SIMPLOT | 0.0% | 0.3709% | 0.3709% |
| DEBBIE SIMPLOT MCDONALD | 0.0% | 0.3709% | 0.3709% |
| CINDY SIMPLOT HAROIAN | 0.0% | 0.3709% | 0.3709% |
| JOHN DON SIMPLOT | 0.0% | 0.3709% | 0.3709% |
| APRIL SIMPLOT GWIN | 0.0% | 0.3709% | 0.3709% |
| JOHN RALSTIN SIMPLOT | 0.0% | 0.3709% | 0.3709% |
| MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 0.0% | 0.1417% | 0.1417% |
| MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR BREANNE ELIZABETH SIMPLOT, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 0.0% | 0.1417% | 0.1417% |
| DEBBIE SIMPLOT MCDONALD AS CUSTODIAN FOR PATRICK HENRY MCDONALD, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 0.0% | 0.1417% | 0.1417% |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR ANDREW CORTLAND HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 0.0% | 0.1417% | 0.1417% |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR SAMANTHA ERIN HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 0.0% | 0.1417% | 0.1417% |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR ISABELLE MORGAN HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 0.0% | 0.1417% | 0.1417% |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR JULIAN JAMES HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 0.0% | .0398% | 0.0398% |
| DJS II FAMILY GRANTOR TRUST U/T/D 3/6/00 | 0.0% | 20.0% | 20.0% |
| TOTAL: | 2.0% | 98.0% | 100.0% |

**DS 0633**

# SCHEDULE C
## ADJUSTED CAPITAL CONTRIBUTIONS
## DECEMBER 31, 1999
### * * * * * *

| PARTNER: | ADJUSTED CAPITAL CONTRIBUTION: |
|---|---|
| DON J. SIMPLOT | $54,325,451 |
| MICHAEL LLOYD SIMPLOT | $212,350 |
| DEBBIE SIMPLOT MCDONALD | $212,350 |
| CINDY SIMPLOT HAROIAN | $212,350 |
| JOHN DON SIMPLOT | $212,350 |
| APRIL SIMPLOT GWIN | $212,350 |
| JOHN RALSTIN SIMPLOT | $212,350 |
| MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | $81,129 |
| MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR BREANNE ELIZABETH SIMPLOT, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | $81,129 |
| DEBBIE SIMPLOT MCDONALD AS CUSTODIAN FOR PATRICK HENRY MCDONALD, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | $81,129 |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR ANDREW CORTLAND HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | $81,129 |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR SAMANTHA ERIN HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | $81,129 |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR ISABELLE MORGAN HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | $81,129 |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR JULIAN JAMES HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | $22,790 |
| TOTAL: | $54,718,343 |

DS 0634

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP - P. 55

## SCHEDULE D
## SPECIAL ALLOCATIONS

\* \* \* \* \* \*

NONE

**DS 0635**

## SCHEDULE E
## SPECIAL GENERAL PARTNERS

\* \* \* \* \* \*

NONE

**DS 0636**

## SCHEDULE F
## ADDRESSES OF PARTNERS

\* \* \* \* \* \*

| | |
|---|---|
| DON J. SIMPLOT | 28371 EL PASO ROAD<br>CALDWELL, ID 83644 |
| MICHAEL LLOYD SIMPLOT | 4390 N. WESTVIEW PLACE<br>BOISE, ID 83704 |
| DEBBIE SIMPLOT MCDONALD | 3085 EAST NATURE DRIVE<br>BOISE, ID 83706 |
| CINDY SIMPLOT HAROIAN | 1849 NORTH STONEVIEW PLACE<br>BOISE, ID 83702 |
| JOHN DON SIMPLOT | 909 N. 20TH<br>BOISE, ID 83702 |
| APRIL SIMPLOT GWIN | 1936 TEAL LANE<br>BOISE, ID 83706 |
| JOHN RALSTIN SIMPLOT | 2400 ELLIOTT AVENUE, #116<br>SEATTLE, WA 98121 |
| MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR ERIC MICHAEL SIMPLOT, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 4390 N. WESTVIEW PLACE<br>BOISE, ID 83704 |
| MICHAEL LLOYD SIMPLOT AS CUSTODIAN FOR BREANNE ELIZABETH SIMPLOT, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 4390 N. WESTVIEW PLACE<br>BOISE, ID 83704 |
| DEBBIE SIMPLOT MCDONALD AS CUSTODIAN FOR PATRICK HENRY MCDONALD, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 3085 EAST NATURE DRIVE<br>BOISE, ID 83706 |

**DS 0637**

| | |
|---|---|
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR ANDREW CORTLAND HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 1849 NORTH STONEVIEW PLACE BOISE, ID 83702 |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR SAMANTHA ERIN HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 1849 NORTH STONEVIEW PLACE BOISE, ID 83702 |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR ISABELLE MORGAN HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 1849 NORTH STONEVIEW PLACE BOISE, ID 83702 |
| CINDY SIMPLOT HAROIAN AS CUSTODIAN FOR JULIAN JAMES HAROIAN, A MINOR CHILD, UNDER THE IDAHO UNIFORM TRANSFERS TO MINORS ACT | 1849 NORTH STONEVIEW PLACE BOISE, ID 83702 |

**DS 0638**